UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X
ALPHA CEPHEUS, LLC
FIRST UNITED HEALTH, LLC,
CONSTELLATION HEALTH, LLC
NAYA CONSTELLATION HEALTH, LLC and
CONSTELLATION HEALTH INVESTMENT,
LLC,

     Plaintiffs,        Docket No.: 18-cv-14322

  -against-

CHINH CHU,
TRUC TO,
DOUGLAS NEWTON,
JAMES STEPIEN,
VICTOR CARDONA, and
JOHN DOE 1-10,

     Defendants.
--------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF MOTION**


Parlatore Law Group, LLC
*Counsel for the Plaintiffs*
Timothy C. Parlatore, Esq.
221 River Street, 9th Floor
Hoboken, NJ 07030
212-679-6312
212-202-4787 Facsimile
Timothy.parlatore@parlatorelawgroup.com

## Table of Contents

PRELIMINARY STATEMENT ...................................................................2

STATEMENT OF FACTS ........................................................................5

   Background of CHT .........................................................................5

   Bank Financing and Bankruptcy Fraud .........................................10

   Illegal Surveillance, Hacking, and Threats ...................................13

   Declaration of Chinh Chu ..............................................................16

ARGUMENT .......................................................................................19

   A.   Legal Standard .......................................................................19

   B.   The Plaintiffs Have Standing ................................................20

   C.   The Likelihood that Plaintiffs will Succeed on the Merits is Overwhelming ..........................................................................21

      a.   The Criminal Case Against Mr. Parmar .........................21

      b.   Evidence Against the Defendants ...................................25

   D.   The Balance of Interests Weighs Overwhelmingly in Favor of a Preliminary Injunction .......................................................28

   E.   Limited Expedited Discovery is Essential ............................30

   to Identifying All Parties Involved in the Unlawful Treatment ....30

   of Mr. Parmar and his Family .......................................................30

      a.   Electronic Data ...............................................................31

      b.   Identity of Other Involved Parties ..................................32

      c.   Plaintiffs Request is Necessary for the Court to Evaluate the Application for a Preliminary Injunction .................34

   CONCLUSION..............................................................................36

## PRELIMINARY STATEMENT

Plaintiffs submit this motion for a Preliminary Injunction and to reconsider the Court's prior denial of a similar application to stop Defendants' ongoing pattern of illegal activity, which includes violent threats against the manager and members of the Plaintiffs.

This case addresses the illegal activities of the members of CC Capital to wrongfully devalue, divert and ultimately steal the valuable assets of the Plaintiffs. Although there is significant overlap of the fact pattern in this case and the related civil and criminal proceedings involving Paul Parmar, the allegations in this complaint relate specifically to Defendants activities in improperly saddling Plaintiffs' assets with unnecessary debt without any consideration, then fraudulently putting those assets into bankruptcy and stealing them.  In order to protect this illegal scheme from being derailed, Defendants have illegally targeted the manager and shareholders of the Plaintiff entities by illegally stalking, harassing, threatening and intimidating them, as well as illegally hacking into their electronic communications to access confidential information belonging to Plaintiffs.

As much as Defendants are attempting to spin the very specific, well supported and damaging allegations against them as "fabricated," the reality is that

these allegations are based on both documentary evidence, as well as admissions by the Defendants, or their agents.

It is undisputed that Chinh Chu hired a convicted felon and off-duty police officer to sit outside of Mr. Parmar's home to follow members of his family.  It is undisputable that these two individuals are prohibited from performing private investigatory functions in the State of New Jersey, or that they illegally trespassed onto private property in furtherance of their improper activities.  Stunningly, Chinh Chu has admitted that they were performing these illegal functions on his behalf. Chinh Chu also admits that he had commissioned this unlawful 24-hour surveillance outside Mr. Parmar's home during the exact same period of time that someone illegally accessed the computer server at Mr. Parmar's residence, which houses communications belonging to Plaintiffs, through an access point at the front gate and downloaded a massive amount of data.  Finally, Defendants admitted that the "security consultant" who oversaw the illegal surveillance activities is not a licensed private investigator, but rather an international spy and mercenary who publicly advertises his ability to hack into electronic systems as a service offering.

As to the underlying allegations of Defendants' activities to devalue and steal Plaintiffs' assets, this is also supported by both documentary evidence as well as Defendants own admissions.  Before the bankruptcy petitions were even filed, John

Altorelli ("Altorelli"), private attorney for Chinh Chu explained Defendants' plan to Mr. Parmar.

It is undisputable that, prior to the going private transaction, Plaintiffs held a controlling interest in a profitable, valuable, debt free company. Without receiving any consideration, this company was subsequently saddled with overwhelming debt and put into bankruptcy, which led to the sale of all its assets. Thus, Plaintiffs' assets were taken from them without any compensation through the pattern of illegal activity by Defendants.

Plaintiffs had made a prior application for a preliminary injunction to stop Defendants' continuing criminal activities and permit limited discovery to identify additional co-conspirators, so that they could also be brought before the Court and restrained from continuing their unlawful conduct. Unfortunately, although the Court set a briefing schedule, the Court then denied Plaintiffs' application based on the flawed arguments advanced by Defendants before Plaintiffs deadline to file a reply. Plaintiffs ask the Court to reconsider its prior denial. Additionally, Plaintiffs are making a second application for the same relief, based on additional information that was discovered subsequent to the initial application.

Plaintiff is therefore seeking a preliminary injunction to enjoin Defendants from any further unlawful, threatening or potentially violent activity targeting

Plaintiffs' manager, shareholders, or associates.  Additionally, Plaintiffs seek limited expedited discovery to uncover the identities of the additionally involved parties.

## STATEMENT OF FACTS

### Background of CHT

Constellation Healthcare Technologies, LLC ("CHT") was a medical billing, collections, and practice management service company, which was formed by Parmar.  CHT operated through many subsidiaries and, before being taken private, was a publicly traded company on the London Stock Exchange's Alternative Investment Market ("AIM"). At the time that CHT was publicly traded, the majority of shares were held by Plaintiffs First United Health, LLC, ("FUH"), Constellation Health, LLC ("CH"), Naya Constellation Health, LLC ("Naya") and Constellation Health Investment, LLC, ("CHI").  While Parmar is the manager of these Plaintiff entities, he holds no ownership interest.

In January 2016, Parmar began to discuss taking CHT private with Defendant Chu.  At issue in this case, the related civil cases, the criminal case against Mr. Parmar, and the bankruptcy case is a dispute over whether Parmar fraudulently induced CC Capital to purchase CHT at an inflated value by providing false revenue data.  Specifically, it has been alleged that Parmar misrepresented three of CHT's

subsidiaries as being profitably companies when, in fact, they were empty shell companies with little or no revenue.

Parmar's defense to these allegations is simple:

1. CC Capital was not misled because, despite some allegedly inaccurate models that were provided early in the due diligence process, which were labeled as "proforma" and included "forward looking statements," CC Capital was then given unfettered access to all of the accurate data and could not possibly have reasonably relied upon the initial inconsistent models.[1]   CC Capital was never provided any falsified bank statements.

2. The price that CC Capital paid was less than the actual value of CHT.   Parmar contends that CC Capital was fully aware of the true

---

[1] 1.   The models included projected revenues from three potential subsidiaries, MDRX, Northstar and Phoenix, which were not actually acquired.  Yet, the data provided to CC Capital make it utterly impossible to believe that any potential investor would find it plausible that these were operating subsidiaries.  Further, the projections in these models did not include the subsidiaries that CHT ultimately did acquire, NYNM, ABC, ACA or Vachette.  Moreover, the models did not include the projected acquisition of NACO, a very profitable potential acquisition, which was derailed at Defendants direction.  On information and belief, the NACO acquisition was cancelled because it would have substantially increased CHT's revenue and made Defendants bankruptcy fraud even more difficult to achieve. Had the models included projections based on these acquisitions, the calculated value of CHT would likely have been much higher than using the models that included MDRX, Northstar and Phoenix and, unquestionably higher than the price that CC Capital paid for CHT.

value of CHT and used their knowledge of the inaccurate models as leverage to push the sale through at the discounted price.

Defendants then provided the Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") with partial information, presented in a manner to make it appear as if CC Capital was completely fooled by Parmar. It has subsequently become clear that Defendants withheld a significant amount of exculpatory material and information from the DOJ and SEC.

For the sake of judicial economy, all the details of this process need not be repeated here here, as they have already been described in great detail to this Court, with significant supporting documentation in Parmar's motion to dismiss, which was filed in *S.E.C. v. Parmar,* 18-cv-9284-MCA-MAH (the "SEC Litigation"). However, for the purposes of this motion, there are a few details of this filing, which Defendants will be unable to either dispute or explain:

1. During the due diligence process, Defendants were given full access to Pegasus, the proprietary business software that showed all the underlying data for all CHT subsidiaries.  As Pegasus only contained accurate data, Defendants' review of the Pegasus system gave them a full and accurate understanding of CHT's actual revenues. To the extent that this data did not match any models that were provided earlier in the due diligence process, Defendants made no efforts to resolve this discrepancy.

2. Defendants claim that they were misled into believing that one of the empty shells was an Ohio company with offices in Akron.  They claimed that they later discovered the address was fake, yet Defendants own submissions to Bank of America ("BofA") to finance the transaction demonstrated that they were never misled into believing that there were offices in Akron, as they listed MDRX's address in Hazlet, NJ and listed

7

no Akron office on the list of real properties.  Because these documents demonstrated Defendants' actual knowledge, they were withheld from Parmar, notwithstanding the fact that he was a signatory to the credit agreement.

3.  The insurance policies that Defendants managed for CHT immediately after the going private demonstrate their knowledge that the Empty Shells were not revenue producing entities, as they immediately dropped these entities from the list of insured subsidiaries on both the property and liability insurance policies.

4.  On September 13, 2016, Chinh Chu received and reviewed a report prepared by Duff & Phelps ("D&P"), which showed that various valuation models resulted in a value for CHT well above what CC Capital wanted to pay and ultimately agreed to. This report contains several elements which were designed to artificially lower the value of CHT (i.e. listing a loan that had already been repaid as a liability, and projecting almost no growth).

5.  Because CC Capital's offer was so much lower than any calculated value of CHT, D&P was unable to issue a fairness opinion.  Soon thereafter, they were terminated.  Subsequently, SunTrust was hired, but they also were unable to issue a fairness opinion at the price CC Capital wanted to pay; they were also terminated.  The deal closed without any fairness opinion because no reputable firm could be found willing to issue a fairness opinion at the price CC Capital wanted to pay.  In order to convince the committee to approve CC Capital's offer, Chinh Chu decided to offer them indemnity for any shareholders suit for approving an unfair price.

6.  The agenda for the first board meeting following the closing of the going-private included a search for a new CEO to replace Parmar.  This was months before Defendants now falsely claim that they discovered any wrongdoing by Parmar.

7.  The entire due diligence process was overseen by Defendant Truc To, who was then a partner at KPMG.  He was singularly responsible for examining and verifying all the financials provided by Parmar.  He was also singularly in the position to hide the fact that CC Capital was fully aware of the true financial condition of CHT.  Immediately after closing, Chinh Chu offered Truc To the CFO position of CHT, with a compensation package that was

significantly greater than that of any CFO for a comparably sized company and larger than even the CEO's compensation.

The truth that Defendants cannot avoid is that they manipulated the going private process by removing all the standard safeguards, in order to purchase a controlling interest in CHT for the significantly discounted rate of $300 million.  On January 31, 2017, the going private transaction closed, with CC Capital gaining a 51% stake in CHT.  What was unknown to Parmar or Plaintiffs at the time was that pushing the sale through was only the first step of a much larger fraudulent scheme by Defendants.

Incredibly, although CC Capital was the beneficiary of the financing provided by BofA, the credit agreement placed this debt on CHT, not CC Capital.  The full credit agreement was withheld from Parmar until months after closing, with representatives of CC Capital providing Parmar with a copy of only the signature page to sign for the closing.

Prior to closing, Plaintiffs were majority shareholders in a valuable, debt-free, revenue producing entity.  Through the going private, Defendants improperly saddled CHT with crushing bank debt, without any consideration for that debt.  It was this improper debt which put Defendants into position to execute the next phase of their unlawful scheme.

## Bank Financing and Bankruptcy Fraud

As Defendants have admitted, through the affidavit of Timothy Dragelin, which was submitted as Exhibit "1" of their opposition to Plaintiff's prior application, CHT incurred "approximately $130.0 million in debt to finance the Merger (which amount was later increased to approximately $160.0 million)… [CHT] simply cannot sustain their current debt load." *Dragelin affidavit* ¶112. Defendants used this debt, which they had improperly placed on CHT, as a pretext to put CHT into bankruptcy.

Beginning in January, 2018, John Altorelli ("Altorelli"), personal attorney for Chinh Chu, began discussing Defendants' plan to use bankruptcy proceedings to remove BofA as a creditor of CHT.  Altorelli explained he calculated that this could be done for approximately $40 million and that Chinh Chu was prepared to put in another $10 million of his own money and offer equity to an unnamed third party who would put in the balance.  However, Altorelli explained that, in order for this plan to work, Plaintiffs' "equity is toast."

While certain details of Altorelli's plan evolved over time, this is exactly what Defendants ultimately did – gain full control of CHT's assets, without properly repaying BofA, and ensuring that Plaintiffs' "equity is toast."  In fact, they were able to ultimately achieve this goal for a reduced price of just under $30 million.

On March 16, 2018, bankruptcy petitions were filed for CHT and most of its subsidiaries.  That night, Altorelli met with Parmar to inform him that they were now in "phase 2" and that, because the banks would not sell the debt for $40 million before filing, now "they'll take less."

As outlined in the complaint, Defendants were able to orchestrate two sham auctions using "stalking horse" bidders that were actually straw purchasers, backed by Defendants.  Interestingly, Altorelli foreshadowed Chinh Chu's intent to invest an additional $10 million[2] into purchasing CHT's assets – almost the exact same amount as the $10.5 million that Plaintiff has alleged that Chinh Chu invested in MTBC to enable them to purchase CHT's assets through a sham auction.  This is consistent with Altorelli's persistent claims that Chinh Chu was prepared to invest more money into CHT, but only if he can remove the banks and Plaintiffs.  Chinh Chu's claims that he already invested over $82 million of his own money and was ready to invest much more, is markedly inconsistent with his fabricated claims that CHT was worthless.

Defendants' false claims about the value of CHT is also belied by the subsequently reported performance of CHT's assets.  MTBC, which purchased all the assets that CHT held prior to the going private transaction, reported $17.0 million

_____

[2] One must wonder why Chinh Chu was willing to invest an additional $10 million of his own funds.

revenue for the third quarter of 2018, a 127% increase over the third quarter of 2017. This is striking, considering that CHT's former assets were only on the books of MTBC for part of the quarter.  MTBC reported non-GAAP adjusted net income of $2.5 million for YTD 2018, which was a $3.7 million increase over 2017's numbers, which they reported as a net loss.

By extrapolation, CHT's assets represented roughly $32 million to $48 million of revenue and about $14.8 million to $22 million profit.  MTBC managed to purchase these profitable assets for a mere $12.6 million in the bankruptcy auction.  It is important to remember that these numbers are also significantly lower than they would have been, had CC Capital permitted CHT to continue operating, rather than put it into bankruptcy, which always has a devastating effect on revenue and growth.

Similarly, the remaining assets of CHT, which were purchased after the going private closing and while Defendants were running CHT for $60-95 million were then sold to Defendants' straw purchaser for $16.5 million.

At present, motion practice is being litigated in the bankruptcy court to review the propriety of these auctions, and to potentially have an independent examiner appointed to ensure that Defendants can no longer improperly influence the process.

Given the tremendous performance of the assets sold to MTBC and the obvious discrepancies in the value of the assets sold to Healthtek, it is difficult for

Defendants to get past the overwhelming evidence that they committed bankruptcy fraud.

### Illegal Surveillance, Hacking, and Threats

As outlined in the complaint, in September through October 2017, Defendants admitted to accessing the emails which are stored in a domain belonging to Plaintiff CHI. *Complaint* ¶¶ 256-266.  They did so without permission and, when given notice, they promised to stop accessing the emails until a judge could rule on the proper ownership of these stored electronic communications.  However, this promise turned out to be a lie, successfully misleading CHI to refrain from seeking judicial intervention in order to stop Defendants' illegal access and inspection of these confidential and privileged communications.[3]  While Defendants may unsuccessfully attempt to dispute the ownership of the emails, the fact that they accessed them and then provided copies of emails between Parmar and Plaintiffs' then-attorneys to the USAO-NJ is undisputable.

As further outlined in the complaint, Defendants illegally hacked into the server at Mr. Parmar's home to spy on Plaintiff's electronic communications. *Complaint* ¶¶ 267-275.

---

[3] As outlined in detail in the motion to dismiss and to disqualify counsel in the *in rem* proceedings, Defendants provided these illegally obtained privileged attorney-client communications to the Government, who then published these communications in their complaint.

At the time the complaint was filed, Plaintiffs had identified two individuals, Defendants Stepien and Cardona, who had been performing illegal, unlicensed surveillance outside of Mr. Parmar's home during the exact same time period as the access logs showed that someone had illegally logged into the server from the front gate access point and downloaded a significant amount of data. Since that time, Plaintiffs have been able to conclusively establish the connection between Cardona and Stepien's activities and Defendant Chinh Chu. In fact, Chinh Chu even admitted his involvement.

We now know that, rather than hire a licensed private investigator to perform legitimate functions, Chinh Chu instead hired a private military contractor, Multi Operational Security Agency Intelligence Company ("MOSAIC"). MOSAIC advertises its employment of former special operations forces to engage in active combat against ISIS in Kurdistan and pursue human traffickers. Chinh Chu's reasoning for hiring trained combatants, rather than investigators, has not yet been explained.

MOSAIC is run by a man named Antonio Schiena, who claims to be the heavyweight world champion in Karate and an intelligence operative from South Africa. While much of his background appears to be inflated or unverifiable, Mr. Schiena has put a significant amount of effort into marketing himself as "the most highly trained covert operative in the world," a "real life James Bond" and "an old-

fashioned mercenary, quite literally a gun for hire."  In a largely unregulated and

unlicensed industry, Mr. Schiena is precisely the individual for Chinh Chu to hire

for performing tasks that no reputable, licensed professional would.

MOSAIC also advertises services in "cybersecurity," which include testing

systems:

> utilizing a series of techniques including attacking software and
> computer systems from the start by scanning ports, and
> examining known defects and patch installations. Attack types
> include social engineering, open source research, and deception
> to attempt a cyber attack in order to bypass and breach your
> perimeter and physical security, within an agreed set of
> boundaries.

While presented as a method of testing the security of clients' systems,

MOSAIC is in fact advertising their ability to hack into computer networks and steal

data – exactly what Plaintiffs allege that Chinh Chu hired someone to do.

The evidence that MOSAIC used their capability to illegally access Plaintiffs'

electronic system is clear.  Defendants have admitted that Stepien and Cardona were

posted outside of Parmar's house from September 7-11, 2018.[4]  Access logs show

that the system was illegally accessed from the front gate Wi-Fi antennae during this

exact time period, September 7-11, 2018.

---

[4] Although Chinh Chu has only admitted to the team working from September 8-11,
Stepien and Cardona's supervisor admitted that they were working for a longer
period of time and specifically identified surveilling incidents that occurred on
September 7.

The photographs previously submitted of Cardona in his vehicle were taken in the driveway of 14 Colts Gait Lane, next door to Parmar's residence.  From this vantage point, Cardona had a clear view of Parmar's front gate and was within range of the Wi-Fi signal.

It is undisputable that MOSAIC, acting at the direction of Chinh Chu, had placed people, including a convicted felon, within feet of the Wi-Fi antennae for at least four straight days, and that during that four days, someone repeatedly accessed that specific antennae and downloaded a massive amount of data.

### Declaration of Chinh Chu

In his opposition to Plaintiffs' initial application, Chinh Chu took the extraordinary step of submitting a declaration, under penalty of perjury, to issue thin and unsupported denials that he had never issued any death threats or directed anyone else to threaten Mr. Parmar or his family.  This declaration was riddled with false statements and justifications for his illegal actions that defy common sense. But the most astonishing aspect of this declaration is that Chinh Chu makes the following admissions:

1. The two unlicensed individuals, including a convicted felon, who performed the unlawful surveillance of Parmar's home and followed members of Mr. Parmar's family were there at Chinh Chu's direction.

16

2. Chinh Chu hired a private military contractor, which advertises its ability to surreptitiously access electronic data systems to perform cybersecurity functions related to access and remote monitoring of computer and telephones.

Amazingly, Chinh Chu appears to admit that he hired MOSAIC to perform exactly this function, but gives a flimsy justification, stating that he "engaged the firm to conduct a cybersecurity analysis and determine whether my computer or phone might be bugged or otherwise monitored." Chinh Chu expects this Court to be convinced that he feared that Mr. Parmar, who is on home incarceration with all his funds frozen by the Government, was bugging his phone. Aside from the illogical and outrageous paranoia of this assertion, the Court should remember that Chinh Chu is considered by the USAO-NJ and FBI to be a victim. If a true victim were concerned about being bugged by a defendant, the natural response would be to immediately bring these concerns to the USAO-NJ or the FBI, not to hire a private military contractor.

Chinh Chu goes even further, to admit that he hired the surveillance team to watch Mr. Parmar's family, but gives an utterly implausible justification for this action:

> [E]arlier this year I became concerned that Mr. Parmar posed a potential threat to me and my children, and that he might be engaged in ongoing wrongful conduct targeting me and my firm…In July, Mr. Parmar was released from jail… I became

17

> concerned that Mr. Parmar was becoming increasingly desperate
> and might take rash action. In light of such concerns, the security
> firm advising me recommended that I consider surveillance to try
> to assess the potential threat to me or my family from Mr.
> Parmar's activities…Because Mr. Parmar's temporary release
> conditions confined him to his residence with limited exceptions,
> the security firm believed that he might rely on others to
> coordinate activities on his behalf. Thus, the security firm
> recommended that it arrange for surveillance of Mr. Parmar's
> residence and the activities of individuals who might come and
> go from his residence.

If Chinh Chu truly feared that Mr. Parmar posed some unspecified threat to him or his children when he was released in July, how does it possibly make sense to surveil his family members coming and going from his house for four days all the way in mid-September?  Moreover, if a true victim were concerned about their family's safety from a defendant, why would they hire a private military contractor instead of going directly to the FBI?  This is a far departure from the behavior of a reasonable person.  Much like the "cybersecurity analysis," the only way Chinh Chu's excuses could be deemed credible is if one also assumes he is a naïve fool, easily taken advantage of by a fee-hungry private military contractor, to perform a completely useless function.  Much like the due diligence process for CHT, there must be a limit to how much gullibility Chinh Chu can believably claim in order to shift responsibility away from himself.

Beyond the fantasy of Chinh Chu's implausible, self-serving explanations, there are undeniable, unavoidable facts.  He hired a private military contractor to

perform cybersecurity and surveillance functions.  The surveillance functions were subcontracted to a convicted felon and an off-duty police officer, both of whom are prohibited from performing private investigations in New Jersey.[5]  During the exact same time period that the Defendants have admitted to surveilling

## ARGUMENT

## A. Legal Standard

In ruling on a motion for a preliminary injunction, the district court must consider (1) the likelihood that the plaintiff will prevail on the merits at trial; (2) the extent to which the plaintiffs will suffer irreparable harm in the absence of an injunction; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary injunctive relief. *Merchant & Evans v.*

---

[5] There were likely several additional surveillance teams, as Stepien and Cardona have claimed that their sole task was to follow Elena Sartison, not anyone else. Chinh Chu has admitted that he directed surveillance of "the activities of individuals who might come and go from [Parmar's] residence.  Presumably, other teams, which have not yet been identified, were also hired to follow the other individuals.  This is a common technique of compartmentalizing the functions, so that nobody knows the full scope of the operation and, if discovered, can plausibly claim not to have been informed.  In this case, because Stepien and Cardona allegedly were assigned solely to follow Elena Sartison, they initially claimed that they thought this surveillance was part of a divorce case.

*Roosevelt Bldg. Products*, 963 F.2d 628, 632-633 (3d Cir. 1992); *Opticians Ass'n v. Independence Opticians*, 920 F.2d 187, 191-92 (3d Cir. 1990).

## B. The Plaintiffs Have Standing

While Defendants have attempted to persuade this Court that Parmar is hiding behind corporate entities to assert purely personal claims, this assertion is inaccurate. The claims that Plaintiffs have raised relate directly to the significant monetary losses that Plaintiffs have sustained as a result of Defendants' pattern of illegal activity. *Complaint* ¶¶ 243, 245, 247, 249, 251, 253, 255, 259, 261. The illegal access and downloading of data from the server in Mr. Parmar's home include communications and records belonging to Plaintiffs. *Complaint* ¶270.

More importantly, Defendants conduct of illegally monitoring and threatening Plaintiffs' manager, shareholders, and associates is being done with the target objective of furthering their corrupt plan to take all of Plaintiffs' assets and to conceal and protect their plan from potentially being discovered and unwound by the Court.

Plaintiffs standing, both in filing the complaint, as well as making the instant application is paramount. Defendants have made the illogical argument that because Parmar would also potentially have standing to bring these claims individually, this somehow deprives the corporate Plaintiffs of standing. However, Defendants cannot show that Parmar's potential standing is exclusive and they have avoided both the

pleadings and the reality, which is that it is Plaintiffs' assets that have been stolen, not Parmar's.  Mr. Parmar is the manager, but he has no ownership interest in the Plaintiff entities.

## C. The Likelihood that Plaintiffs will Succeed on the Merits is Overwhelming

### a.    The Criminal Case Against Mr. Parmar

Defendants rely on the fact that they have successfully misled the U.S. Attorney's Office for the District of New Jersey ("USAO-NJ") and Securities and Exchange Commissions ("SEC") into filing complaints against Mr. Parmar that contain materially false allegations.  However, Defendants reliance upon these deeply flawed and legally insufficient pleadings is misplaced.

As discussed in many filings, these charges were not based on an investigation by the FBI, but rather from claims presented to the USAO-NJ by defendants and a forensic accounting report prepared by FTI Consulting, Inc ("FTI"), who had been hired by CC Capital.  Mr. Parmar has argued that the FTI report is incomplete and misleading, as it cherry picks certain incriminating allegations, but fails to put them into context or establish a causal link to any intended or actual loss.  Incredibly, Altorelli has admitted that the incomplete nature of the FTI report was by design and at the direction of Chinh Chu.  Altorelli explained that once FTI had found "fake bank statements," "fake entities" and "Regus offices," they had found enough, and

Defendants pulled FTI back to prevent them from finishing the investigation to actually link these allegedly fake documents to any fraudulent activity.

There can be no better example of the incomplete investigation by FTI and the blind and defective reliance by the USAO-NJ than the allegedly fake bank statements. FTI's report identifies several allegedly fake bank statements and goes into detail as to why they are allegedly fake but makes only passing reference to the fact that these documents were found as attachments to stolen emails between Parmar and his co-defendants sent *after the going private had closed*. FTI never took the investigative step to tie these allegedly fake statements to any fraud committed against CC Capital, because these statements were never communicated to CHT or anyone else, outside of Parmar and his co-defendants.

This is a clear example of the fatal flaws in the Government's case against Parmar. Defendants illegally accessed CHI's email server and claim to have found fake statements. Without any indicia of authenticity, they provided these fake statements to FTI to prepare a report proving that the bank statements were fake, but pulled them back to prevent them from trying to fit these fake statements into a larger narrative. As Altorelli admitted, they "had enough" by showing the existence of fake statements and did not need to prove that they were actually connected to anything.

Mr. Parmar was arrested on a criminal complaint on May 16, 2018. Notwithstanding Defendant Chu's desire for the Court to simply accept these unsupported allegations as fact, Mr. Parmar is presumed innocent of these charges. Tellingly, the Government's conduct since filing has been to delay discovery and prevent any opportunity to address the merits of these specious claims.

In the ensuing six months, there have been multiple extensions of time for the USAO-NJ to file an indictment, all on the basis that "[t]he parties anticipate engaging in plea discussions in the near future." Parmar, through his attorneys, has made numerous attempts to communicate or negotiate with the USAO-NJ to resolve these claims, but has been consistently rebuffed.   Most importantly, despite numerous efforts and requests by counsel for Mr. Parmar, no plea offer has ever been extended.

In the related and substantially identical civil case filed by the SEC against Mr. Parmar, a motion to dismiss was filed, but the USAO-NJ made an immediate motion to intervene and stay the case.  While Mr. Parmar had consented to staying discovery in that case, this did not go far enough for the USAO-NJ, who argued to this Court that their criminal case could be irreparable harmed if the Court considered the basic legal sufficiency of the SEC's pleadings.

23

Similarly, in the related *in rem* forfeiture proceeding, a motion to dismiss was filed but the USAO-NJ has been avoiding even responding to this motion by serving completely improper special interrogatories.

The pattern of the USAO-NJ ever since Mr. Parmar's arrest has been to delay all of these cases from proceeding to discovery or allowing any court to consider the sufficiency of their allegations.  As outlined in those motions, there are at least two fatal flaws in the USAO-NJ's theory against Mr. Parmar:

1. A review of the documents relied upon and incorporated into these pleadings clearly demonstrates that CC Capital and their due diligence team had full access to all underlying data and cannot credibly claim that they were fraudulently misled.

2. Even if CC Capital and their due diligence team were fooled by certain documents in the due diligence process, they were not defrauded as the price they paid for CHT was equal or less than the actual value of CHT.

These two fatal flaws are not accidental, or rectifiable, as the mountain of due diligence materials provided to CC Capital and the defendants clearly demonstrate that Chinh Chu would have to be an unsophisticated fool to claim that he was unaware of CHT's true financial condition.

Moreover, all the filings by the USAO-NJ, SEC, and counsel in the bankruptcy proceedings carefully avoided making any representations regarding the

true enterprise value of CHT.  This avoidance is not accidental, as any reasonable valuation of CHT will show that the asset CC Capital purchased was worth more than the purchase price.

However, even if there were any validity to the claims about Mr. Parmar related to the going-private transaction, Plaintiffs' claims here are still valid.  Just prior to the closing of the going private, CHT was a valuable, debt-free, revenue producing company, of which Plaintiffs were the majority shareholders.  The complaint at bar focuses on the pattern of illegal activity post-closing, where Defendants devalued and stole Plaintiffs' asset, leaving them with nothing.

### b.  Evidence Against the Defendants

The evidence against the Defendants is significant and overwhelming. Plaintiffs have alleged a pattern of racketeering activity that includes:

1. **Bank fraud** – Defendants made material misrepresentations to the bank in order to put tremendous and unnecessary debt on CHT, without any consideration.  In addition to the credit agreement, this racketeering act will be proven through the documentary evidence that Defendants submitted to BofA but have steadfastly refused to share with Plaintiffs. However, discovery will quickly expose the full extent of Defendants' unlawful actions.

2. **Wire fraud** – Defendants unlawfully manipulated the closing documents and funds flow documents to divert a large amount of money that was intended to be used for the going private transaction to Defendants benefit.

3. **Attempted extortion** – Defendants attempted to illegally extort Plaintiffs' manager into surrendering all of Plaintiffs' assets to the racketeering enterprise.

4. **Bankruptcy fraud** – Defendants put CHT into bankruptcy, fraudulently misrepresenting the financial condition and revenues of CHT. As outlined above, and in the motions filed in the related cases, Defendants had full and complete access to all the accurate financial data of CHT during the due diligence process.  They orchestrated two sham auctions to sell off the assets to straw purchasers.   Subsequent performance of those straw purchasers unequivocally demonstrate the significant value of CHT's assets.

5. **Obstruction of justice** – Defendants made knowingly false representations to federal law enforcement officials in order to corruptly influence them into arresting and charging Plaintiffs' manager and, thereby, remove him as an obstacle to their larger corrupt scheme.

6. **Obstruction of justice** – Defendants falsified evidence and communicated it anonymously to federal law enforcement officials in order to corruptly

26

influence them, and the Court, into having Plaintiffs' manager remanded pending trial and, therefore, severely handicapped in his ability to defend himself.

7. **Tampering with a witness** – Defendants employed a convicted felon and off-duty police officer to illegally surveil, follow, and intimidate Plaintiffs' manager, shareholders, and associates. This includes having a convicted felon trespass onto private property to intimidate one potential witness. His actions cannot be disputed, as he was photographed in the act.

In addition to the RICO count, Plaintiffs have raised two additional causes of action, on which success on the merits is virtually assured due to Defendants' own admissions:

1. **Stored Communications Act (Count 2)** – Defendants illegally accessed the stored communications that were owned by, and kept on a server registered to, Plaintiff CHI. Immediately upon discovery, a cease and desist letter was issued, to which Defendants acknowledged their conduct in accessing these communications but promised to keep the information "frozen" until a judicial determination could be made. This was a materially false statement, as Defendants then proceeded to loot the server of any communications, which they deemed helpful to their corrupt plan and forward these out-of-context and possibly inauthentic communications

to law enforcement officials.  Many of these stolen communications also constitute attorney-client privileged communications.

2. **Stored Communications Act (Count 3)** – Defendants have admitted to hiring a private military contractor, who advertises his services as an international spy and mercenary and his capabilities of surreptitiously accessing secured communications servers.  This mercenary then posted a convicted felon directly outside Plaintiffs' manager's home mere feet away from a wireless access point that logs show was used to download a massive amount of data during the exact times that Defendants were surveilling the access point.  Defendants motive, opportunity and intent are undeniable.  Had it been someone other than Defendants who orchestrated this hack, it had to have been done it right in front of the watchful eye of Defendants' own unlawful surveillance.

The evidence against Defendants is overwhelming and the likelihood of success on the merits is virtually assured, much stronger than the standard required for a motion for a preliminary injunction or expedited discovery.

### D. The Balance of Interests Weighs Overwhelmingly in Favor of a Preliminary Injunction

When balancing the interests of the Plaintiffs, Defendants and the public, the overwhelming weight tips in Plaintiffs' favor.  Plaintiffs' interest in having the manager and shareholders be free from threats of violence or death, while also

28

keeping their private and privileged communications free from intrusion by Defendants is paramount.  The irreparable harm that would result, either from the consummation of Defendants' threatened violence, or their corrupt goal of influencing Mr. Parmar's actions in this and other related litigations, cannot be overstated.

In contrast, the Defendants will suffer no irreparable harm if the requested preliminary injunction is issued.  Defendants have no legitimate interests in continuing to follow, surveil, intimidate, harass or threaten Mr. Parmar or his family. Given that Mr. Parmar is on home confinement and leaves his home only to visit his attorneys, the only information that surveillance would yield to Defendants is insight as to how much time Mr. Parmar spends visiting his attorneys, hardly a legitimate undertaking and certainly not enough to warrant denial of Plaintiffs' application.

In fact, if Chinh Chu's self-serving and implausible denials are to be believed, then he should be joining in this application, as limited discovery will quickly demonstrate that whoever committed these illegal acts against Plaintiffs' manager and his family was unrelated to Chinh Chu, Doug Newton or Truc To.  Contrary to their arguments, these Defendants have a strong interest in having expedited discovery to exonerate them of any connection.

Similarly, the public has a strong interest in this case, and the related cases, being heard and decided on the merits, not resolved through the capitulation of one

29

party due to the corrupt intimidation tactics of Defendants.  Certainly, the public has a strong interest in ensuring that no violent actions are taken against Mr. Parmar or his family members or associates.

In *Wolfson v. Lewis*, 924 F. Supp. 1413 (E.D.Pa 1996), the Court issued a similar preliminary injunction to the one sought here, but on far less severe factual circumstances.  The Court in *Wolfson* enjoined members of the media from "harassing, hounding, following, intruding, frightening, terrorizing or ambushing" the Plaintiffs where the allegations involved aggressive news reporting, not threats of physical violence, as in the case at bar.

For these reasons, Plaintiff respectfully submits that a Preliminary Injunction should be issued enjoining Defendants, their partners, agents, employees, and all persons in active concert or participating with Defendants from committing assault, stalking, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats, or any criminal offense against Mr. Parmar, his family and associates.

### E. Limited Expedited Discovery is Essential to Identifying All Parties Involved in the Unlawful Treatment of Mr. Parmar and his Family

Similarly, limited expedited discovery is essential to ensuring that all offending parties are identified, joined as defendants, and subjected to the same Preliminary Injunction to protect Mr. Parmar, his family and associates.   The

discovery sought by Plaintiffs is limited to two areas: technical information about the illegal hack and the identity of other parties involved with the illegal surveillance and intimidation tactics.[6]

### a.    Electronic Data

At present, Plaintiffs have identified the IP address and MAC address of the device used to illegally access the server.  Subpoenas to the manufacturers will reveal the device information, such as serial numbers and what service provider (i.e. Verizon, AT&T, etc.) distributed and services the device.  A second round of subpoenas will reveal purchaser and subscriber information.[7]

Expedited discovery on this issue is important, as there is a strong possibility that this unlawful activity could have included some form of continuing remote access, which would permit Defendants to continue to monitor Mr. Parmar's electronic communications, including Plaintiffs' privileged attorney-client

---

[6] Plaintiffs' initial application also requested a subpoena to NJ Transit for video recordings of the Hazlet train station.  However, NJ Transit is agreeing to turn over the requested recordings under the Open Public Records Act (OPRA) and, at present, no subpoena is required.

[7] All this information could be discovered much more quickly, if the USAO-NJ used the investigative tools available to them.  Unfortunately, although Plaintiffs have provided all the information necessary for the USAO-NJ to perform this investigation, they are declining to do so.  On information and belief, their refusal to investigate evidence of a federal crime that has occurred within their jurisdiction is due to fear that the results will incriminate their star witness – Chinh Chu.

communications regarding this matter.  Identifying and fully investigating this serious breach is required to protect the integrity of these proceedings.

If Chinh Chu's denials are to be believed, it is difficult to understand why he would object to immediately conducting this limited discovery.  If he had nothing to do with it, then he should want to know who hacked into the system so that he can properly distance himself from the offenders.  Defendants' opposition to this request appears more to be out of fear of discovery than legitimate concerns.

### b.      Identity of Other Involved Parties

Defendants used multiple parties to conduct their illegal surveillance activities, but have only admitted to using those parties that have already been identified and who they cannot deny a connection to.

Chinh Chu has admitted that he ordered "surveillance of Mr. Parmar's residence and the activities of individuals who might come and go from his residence."  However, Defendants Stepien and Cardona have claimed that their instructions were to only follow Elena Sartison.  This disconnect reveals that there were multiple teams assigned to follow various people.  By compartmentalizing the assignments, Defendants were able to ensure that no single member of the team understood the full scope of the plan.  This effective method is common among the intelligence community, military operations, terrorist networks, and drug trafficking organizations – not a private equity fund that claims to be the victim of a crime.

The exigency of this discovery is two-fold.  First, it is likely that Defendants' illegal activities are ongoing and discovery of additional co-conspirators will aid in stopping this activity.

Chinh Chu's Declaration was interesting in that he made limited admissions as to facts that he could not avoid – the connection between him and Defendants Stepien and Cardona – but is refusing to divulge any details that have not already been discovered.  It is as if he believes he can offer a false exculpatory explanation for the limited information that did come out, while hoping to conceal the rest.  For example, he refers generally to an unnamed "security consultant" without admitting that he did hire a private military contractor, known as an international spy and mercenary.  He makes it appear as if Cardona and Stepien were the only people that he sent out to surveil whoever comes and goes from Parmar's house, without revealing that he actually has a whole network of people out there, each assigned to surveil different people.  He makes it appear as if this was only for 4 days, when the Colts Neck Police Department said that he had teams out there for at least two weeks.

Plaintiffs have a clear interest in identifying all persons involved in the ongoing threats against Mr. Parmar, his family and associates, whereas Defendants have no legitimate interest in protecting these unnamed parties.  Similarly, the public has an interest in ensuring that that all parties are identified and brought before this Court.

### c.  Plaintiffs Request is Necessary for the Court to Evaluate the Application for a Preliminary Injunction

Courts have generally employed one of two standards for determining the appropriateness of expedited discovery. The first is the more formal analysis outlined in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982). The *Notaro* standard is very similar to a preliminary injunction analysis and looks more closely at the merits of the requests. The second is the reasonableness standard, which requires the party seeking the discovery to prove that the requests are reasonable under the circumstances.  *Entertainment Technology, Corp. v. Walt Disney Imagineering*, 2003 U.S. Dist. LEXIS 19832 (E.D.Pa. October 2, 2003); *Gucci America, Inc. v. Daffy's, Inc*., 2000 U.S. Dist. LEXIS 16714 (D.N.J. Nov. 14, 2000); *Philadelphia Newspaper Corp. v. Gannett Satellite Information Network, Inc*., 1998 U.S. Dist. LEXIS 10511 (E.D.Pa. July 15, 1998).

The reasonableness standard is considerably more liberal than the *Notaro* standard and its application depends on the actual circumstances of each case, as well as consideration of certain factors such as a pending preliminary injunction hearing, the need for the discovery and the breadth of the requests. *Entertainment Tech., Corp*. at *3. The Eastern District of Pennsylvania Court has noted that "expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Philadelphia Newspaper Corp*. at *2 (*quoting Ellsworth Associates, Inc. v. United States*, 917

34

F.Supp. 841, 844 (D.D.C. 1996)). "Expedited discovery has been ordered where it would 'better enable the Court to judge the parties' interests and respective chances for success on the merits' at a preliminary injunction hearing." *Philadelphia Newspaper Corp.* at *2 (*quoting Edudata Corp. v. Scientific Computers, Inc*., 599 F. Supp. 1084, 1088 (D.Minn. 1984). If narrowly tailored to fit the needs of a preliminary injunction hearing, leave to conduct expedited discovery should be granted. *Entertainment Tech., Corp.* at *3. Where the requests are overly broad and extend beyond the needs of the preliminary injunction, leave should be denied. *Id*.

Here, the proposed expedited discovery is very narrowly tailored to provide the Court with the complete information it needs to properly evaluate this application.  Plaintiffs have alleged, and provided damning supporting evidence to show that Defendants hired a private military contractor, who advertises his capabilities to surreptitiously access electronic systems, to post a team outside Plaintiffs' manager's house to follow and intimidate him and his family members, while illegally hacking into Plaintiff's system.  Chinh Chu has admitted that he hired this international spy and mercenary, who posted a convicted felon outside Plaintiffs' manager's home to follow his family members.  Chinh Chu denies that his team, which was posted mere feet from the access point, had anything to do with hacking into the access point at precisely the same time that they were surveilling the same access point.  The limited, targeted discovery sought should quickly resolve

35

these conflicting allegations and Defendants' vehement opposition only goes to prove that they have something to hide.

## CONCLUSION

For all the reasons stated herein, Plaintiffs respectfully submit that this Court should issue a Preliminary Injunction and order limited expedited discovery, together with such other and further relief as this Court deems appropriate.

Dated:       November 13, 2018
             Hoboken, New Jersey

                              Respectfully submitted,

                              Timothy C. Parlatore, Esq.
                              Parlatore Law Group, LLC
                              *Counsel for the Plaintiffs*
                              221 River Street, 9th Floor
                              Hoboken, NJ 07030