# EXHIBIT A

Mark T. Power, Esq.
John P. Amato, Esq.
**HAHN & HESSEN LLP**
488 Madison Avenue, Suite 1400
New York, New York 10022
Telephone: (212) 478-7200
E-mail:    mpower@hahnhessen.com
           jamato@hahnhessen.com

*Special Counsel and Conflicts Counsel to the Debtors and
Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Orion HealthCorp, Inc. | : | Case No. 18-71748 (AST) |
| Constellation Healthcare Technologies, Inc. | : | Case No. 18-71749 (AST) |
| NEMS Acquisition, LLC | : | Case No. 18-71750 (AST) |
| Northeast Medical Solutions, LLC | : | Case No. 18-71751 (AST) |
| NEMS West Virginia, LLC | : | Case No. 18-71752 (AST) |
| Physicians Practice Plus, LLC | : | Case No. 18-71753 (AST) |
| Physicians Practice Plus Holdings, LLC | : | Case No. 18-71754 (AST) |
| Medical Billing Services, Inc. | : | Case No. 18-71755 (AST) |
| Rand Medical Billing, Inc. | : | Case No. 18-71756 (AST) |
| RMI Physician Services Corporation | : | Case No. 18-71757 (AST) |
| Western Skies Practice Management, Inc. | : | Case No. 18-71758 (AST) |
| Integrated Physician Solutions, Inc. | : | Case No. 18-71759 (AST) |
| NYNM Acquisition, LLC | : | Case No. 18-71760 (AST) |
| Northstar FHA, LLC | : | Case No. 18-71761 (AST) |
| Northstar First Health, LLC | : | Case No. 18-71762 (AST) |
| Vachette Business Services, LTD. | : | Case No. 18-71763 (AST) |
| MDRX Medical Billing, LLC | : | Case No. 18-71764 (AST) |
| Vega Medical Professionals, LLC | : | Case No. 18-71765 (AST) |
| Allegiance Consulting Associates, LLC | : | Case No. 18-71766 (AST) |
| Allegiance Billing & Consulting, LLC | : | Case No. 18-71767 (AST) |
| Phoenix Health, LLC, | : | Case No. 18-71789 (AST) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------------------ x

```
-------------------------------------------------------------------- x
Orion Healthcorp, Inc., et al.,                        :
                                                       :
                              Plaintiffs,              :
               v.                                      :
                                                       :
Parmjit Singh Parmar (a/k/a Paul Parmar), Sotirios     :   Adv. Pro. No. 18-08053 (AST)
Zaharis, Ravi Chivukula, Pavan Bakshi, Naya            :
Constellation Health, LLC, Alpha Cepheus, LLC,         :
Constellation Health Investment, LLC, Constellation    :
Health Group, LLC, Constellation Health, LLC,          :
First United Health, LLC, Taira no Kiyomori LLC,       :
Blue Mountain Healthcare, LLC, CC Capital CHT          :
Holdco LLC, CHT Holdco LLC, PBPP Partners              :
LLC, Axis Medical Services, LLC, Vega Advanced         :
Care LLC, Pulsar Advance Care LLC, Lexington           :
Landmark Services LLC, MYMSMD LLC, PPSR                :
Partners, LLC, AAKB Investments Limited, Destra        :
Targeted Income Unit Investment Trust, on behalf of    :
unitholders, a Delaware Statutory Trust,  United       :
States of America, Aquila Alpha LLC, 2 River           :
Terrace Apartment 12J, LLC, Dioskouroi Kastor          :
Polydeuces, LLC, 21B One River Park LLC, Aquila        :
Alshain LLC, Ranga Bhoomi LLC, Harmohan                :
Parmar (a/k/a Harry Parmar), Kiran Sharma, The         :
Red Fronted Macaw Trust, Young Conaway Stargatt        :
& Taylor, LLP (in its capacity as Escrow Agent), Blue: 
Cross Blue Shield of South Carolina, Honorable         :
Trinidad Navarro, Insurance Commissioner of the        :
State of Delaware, in his capacity as Receiver, and    :
John Does 1 through 100 inclusive,                     :
                                                       :
                              Defendants.              :
-------------------------------------------------------------------- x
```

## FIRST AMENDED ADVERSARY PROCEEDING COMPLAINT

Orion HealthCorp, Inc. ("Orion") and its affiliated debtors and debtors-in-possession

in the above-captioned chapter 11 cases, and as plaintiffs in the above-captioned adversary

proceeding (collectively, the "Debtors" or the "Plaintiffs"), as and for their First Amended

Complaint, respectfully allege as follows:

## NATURE OF THE ACTION

1.      The Plaintiffs are the victims of a large, complex and brazen fraud that was subject to an intricate and deliberate concealment effort perpetrated by their former management.  This action, among other things, seeks to recover (a) funds that were stolen from and rightfully belong to the Debtors in connection with the final chapter of that fraud and, specifically, in connection with a "go-private" merger transaction (the "Merger"), pursuant to which CHT Holdco, LLC ("CHT Holdco") acquired the stock of Plaintiff Constellation Healthcare Technologies, Inc. ("CHT"), as well as (b) certain assets purchased or otherwise fraudulently secreted with funds stolen from the Debtors both before and after the Merger.

2.      The Merger and thefts were orchestrated by defendant Parmjit "Paul" Parmar ("Parmar"), and were implemented through (among other things) looting the Debtors' assets for his own benefit and the benefit of others, including certain unitholders of the Destra Targeted Unit Investment Trust, a Delaware Statutory Trust (the "Destra Trust"). At all times relevant to this First Amended Complaint, Parmar was Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of CHT.  Parmar controlled CHT through his position as CEO and Chairman of the Board of CHT, his ownership of CHT shares, and his ownership and/or control over the Parmar Shareholder Entities (as defined below), all of whom owned, directly or indirectly, CHT shares.

3.      Parmar was assisted in the commission of the acts complained of herein by Sotirios "Sam" Zaharis ("Zaharis"), and Ravi Chivukula ("Chivukula" and together with Parmar and Zaharis the "Board Member Defendants").   Zaharis was the Chief Financial Officer ("CFO") and a Director of CHT, and directly benefited as a result of the Sham

Acquisitions and the Merger, and Chivukula was the Secretary of CHT and Director of Orion. The Board Member Defendants were also assisted by defendant Pavan Bakshi ("Bakshi"), who conspired with and assisted the Board Member Defendants in connection with the Sham Acquisitions, and directly benefited as a result thereof and as a result of the Merger.

4.      To secure an inflated stock purchase price in connection with the Merger, Parmar, with the aid and assistance of the other Board Member Defendants, (a) fabricated the pre-Merger acquisitions of multiple Debtors (the "Sham Acquisitions") by representing that these companies, identified below, were operating businesses with *bona fide* customers and revenue when, in fact, they had no business operations, nor any employees, customers, or revenue, and (b) falsified and altered financial documents, created fictitious customers and invoices, and fabricated the operations of entire subsidiaries of Orion.

5.      Based on the artificially increased stock price, the Board Member Defendants were able to secure a purchase price of $309.4 million – a 45% premium over the pre-Merger stock price (the "Acquisition Price") for CHT in connection with the Merger.

6.      In total, $212,502,269.25 in proceeds ("Merger Proceeds") was paid out in connection with the Merger, approximately $100 million of which was paid to Parmar Shareholder Entities (the "Parmar Shareholder Redemption Payments").

7.      The Merger Proceeds were funded with $130 million in debt (the "Merger Financing") owed to Bank of America, N.A., as Administrative Agent, L/C Issuer and Swingline Lender ("Bank of America" and collectively with the syndicate lenders, the

"Lenders"), and an equity contribution of $82,502,160.25 from defendant CC Capital CC Holdco LLC ("CC Holdco") to CHT Holdco.[1]

8.    To secure the Merger Financing, CHT, the other Plaintiffs and certain non-debtor entities (i) jointly and severally guaranteed the Merger Financing, (ii) gave first priority liens in all of their property (the "Merger Liens"), and (iii) pledged 100% of the equity interests in each of their subsidiaries.

9.    Not content with stealing millions of dollars from the Debtors, Parmar, Zaharis, Chivukula and Bakshi, by and through the Parmar Laundering Entities (as defined below) proceeded to launder, hide and/or secrete the proceeds of the Sham Acquisitions and Merger, as well as other assets in an effort to further defraud the Debtors and their legitimate creditors, and otherwise make themselves appear judgment-proof.  Parmar, Zaharis, Chivukula and Bakshi exercised total domination and control over the Parmar Laundering Entities, and used them to purchase or fraudulently secrete millions of dollars' stolen from the Debtors to acquire real property and other assets held in a constructive trust for the Debtors.

10.    As a result of the fraud and fraudulent conveyances alleged herein, on March 16, 2018, (the "Petition Date"), the Debtors commenced their Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

---

[1]    Following the Merger Financing, the Debtors, Bank of America and certain of the Lenders entered into an Incremental Term Increase Agreement and Lender Joinder Agreement, pursuant to which the Initial Term Loan was increased by $30 million to fund the Debtors' acquisition of New York Network Management, LLC and its subsidiaries, resulting in a total term loan as of the March 16, 2018 petition date of $158.2 million.

11.    Plaintiffs, as debtors in possession and on behalf of their bankruptcy estates, hereby seek, among other things, (a) turnover of the Parmar Shareholder Redemption Payments and monies stolen from the Debtors before and after the Merger, pursuant to Sections 542 and 543 of the Bankruptcy Code and state law common law, (b) imposition of constructive trusts of the property acquired with the Parmar Shareholder Redemption Payments and monies stolen from the Debtors before and after the Merger, and (c) related relief against certain, additional defendants, to the extent such defendants assert any interest in the monies and properties at issue herein.

12.    Alternatively, Plaintiffs hereby seek to set aside and recover as fraudulent transfers the Parmar Shareholder Redemption Payments and assets acquired with monies stolen from the Debtors, pursuant to Sections 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of the Delaware Uniform Fraudulent Transfer Act ("DUFTA").

## THE PARTIES

### I.    The Plaintiffs

13.    Plaintiff CHT is a Delaware corporation with a principal place of business in Jericho, New York.  CHT directly owns 100% of the interests in Orion.

14.    Plaintiff Orion is a Delaware corporation with a principal place of business in Jericho, New York.  Orion owns 100% of the interests in various operating entities, holding companies, and certain of the sham corporations created and/or acquired by Parmar.

15.    Plaintiff Integrated Physician Solutions, Inc. ("IPS") is a Delaware corporation wholly owned by Orion.  IPS operates the Debtors' physician practice management and group purchasing organization businesses.

16.     Plaintiff Medical Billing Services, Inc. ("MBS") is a Texas corporation wholly owned by Orion.  MBS operates as part of Orion's revenue cycle management ("RCM") business.

17.     Plaintiff Rand Medical Billing, Inc. ("Rand") is a California corporation wholly owned by Orion.  Rand operates as part of Orion's RCM business.

18.     Plaintiff RMI Physician Services Corporation ("RMI") is a Texas corporation wholly owned by Orion.  RMI operates as part of Orion's RCM business.

19.     Plaintiff Western Skies Practice Management, Inc. ("Western Skies") is a Colorado corporation wholly owned by Orion.  Western Skies operates as part of Orion's RCM business.

20.     Plaintiff NEMS Acquisition, LLC ("NEMS Acquisition") is a Delaware limited liability company wholly owned by Orion.  NEMS Acquisition acts as a holding company for Plaintiff Northeast Medical Solutions, LLC and Plaintiff NEMS West Virginia, LLC, both of which are Pennsylvania limited liability companies that operate as part of Orion's RCM business.

21.     Plaintiff Physicians Practice Plus Holdings, LLC ("PPP HoldCo") is a Delaware limited liability company wholly owned by Orion.  PPP HoldCo acts as a holding company for Plaintiff Physician Practice Plus, LLC, a Delaware limited liability company that operates as part of Orion's RCM business.

22.     Plaintiff Northstar FHA, LLC ("Northstar FHA") is a Delaware limited liability company wholly owned by Orion.  Northstar FHA acts as a holding company for Plaintiff Northstar First Health, LLC ("Northstar"), a Delaware limited liability company,

which in turn acts as a holding company for Plaintiff Vachette Business Services, Ltd., an Ohio limited liability company.

23.   Plaintiff Phoenix Health, LLC ("Phoenix") is a Delaware limited liability company wholly owned by Orion.  Phoenix is an entity that was the subject of one of the Sham Acquisitions.

24.   Plaintiff MDRX Medical Billing LLC ("MDRX") is a Delaware limited liability company wholly owned by Orion.  MDRX is an entity that was the subject of one of the Sham Acquisitions and, upon information and belief, certain of the capital raised in connection with the acquisition of MDRX was actually used by Parmar and certain of the Parmar Laundering Entities to purchase the Colts Neck Property Mortgage (as defined herein) to hinder, delay and defraud creditors, secrete Parmar's assets and make him appear judgment proof.

25.   Plaintiff VEGA Medical Professionals, LLC ("Vega") is a Delaware limited liability company wholly owned by Orion.  Vega acts as a holding company for Plaintiff Allegiance Consulting Associates, LLC and Plaintiff Allegiance Billing & Consulting, LLC, both of which are New York limited liability companies.

26.   Plaintiff NYNM Acquisition, LLC ("NYNM Acquisition") is a Delaware limited liability company wholly owned by Orion.  NYNM Acquisition acts as a holding company for certain non-debtor entities that are not parties to this action.

## II.   Defendants

27.   Upon information and belief, Parmar resides at 18/19 Colts Gait Lane, Colts Neck, New Jersey (the "Colts Neck Property"), and also maintains residences at 2 River Terrace, Apartment 12J, New York, New York 10282 (the "River Terrace Property") and

50 Riverside Boulevard, Apartment 21B, New York, New York (the "Riverside Boulevard Property"). At all relevant times herein, Parmar was CEO and Chairman of the Board of CHT. Parmar controlled CHT through his ownership of CHT shares, his control over the Parmar Shareholder Entities and other entities owning CHT shares, and his position as CEO and Chairman of the Board.

28.     Upon information and belief, Chivukula is a close, personal associate of Parmar and resident of the State of New Jersey. At all relevant times herein, Chivukula was Secretary of CHT and a Director of Orion and worked closely, assisted and conspired with Parmar to actively launder, secrete and/or hide the fruits of their fraud.

29.     Upon information and belief, Zaharis is a close, personal associate of Parmar and resident of the State of New Jersey and an Australian citizen. At all relevant times herein, Zaharis was on the Board of CHT and worked closely, assisted and conspired with Parmar to actively launder, secrete and/or hide the fruits of their fraud. Zaharis personally benefited from the fraud and fraudulent transactions described herein as a result of, among other things, his indirect or direct ownership of defendant MYMSMD LLC and receipt of certain of the Parmar Shareholder Redemption Payments as a result thereof.

30.     Upon information and belief, Bakshi is a close personal associate of Parmar and a resident of the State of New York. At all relevant times herein, Bakshi worked closely, assisted and conspired with Parmar to actively launder, secrete and/or hide the fruits of their fraud. Bakshi personally benefited from the fraud and fraudulent transactions described herein as a result of, among other things, his indirect or direct ownership of defendant AAKB Investments Limited and receipt of certain of the Parmar Shareholder Redemption Payments as a result thereof.

31.     Upon information and belief, defendant Naya Constellation Health, LLC ("Naya") is a Delaware limited liability company.  At all relevant times herein, Naya was wholly owned and controlled by Parmar.

32.     Upon information and belief, defendant Constellation Health Investment, LLC ("Constellation Investment") is a Delaware limited liability company.  At all relevant times herein, Constellation Investment was wholly owned and controlled by Parmar.

33.     Upon information and belief, defendant First United Health, LLC ("First United") is a Delaware limited liability company.  At all relevant times herein, First United was wholly owned and controlled by Parmar.

34.     Upon information and belief, defendant Alpha Cepheus, LLC ("Alpha Cepheus") is a Delaware limited liability company.  At all relevant times herein, Alpha Cepheus was wholly owned and controlled by Constellation Investment and First United, which in turn were owned and controlled by Parmar.

35.     Upon information and belief, defendant Blue Mountain Healthcare, LLC ("Blue Mountain") is a Delaware limited liability company.  At all relevant times herein, Blue Mountain was owned by defendant Taira no Kiyomori ("Kiyomori"), another Delaware limited liability company, which was owned and controlled by Parmar.

36.     Upon information and belief, defendant CHT Holdco is a Delaware limited liability company.  Upon information and belief, CHT Holdco was formed in anticipation of the Merger, and is the owner of all of plaintiff CHT's outstanding shares.  CHT Holdco is named a defendant herein because of its alleged interest in all or at least some portion of the Merger Proceeds.

37.    Upon information and belief, defendant CC Capital CHT Holdco LLC ("CC Holdco") is a Delaware limited liability company.  Upon information and belief, CC Holdco was formed in anticipation of the Merger and is the controlling member of CHT Holdco.   CC Holdco funded approximately $82.5 million of the Merger Proceeds in connection with the Merger and is named a defendant herein because of its alleged interest in all or at least some portion of the Merger Proceeds.

38.    Upon information and belief, defendant PBPP Partners LLC ("PBPP Partners") is a Delaware limited liability company.  At all times herein, PBPP Partners was owned (directly or indirectly) and controlled by Parmar.

39.    Upon information and belief, defendant Axis Medical Services LLC ("Axis") is a Delaware limited liability company.  At all times herein, Axis was owned (directly or indirectly) and controlled by Parmar.

40.    Upon information and belief, defendant Vega Advanced LLC ("Vega") is a Delaware limited liability company.  At all times herein, Vega was owned (directly or indirectly) and controlled by Parmar.

41.    Upon information and belief, defendant Pulsar Advance Care LLC ("Pulsar") is a Delaware limited liability company.  At all times herein, Pulsar was owned (directly or indirectly) and controlled by Parmar.

42.    Upon information and belief, defendant Lexington Landmark Services LLC ("Lexington") is a Delaware limited liability company.  At all times herein, Lexington was owned (directly or indirectly) and controlled by Parmar.

43.     Upon information and belief, defendant MYMSMD LLC ("MYMSMD") is a New Jersey limited liability company.  At all times herein, MYMSMD was owned (directly or indirectly) and controlled by Zaharis and Parmar.

44.     Upon information and belief, defendant AAKB Investments Limited ("AAKB") is a UK company registered in Guernsey.  At all times herein, AAKB was owned (directly or indirectly) and controlled by Bakshi and Parmar.

45.     Upon information and belief, defendant PPSR Partners, LLC ("PPSR" and collectively with Blue Mountain, Kiyomori, Naya, Alpha Cepheus, First United, Constellation Investment, PBPP Partners, Axis, Vega, Pulsar, Lexington, MYMSMD and AAKB, the "Parmar Shareholder Entities") is a Delaware limited liability company.  At all times herein, PPSR was owned (directly or indirectly) and controlled by Parmar.

46.     Defendant Destra Targeted Income Unit Investment Trust, on behalf of unitholders (defined above as the "Destra Trust") is a Delaware statutory trust. U.S. Bank Trust National Association is trustee for the Destra Trust, which is named a defendant herein because of its alleged interest in $55,267,485.28 (plus interest) presently being held in an escrow account maintained by Defendant Young Conaway Stargatt & Taylor LLP, as discussed more fully below (the "YC Escrowed Funds")

47.     Upon information and belief, defendant Constellation Health Group, LLC ("CH Group") is a Delaware limited liability company which is named a defendant herein because of its alleged interest in the YC Escrowed Funds.

48.     Upon information and belief, defendant Constellation Health, LLC ("CHLLC") is a Delaware limited liability company which is named a defendant herein because of its alleged interest in the YC Escrowed Funds.

49.    Defendant United States of America is a sovereign and named herein based on its claimed interest in the real property assets owned and controlled by the Parmar Laundering Entities, and certain of the Parmar Shareholder Redemption Payments, including the YC Escrowed Funds and approximately $20 million of the Debtors' monies seized from Robinson, Brog, Leinwand, Greene, Genovese & Gluck, P.C. ("Robinson Brog") by virtue of (a) a certain seizure warrant or warrants issues in connection with criminal investigations by the United States Department of Justice ("DOJ"), (b) a certain criminal complaint filed by the DOJ against Parmar, Zaharis, and Chivukula alleging claims for conspiracy to commit securities fraud and securities fraud, and related forfeiture complaint seeking forfeiture of the Parmar Real Property (as defined below), and (c) a certain civil complaint filed by the United States Securities and Exchange Commission ("SEC") against Parmar, Zaharis and Chivukula alleging claims for fraud and securities fraud arising from the Sham Acquisitions and Merger discussed herein and seeking, *inter alia*, disgorgement of all ill-gotten gains in connection therewith.

50.    Upon information and belief, defendant Aquila Alpha LLC ("Aquila Alpha") is a Delaware limited liability company formed on January 22, 2016 and used by Parmar to fraudulently acquire assets.  Upon information and belief, Aquila Alpha is owned and controlled by Parmar, and Aquila Alpha is the *alter-ego* of Parmar and *vice versa*.  Aquila Alpha is a shell entity used by Parmar to perpetrate the fraud and fraudulent transfers alleged herein and/or otherwise hide or secrete assets in an effort to hinder, delay and defraud legitimate creditors such as the Debtors.

51.    Upon information and belief, defendant 2 River Terrace Apartment 12J ("2 River Terrace") is a New York limited liability company formed on December 23, 2015.

Upon information and belief, 2 River Terrace is owned and controlled by Parmar, and 2 River Terrace is the *alter-ego* of Parmar and *vice versa*. 2 River Terrace is a shell entity used by Parmar to perpetrate the fraud and fraudulent transfers alleged herein and/or otherwise hide or secrete assets in an effort to hinder, delay and defraud legitimate creditors such as the Debtors.

52.     Upon information and belief, defendant Dioskouroi Kastor Polydeuces, LC ("DKP") is a Delaware limited liability company formed on June 27, 2017. Upon information and belief, DKP was incorporated by Parmar's father, Harmohan Parmar, but is actually owned and controlled by Parmar, and DKP is the *alter-ego* of Parmar and *vice versa*. DKP is a shell entity used by Parmar to perpetrate the fraud and fraudulent transfers alleged herein and/or otherwise hide or secrete assets in an effort to hinder, delay and defraud legitimate creditors such as the Debtors.

53.     Upon information and belief, defendant 21B One River Park, LLC ("21B One River Park") is a Delaware limited liability company formed in or around April 2017. Upon information and belief, 21B One River Park is owned and controlled by Parmar, and 21B One River Park is the *alter-ego* of Parmar and *vice versa*. 21B One River Park is a shell entity used by Parmar to perpetrate the fraud and fraudulent transfers alleged herein and/or otherwise hide or secrete assets in an effort to hinder, delay and defraud legitimate creditors such as the Debtors.

54.     Upon information and belief, defendant Aquila Alshain LLC ("Aquila Alshain) is a Delaware limited liability company formed in or around April 2017. Aquila Alshain is the sole member of Defendant 21B One River Park, and is owned and controlled by Parmar, and Aquila Alshain is the *alter-ego* of Parmar and *vice versa*. Aquila Alshain is a

shell entity used by Parmar to perpetrate the fraud and fraudulent transfers alleged herein and/or otherwise hide or secrete assets in an effort to hinder, delay and defraud legitimate creditors such as the Debtors.

55.    Upon information and belief, defendant Kiran Sharma ("Sharma") is Parmar's sister and resides at 5 Muncee Ct., Holmdel, New Jersey 07733-1246.    Upon information and belief, Sharma is the trustee of defendant The Red Fronted Macaw Trust and is named herein because of an alleged interest in the Riverside Boulevard Property (defined below).

56.    Upon information and belief, defendant The Red Fronted Macaw Trust ("Red Trust") is a trust formed under the laws of New York.    Upon information and belief, the Red Trust is the sole member of Aquila Alshain, which, in turn, is the sole member of 21B One River Park, which is the shell entity used by Parmar to acquire the Riverside Boulevard Property.    The Red Trust is named herein because of an alleged interest in the Riverside Boulevard Property.

57.    Upon information and belief, defendant Ranga Bhoomi LLC ("Ranga" and collectively with Aquila Alpha, 2 River Terrace, 21B One River Park, DKP, the Red Trust and Aquila Alshain, the "Parmar Laundering Entities") is a Delaware limited liability company formed in or around January 2016.    Upon information and belief, Ranga is owned and controlled by Parmar, and Ranga is the *alter-ego* of Parmar and *vice versa*.    Ranga is a shell entity used by Parmar to perpetrate the fraud and fraudulent transfers alleged herein and/or otherwise hide or secrete assets in an effort to hinder, delay and defraud legitimate creditors such as the Debtors.

58.     Upon information and belief, Defendant Harmohan Parmar (a/k/a Harry Parmar) ("Harry Parmar") is Parmar's father and resides at 40 Broad Street, Apt. 20  FG, New York, New York 10004 (the "Broad Street Property"), and is named herein because of an alleged interest therein.

59.     Upon information and belief, Defendant Young Conaway Stargatt & Taylor, LLP (defined above as the "Escrow Agent") is a limited liability partnership with a principal place of business in Wilmington, Delaware, and also maintains a place of business in New York, New York.  The Escrow Agent is named herein because of its custody, possession and control of the YC Escrowed Funds.

60.     Upon information and belief, Defendant Blue Cross Blue Shield of South Carolina ("Blue Cross") is a Louisiana insurance company with a principal place of business in Columbia, South Carolina.  Blue Cross is named herein because of an alleged interest, as successor in interest to Companion Property & Casualty Insurance Company, in the YC Escrowed Funds.

61.     The Honorable Trinidad Navarro is the Insurance Commissioner of the State of Delaware, and is named herein, in his capacity as Receiver of Freestone Insurance Company in Liquidation (the "Receiver") because of an alleged interest, in his capacity as Receiver, in the YC Escrowed Funds.

62.     Party defendants named herein as Does 1 through 100, inclusive, are unknown individuals and/or corporate entities who participated in some manner in the fraudulent acts that are the subject of this action or may have an interest in the assets which are the subject of this action.  When the true names and capacities of these Doe Defendants

are ascertained, this First Amended Complaint will again be amended to allege such information.

**JURISDICTION AND VENUE**

63.    This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

64.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because the claims asserted herein arise in the above-captioned Chapter 11 cases.

65.    This is a core proceeding under 28 U.S.C. § 157(b)(2).

66.    Venue is proper pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Chapter 11 cases, which are currently pending before this Court.

67.    In the event that this Bankruptcy Court or any other appropriate court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Bankruptcy Rule 7008. Plaintiffs also consent to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**FACTUAL BACKGROUND**

**I.    Pre-Merger Background**

68.    In 2012, Parmar and Southport Lane Management, LLC ("Southport") entered into a joint business venture to acquire 100% of the equity in Debtor Orion.

69.    Parmar and Southport formed CH Group, CHLLC, Constellation Investment, and First United to serve as holding companies for their respective interests in CHT.

70. CHLLC's initial members were CH Group, which was controlled by Southport, and Constellation Investment and First United, both of which were controlled by Parmar.

71. On or about June 17, 2013, CHLLC acquired control over the entire issued share capital of Orion.

72. On or about June 9, 2014, Parmar acquired control over all of the interests in CHLLC.

73. On September 3, 2014, Parmar formed CHT as the holding company for Orion and its subsidiaries.

74. On or about December 8, 2014, CHT consummated a "go-public" transaction, after which it was publicly traded on the London Stock Exchange's Alternative Investments Market (the "AIM").

75. CHLLC owned 68.08% of CHT's outstanding shares after the conclusion of the "go-public" transaction.

## II. The Sham Acquisitions Inflate CHT's Value

76. As discussed below, the Sham Acquisitions were funded with money raised in secondary rounds of equity offerings through the AIM.

77. Upon information and belief, the Sham Acquisitions began in or about May 2015, when CHT raised approximately $15.8 million through a secondary offering on the AIM.

78. The Sham Acquisitions shared common characteristics: (1) money was raised through secondary public offerings on the AIM; (2) the acquisition target was formed shortly before the date of acquisition; and (3) the proceeds of the public offerings were used

for other purposes, including (among other purposes), to line Parmar's own pockets and secrete property for Parmar's benefit.

79.     On September 16, 2015, CHT announced its acquisition of Northstar for $18 million.  In connection therewith, Parmar, the other Board Member Defendants and Bakshi caused CHT to falsely describe Northstar as having 233 employees, 77 clients, and 2014 year end revenue of $7.9 million.  Northstar had no operations at the time of the alleged acquisition.

80.     On September 18, 2015, CHT announced its acquisition of Phoenix.   In connection therewith, Parmar, the other Board Member Defendants and Bakshi caused CHT to falsely describe Phoenix as having 138 employees and generating revenue of $9.8 million and EBITDA of $2.2 million, with net assets of $1.1 million as of December 31, 2014.  In truth, Phoenix had no operations at the time of the alleged acquisition and, in fact, Phoenix did not obtain an Employer Identification Number ("EIN") from the IRS until November 27, 2015.

81.     On December 11, 2015, CHT announced a second capital raise earmarked for the acquisition of MDRX.  In connection therewith, Parmar, the other Board Member Defendants and Bakshi caused CHT to falsely describe MDRX's business by stealing, almost verbatim, the description of an unrelated company used in a confidential offering memorandum sent to Parmar and Zaharis a few months earlier.  In reality, MDRX was only formed on December 7, 2015.  On January 6, 2016, the Board approved the admission of 18,751,195 new shares to the AIM market, which raised approximately $45 million.  On February 10, 2016, CHT announced its acquisition of MDRX for $28 million.  MDRX claimed to have acquired its customers from Apex Healthcare Systems, a fictitious

company.  MDRX was not assigned an EIN until March 11, 2016 and had no operations or employees at any time.

82.     When questioned about this by a representative of the company whose information was stolen, Zaharis immediately forwarded the email to his co-conspirators, including Parmar and Bakshi, indicating "not good ………".  Apparently, Bakshi agreed, and replied "oh fu**."  Zaharis then indicated that he would call Bakshi to discuss, and Bakshi replied "Pls.  We need to be ready for this."

83.     The Board Member Defendants and Bakshi created fictitious revenue for non-existent customers by re-characterizing cash raised from the secondary offerings as third-party customer receipts.

84.     The Board Member Defendants and Bakshi altered financial statements and fabricated financial information to include fictitious entries, which created the illusion of customer deposits.

85.     The Sham Acquisitions caused CHT's revenue and earnings to be overstated in its financial statements filed with the AIM in 2015 and 2016.  CHT's stock price then increased based on these fraudulent financial statements.

## III.   The Go-Private Merger Transaction

86.     Starting in or about June 2016, CHT pursued a potential merger transaction with CC Capital Management, LLC ("CC Capital"), a private investment firm formed under the laws of the State of Delaware.  At the time, CHT's shares were publicly traded on the AIM, and, pursuant to the proposed transaction, CC Capital would acquire a controlling interest in CHT.

87.     Ultimately, these negotiations resulted in the Merger, pursuant to which CHT Holdco acquired one hundred percent (100%) of the issued and outstanding shares of CHT.

88.     Throughout the course of negotiations and continuing for some period of time following the closing of the Merger, Parmar was a Director and CEO of CHT, Zaharis was a Director and CFO of CHT, and Chivukula was a Director of Orion and the Secretary of CHT.

89.     Prior to the Merger, the Parmar Shareholder Entities owned, directly or indirectly, approximately 53.5% of CHT's outstanding shares.  Other entities owned and controlled by Parmar's close associates, including Zaharis and others, owned approximately 11.65% of CHT's outstanding shares.  The balance of CHT's shares was owned by public shareholders.

90.     Upon information and belief, as a condition and inducement to the Merger, stockholders representing at least 89% of CHT's outstanding shares were required to execute, and did, in fact, execute, Voting and Support Agreements in furtherance of the Merger.

91.     During the Merger negotiations and related due diligence, Parmar acted as principal on behalf of CHT.  Zaharis and Chivukula, as Directors and/or members of CHT's senior management, actively supported Parmar in this effort and, upon information and belief, interacted directly with CC Capital in providing information regarding CHT's operations, financial condition and other information relevant to the proposed Merger.

92.     The Board Member Defendants represented CHT as a growing force in the $37 billion medical billing industry, and used the Sham Acquisitions discussed above to fraudulently inflate CHT's size and value.

93.    The Sham Acquisitions were also used to support the Board Member Defendants' claims that CHT's revenue and EBITDA were rapidly growing and continually exceeding expectations.  For example, upon information and belief, CHT's EBITDA was represented as having increased in 2014 by 104% to $14.2 million and another 68.3% to $23.9 million in 2015.  Similarly, upon information and belief, (a) revenue was represented as having grown by more than 40% to $76.7 million in 2015, with CHT's strategic acquisitions during that year purportedly contributing $15.5 million to the company's growth (20.2% of all revenues), and (b) organic revenue also purportedly increased by $10 million, at a rate of 12% in 2015.

94.    Upon information and belief, the Board Member Defendants also represented that, for the six-month period ended June 30, 2016, CHT's revenues were approximately $57 million and its EBITDA was approximately $21 million.  And, for the year ended December 31, 2016, CHT's revenues were purportedly $136 million and its EBITDA $50 million.

95.    During the course of the Merger negotiations, the Board Member Defendants provided documents and other information to CC Capital regarding CHT's financial condition and business operations, which, upon information and belief, was represented to be true and correct.

96.    As the form of the proposed Merger took shape, CHT Holdco was formed as a single member limited liability company, with Alpha Cepheus being the sole member and Parmar acting as its Manager.

97.    Upon information and belief, CC Holdco was formed on November 14, 2016.

98.    Ultimately, the terms and conditions of the Merger were agreed to and memorialized in a certain Merger Agreement, Subscription Agreement dated November 24 2016, and other related agreements (each a "Transaction Document" and collectively the "Transaction Documents").

99.    On November 25, 2016, CHT and CHT Holdco announced the Merger.

100.    Upon information and belief, as a condition and inducement to the Merger, the Board Member Defendants and certain of the Parmar Shareholder Entities (including Alpha Cepheus, First United and CHLLC) made numerous representations and warranties concerning CHT's financial state, and business, including, among other things:

(a)    that CHT's financial statements were truthful and accurate;

(b)    that there were no false entries on any of CHT's books and records;

(c)    that CHT's accounts receivable were the result of *bona fide* transactions; and

(d)    that CHT's material contracts were valid and enforceable.

101.    Upon information and belief, as further inducement and protection in the event of a breach of representations, warranties, covenants or indemnity obligations, (a) Parmar, as Manager of Alpha Cepheus, executed a Pledge and Security Agreement, granting CC Holdco a first priority security interest and continuing lien on all right, title and interest in membership interests in CHT Holdco held by Alpha Cepheus, and (b) Parmar, as Manager of CHLLC and First United, executed Pledge and Security Agreements granting CC Holdco a first priority security interest and continuing lien in all right, title and interest in the membership interests held by these entities in Alpha Cepheus.

102.    Based on the information provided by the Board Member Defendants CHT was valued in excess of $309 million.

103.    Accordingly, under the terms of the Merger Agreement, at the closing of the Merger, each share of CHT common stock outstanding would be cancelled and converted into the right to receive $2.93 cash and $0.43 in promissory notes per share (the "Acquisition Price"), which represented a 45% premium to the AIM closing price of CHT shares as of November 25, 2016.

104.    On January 18, 2017, CHT's shareholders approved the Merger.

105.    On January 26, 2017, CHT requested that trading of its shares on the AIM be suspended.

106.    The Merger closed on or about January 30, 2017.

107.    Upon information and belief, in connection with the consummation of the Merger, CC Holdco was admitted as the controlling member of CHT Holdco.

108.    Following the Merger, (i) CHT Holdco owned 100% of the equity interests in CHT; (ii) CC Holdco controlled approximately 50.7% of the economic and 55% of the voting interests in CHT; and (iii) Alpha Cepheus controlled approximately 49.3% of the economic and 45% of the voting interests in CHT.

## IV.    The Merger Proceeds, Merger Financing and Shareholder Redemption Payments

109.    In anticipation of and in connection with the Merger closing, upon information and belief, between January 24, 2017 and January 30, 2017, CC Capital and its related investors deposited a total of $82,502,260.25 into a CC Holdco bank account maintained by JPMorgan Chase (the "CC Holdco Bank Account"). Upon information and belief, the CC Holdco Bank Account was established by and opened in the name of CC Holdco.

110.    At closing on January 30, 2017, the Debtors, as borrower and/or guarantors under the Bank of America credit agreement and related loan documents, deposited the $130,000,000 of Merger Financing into the CC Holdco Bank Account.

111.    The Merger Financing was jointly and severally guaranteed by all Plaintiffs.

112.    As collateral security for their guarantees, Plaintiffs granted first priority liens on all of their property, including 100% of the equity interests in each of their subsidiaries, to Bank of America.

113.    As a result of the deposits by CC Holdco's investors and the Debtors, as of January 30, 2017, the CC Holdco Bank Account held the full $212,502,269.25 of Merger Proceeds.

114.    The remainder of the Acquisition Price was financed by the issuance by CHT of unsecured promissory notes to its shareholders in the amount of approximately $39.6 million.

**A.      The Destra Litigation and The YC Escrowed Funds**

115.    On April 24, 2014, the Delaware Insurance Commissioner commenced litigation by filing state court rehabilitation proceedings against Freestone Insurance Company ("Freestone") in the Delaware Court of Chancery (the "Chancery Court") and, by order dated April 28, 2014, the Chancery Court placed Freestone into liquidation.  *See In the Matter of the Liquidation of Freestone Insurance Company*, Del. Ch. No. 9574-VCL.

116.    On December 27, 2016, the Destra Trust, CH Group and CHLLC (the "Destra Plaintiffs") commenced an *in personum* action styled *Destra Targeted Income Unit Investment Trust, on behalf of Unitholders, et al. v. Parmjit Singh Parmar (a.k.a. Paul Parmar), et al.*, Del. Ch. No. 13006-VCL (the "Destra Litigation"), currently pending before the

Chancery Court, by filing a verified complaint (1) seeking a declaratory judgment as to the ownership of certain CHT shares and invalidating certain transfers of CHT shares and any actions taken by Parmar and the other defendants in the Destra Litigation regarding the conveyance, transfer, or encumbrance of CHT's shares; and asserting (2) breaches of fiduciary duties and the aiding and abetting thereof; (3) breaches of the CH Group and CHT operating agreements; and (4) counts of fraudulent transfer, conversion, unjust enrichment, and civil conspiracy and fraud.

117.    The Destra Litigation arises from the "go-public" transaction involving Southport, Plaintiff Orion, CHT and others discussed above, and the plaintiffs therein allege that Southport defrauded its investors, most or all of whom were insurance companies, siphoning off good, high-quality assets, including cash, and exchanging them with "dubious investments" including seven "synthetic preferred investments", including the CHT "go-public" transaction discussed above.

118.    Upon information and believe, $11 million of the monies stolen from the Southport investors was used to acquire direct or indirect equity interests in Orion before the "go-public" transaction occurred.

119.    Simultaneously with the commencement of the Destra Litigation, the plaintiffs moved for preliminary injunctive relief, seeking an injunction preventing the defendants and parties acting in concert with them from distributing cash and other securities that they would receive in connection with the Merger.

120.    The plaintiffs in the Destra Litigation did not seek to prevent the Merger from closing and, in fact, desired it to close to enable them to receive the Parmar Shareholder Redemption Payments that were stolen from the Debtors.

121.    By order dated January 25, 2017 (five days before the Merger closed), the Chancery Court directed Parmar, upon the closing of the Merger, to cause certain of the Parmar Shareholder Entities to deposit the YC Escrowed Funds, representing a $55,267,485.28 portion of the Parmar Shareholder Redemption Payments that were expected to be paid to Parmar-controlled entities (specifically, Blue Mountain and Alpha Cepheus) in an escrow account maintained at Wilmington Savings Fund Society under the name Blue Mountain Healthcare/Young Conaway Stargatt & Taylor Escrow Savings, Account Number 465102150 (the "YC Escrow Account").

### B.    Disbursement of the Merger Proceeds

122.    On the Merger closing date, $177,154,981.43 in Merger Proceeds was transferred from the CC Holdco Bank Account to an account at the Royal Bank of Scotland, plc. maintained by Capita Registrars Limited ("Capita"), the exchange agent for the Merger.  Upon information and belief, the remaining $35,347,287.82 was held in the CC Holdco Bank Account.   Upon information and belief, Capita and CC Holdco then disbursed the Merger Proceeds to CHT shareholders, including public shareholders and the Parmar Shareholder Entities, or otherwise used the Merger Proceeds to pay fees and costs incurred in connection with the Merger.

123.    On January 30, 2017, $5,348,500.72 in Merger Proceeds was wired from the CC Holdco Bank Account to the YC Escrow Account.  These funds were Merger Proceeds due to be paid to Alpha Cepheus in connection with the Merger.  On or about February 3, 2017, $49,918,984.28 in Merger Proceeds were wired from the Capita account to the YC Escrow Account.  These funds were Merger Proceeds due to be paid to Blue Mountain

(these funds, collectively, comprise the "YC Escrowed Funds", as defined above and discussed herein).

124.    On January 30, 2017, $9,520,035.90 of Merger Proceeds was transferred from the CC Holdco Bank Account to an account in the name of Plaintiff Orion.  On the same date, approximately (a) $3.1 million was withdrawn in connection with a loan repayment to "Large Corporate Loan Servicing", and (b) $2.5 million was paid to Winston & Strawn LLP.  Numerous additional withdrawals were also made from the account, resulting in an ending balance as of January 31, 2017 of less than $ 1 million.

125.    Upon information and belief, on January 30, 2017, (a) $11,973,562.20 of Merger Proceeds was wired from the CC Holdco Bank Account to, upon information and belief, public shareholders, and (b) $661,558.28 of Merger Proceeds due to be paid to Alpha Cepheus was wired from the CC Holdco Bank Account to an attorney escrow account maintained at Wells Fargo by Robinson Brog, Parmar's long-time attorneys who represented CHT in connection with the Merger and Parmar in the Destra Litigation (the "RB Escrow Account").

126.    In sum, upon information and belief, all of the Merger Proceeds were disbursed from the CC Holdco Account on January 30, 2017.

127.    Upon information and belief, on or about January 30, 2017 Capita wired $7,843,621.72 into an account in the name of, or for the benefit of AAKB.  Upon information and belief, thereafter, $4 million thereof was sent to the RB Escrow Account (or some other escrow account maintained by Robinson Brog).

128.    Upon information and belief, as the beneficial owner of AAKB, Bakshi received, or otherwise directly benefited from, the monies paid to AAKB in connection with the Merger.

129.    On January 30, 2017 Capita wired $45,959,429.43 into the RB Escrow Account.  These monies represented Merger Proceeds due to be paid to defendants Alpha Cepheus, PPSR, PBPP Partners, MYMSMD (for the account and benefit of Zaharis), Lexington and Vega.

130.    On March 15, 2017, the DOJ seized $20.1 million in Merger Proceeds from the RB Escrow Account.  These monies represented the portion of the Merger Proceeds held in the RB Escrow Account due to be paid, and specifically attributable to defendant PBPP Partners.

131.    As more specifically set forth below, the Debtors have further traced approximately $17 million of Merger Proceeds into the fraudulent purchase, by Parmar and the Parmar Laundering Entities, of various real property assets.

132.    Upon information and belief, approximately $77.8 million of the Merger Proceeds were paid or due to be paid to public shareholders not owned or controlled by any of the defendants herein.

133.    Approximately $10 million of the Merger Proceeds was withheld by Capita for potential tax liabilities to non-US selling shareholders.  Those funds, which were turned over to the Internal Revenue Service, are the subject of the Debtors' related adversary proceeding styled *Orion HealthCorp., Inc., et al. v. Capita IRG Trustees (Nominees) Limited*, Adversary Proceeding No. 18-08048 (AST) (the "IRS Proceeding").

## V.    Proposed Settlement of the Destra Litigation

134.    In or around August 2017, the Receiver proposed a settlement agreement (the "Settlement Agreement") with Parmar, the Destra Trust, and others.  If approved, the Settlement Agreement would have resulted in the transfer of the YC Escrowed Funds as follows:   (a) $32,283,132.53 to the Destra Trust; (b) $10,849,716.59 to Blue Cross, as successor in interest to Companion Property & Casualty Insurance Company; (c) $3,117,150.88 to the Receiver; and (d) the remaining $9,017,485.28 to Parmar.   The Settlement Agreement did not expressly address or provide for payment of the Escrow Agent's fees.

135.    On December 8, 2017, the FBI obtained a seizure warrant involving the YC Escrowed Funds which was amended on December 14, 2017 due to a typographical error in the original warrant.

136.    At the request of the Delaware Chancery Court, CC Capital filed a motion to lift the preliminary injunction as to the YC Escrowed Funds to allow the seizure of the YC Escrowed Funds pursuant to the warrant, and to pay the administrative expenses of the Escrow Agent. The Chancery Court granted this motion by order issued on March 16, 2018.

137.    The Chancery Court's March 16th order lifting the preliminary injunction and relinquishing any jurisdiction over the YC Escrowed Funds, states, in relevant part "[t]he [YC] Escrowed Funds shall remain in the [YC Escrow Account] … until the USDOJ or the Court issuing a seizure warrant provides or causes to be provided to Wilmington Savings Fund Society ("WSFS") instructions concerning the YC Escrowed Funds, and [the Escrow Agent] and WSFS are authorized to comply with those instructions without further order of

this Court and regardless of any opposition by any other person including any parties to these actions."

138.    Upon information and belief, no such instructions were provided by the United States government before commencement of the Debtors' chapter 11 proceedings, and the YC Escrowed Funds remain in the YC Escrow Account, are subject to the automatic stay and are assets of the Debtors' estates.

139.    The YC Escrowed Funds are rightfully the Debtors' property, as they constitute stolen cash proceeds of the Merger that were illegally obtained by Parmar (indirectly through Blue Mountain and Alpha Cepheus) as a result of the Debtors incurring the Merger Liens because of Parmar's massive fraud, breach of fiduciary duties and illegal conduct.

## VI.    Discovery of the Fraud

140.    Upon the closing of the Merger, CHT's Board was reconstituted, with CC Holdco appointing the majority of directors.  Parmar continued as a Director, and Parmar, Zaharis, Chivukula and others continued to manage the business and controlled the books and records of CHT.

141.    In or about April 2017, Truc To ("To"), the KPMG partner who had led the financial due diligence efforts in connection with the Merger, was hired as CFO of CHT. The hiring of To was part of an effort by the newly constituted Board to improve CHT's financial and accounting processes and reporting and to exercise increased oversight over the processes.  With access to this information, questions and concerns emerged about the state of CHT's business operations.

142.    Upon information and belief, in or about September 2017, Parmar complained to To about the increased oversight.

143.    The emerging questions and concerns were addressed with Parmar, who, upon information and belief, provided various explanations.  Upon information and belief, these conversations culminated in a specially called meeting of CHT's Board on or about September 29, 2017 wherein Parmar disclosed that CHT's consolidated revenue and EBITDA for 2017 were $70 million less and $50 million less, respectively, than the amounts indicated during the Merger negotiations.

144.    On September 29, 2017, Parmar resigned from the Board of CHT effective immediately.

145.    Zaharis and Chivukula were placed on administrative leave and then terminated on October 13, 2017 after refusing to be interviewed and refusing to return CHT computers.

146.    CHT and CC Capital accelerated the investigation into CHT's financial condition and the circumstances of the Merger.  This investigation ultimately resulted in the appointment of Tim Dragelin as the Debtors' interim CEO and CFO, a thorough investigation into the Debtors, and the filing of the Debtors' bankruptcy cases and related adversary proceedings.

**VII.    The Parmar Shareholder Redemption Payments
         Were Stolen From and Rightfully Belong to the Debtors**

147.    In order to effectuate the Merger, the Board Member Defendants knowingly concealed and falsified the true financial condition of the Debtors.

148.    The Parmar Shareholder Redemption Payments constitute property of the Debtors' estates that could be used to pay their legitimate creditors.

149.    As the rightful owners, the Debtors have a superior interest in and to the Parmar Shareholder Redemption Payments over all other parties hereto.

150.    As a result of the theft of the Parmar Shareholder Redemption Payments from the Debtors, any party that received any portion of the Parmar Shareholder Redemption Payments, have been unjustly enriched at the Debtors' expense.

## VIII.    Alternatively, the Parmar Shareholder Redemption Payments Are Proceeds of Avoidable Fraudulent Transfers

151.    The Debtors did not receive reasonably equivalent value for incurring the Merger Financing and other transfers they made in connection with the Merger.

152.    Each of the Debtors' pre-Merger financial condition was significantly impacted by the Merger Financing.

153.    The Board Member Defendants knowingly concealed and falsified the true financial condition of the Debtors from their creditors, pre- and post-Merger.

154.    The Debtors were under no obligation to enter into the Merger or incur the obligations under the Merger Financing that resulted in a massive payout to its shareholders, including Parmar and the Parmar Shareholder Entities.  But for the fraudulent intent of the Board Member Defendants, the Debtors would not have done so.

155.    The Debtors seek to avoid and recover the Parmar Shareholder Redemption Payments as actual and constructive fraudulent transfers.

## IX.    Parmar, Zaharis and Chivukula Defrauded the Debtors by Secreting Assets Stolen Before the Merger and Using the Parmar Shareholder Redemption Payments to Purchase Real Property Assets After the Merger

### A.    Parmar and Zaharis Create a Fraudulent Email Account to Help Hide Real Estate Purchases

156.    Tomer Vardi ("Vardi"), a close personal associate of Parmar, appears frequently in the real estate transactions discussed herein.  However, evidence obtained by

the Debtors shows that emails allegedly written by Vardi, specifically those from the account tomer.vardi@yahoo.com (the "Vardi Yahoo Account"), were in fact, on many occasions, written by Zaharis or Parmar, who pretended to be Vardi to shield the fact that they were involved in the transactions discussed below.

157.    In light of this evidence, with respect to the communications involving Vardi discussed below and herein, upon information and belief, the true author is Zaharis or Parmar.

### B.    The Colts Neck Property

158.    According to property records maintained by Monmouth County, New Jersey, Parmar is the current owner of the Colts Neck Property, on which he built the 39,000 square foot mansion in which he resides.

159.    In or around February 2008, Parmar granted to Deutsche Bank a mortgage on the Colts Neck Property in the principal amount of $23,700,000 (the "Colts Neck Property Mortgage").

160.    In December 2015 (at a time when Parmar and Zaharis were already entrenched in fraud, including by way of the Sham Acquisitions), Zaharis sent Parmar a letter allegedly written by John Petrozza ("Petrozza") (a close associate of Parmar and member of CHLLC's Board of Directors), in which Petrozza purportedly expresses interest in purchasing, by short-sale, the Colts Neck Property for $6.75 million.

161.    Upon information and belief, the offer letter was sent to Deutsche Bank via the Vardi Yahoo Account.

162.    Thereafter, counsel for Deutsche Bank responded to Petrozza's short-sale offer, noting that one condition of the sale is that it is an arm's length transaction.

163.    On January 11, 2016, Zaharis sent a modified short-sale offer letter to Parmar, also purportedly from Petrozza, with an offer of $3 million, purportedly because of an estimated $3.25 million it would cost to settle various liens on the property.

164.    Several days later, Zaharis sent Parmar an outline of talking points for Vardi to present to Deutsche Bank, which included Petrozza's (a) background, (b) relationship with Vardi, and (c) plans for the property (including the alleged vacatur by Parmar within thirty days of closing).

165.    Throughout December 2015 and January 2016, the Vardi Yahoo Account was in regular communication with Deutsche Bank and its counsel regarding the proposed short-sale and, upon information and belief, the letters and emails described above (among others) were orchestrated and prepared by Parmar and/or Zaharis and sent to Emmet, Marvin & Martin LLP via the Vardi Yahoo Account purportedly by Vardi, to hide the fact that Parmar and other defendants were fraudulently orchestrating this short-sale (and ultimate foreclosure, as discussed below).

166.    A January 24, 2016 email from the Vardi Yahoo Account informed Deutsche Bank's counsel that "I [presumably implying Vardi] will form Aquila Alpha" to hold the Colts Neck Property Mortgage after the short sale is consummated, and that Vardi will be the manager.

167.    In actuality, Parmar owns, controls and dominates Aquila Alpha, having incorporated it on January 22, 2016 as a vehicle through which he would acquire assets.

168.    On March 2, 2016, Deutsche Bank and Aquila Alpha executed a Note Sale Agreement, pursuant to which Aquila Alpha purchased the Colts Neck Property Mortgage for $3,800,000.  Per Deutsche Bank's requirement, the agreement contains an arm's length

transaction provision, pursuant to which Aquila Alpha covenanted that "[n]o hidden terms or special understandings exist between the [p]urchaser and the [b]orrower."  This provision was knowingly false and fraudulent.

169.    On March 31, 2016, the Colts Neck Property Mortgage was assigned to defendant Aquila Alpha.

170.    Upon information and belief, the Colts Neck Property Mortgage was acquired using the proceeds of certain of the Sham Acquisitions, which, but for Parmar, Zaharis and Chivukula's fraud and fraudulent transfers alleged herein, should have been used to pay Parmar's legitimate creditors such as the Debtors and their creditors.

171.    Specifically, upon information and belief, the money originated from the early 2016 capital raise completed in connection with the acquisition of Debtor MDRX.

172.    In April 2016 (less than one month after the Colts Neck Property Mortgage was assigned to Aquila Alpha), Parmar (through the Vardi Yahoo Account) initiated the fraudulent foreclosure of the Colts Neck Property Mortgage to make it appear as if the Colts Neck Property was being foreclosed on, and to ensure that Aquila Alpha is first in line as a creditor on the property.

173.    The foreclosure scheme orchestrated by Parmar was perpetrated to secrete the Colts Neck Property, hinder, delay and defraud the Debtors, and to make it appear that Parmar is judgment proof.  As a result, Parmar and the Parmar Laundering Entities have been unjustly enriched at the Debtor's expense.

### C.    The River Terrace Property

174.    Upon information and belief, the River Terrace Property is a 2,729 square foot apartment in Battery Park Place, New York City.  In December 2015, Parmar began

negotiating the purchase of the River Terrace Property, and, in 2016 purchased the property for $5,450,000.

175.   In order to obfuscate the fact that he was the purchaser and is the owner of the River Terrace Property, Parmar placed title in the name of defendant 2 River Terrace, a shell entity formed to launder, hide and/or secrete money and other assets on December 23, 2015 (less than two months before the closing on the River Terrace Property and around the same time Parmar began negotiating its purchase).

176.   Upon information and belief, the River Terrace Property was purchased using proceeds from certain of the Sham Acquisitions, which, but for Parmar, Zaharis and Chivukula's fraud and fraudulent transfers alleged herein, should have been used to pay the Debtors and their creditors.

177.   Parmar placed title of the River Terrace Property in 2 River Terrace in order to make it appear that he is judgment proof and in an effort to hinder, delay and defraud his legitimate creditors, such as the Debtors.  As a result, Parmar and the Parmar Laundering Entities have been unjustly enriched at the Debtors' expense.

**D.    The Broad Street Property**

178.   According to property records maintained by the City of New York, defendant DKP is the current owner of a condominium apartment located at 40 Broad Street, Apt. 20FG, New York, New York 10004 (the "Broad Street Property" and, together with the Colts Neck Property, River Terrace Property and Riverside Boulevard Property, the "Parmar Real Property"), having purchased the property for $1,640,000 in August 2017.

179.   In June 2017, only a few months after the Merger was consummated, the Vardi Yahoo Account was used by, upon information and belief, Zaharis to discuss

arrangements for the purchase of the Broad Street Property. During these discussions, an individual acting through the Vardi Yahoo Account (upon information and belief, either Zaharis or Parmar) directed that defendant DKP be formed to purchase the property.

180.    DKP was incorporated in Delaware on June 27, 2017, with the incorporation records having been signed by defendant Harry Parmar, Parmar's father.  In actuality, Parmar owns controls and dominates defendant DKP, and DKP is a shell entity formed to launder, hide and/or secrete money and other assets.

181.    Between June 2017 and August 2017, the Vardi Yahoo Account (by and through, upon information and belief, Zaharis and Parmar) continued to engage in contract negotiations regarding the purchase of the Broad Street Property.

182.    The money used to purchase the Broad Street Property was a portion of the Parmar Entity Shareholder Redemption Payments (and specifically, a portion of the monies formerly held in the RB Escrow Account), are directly traceable thereto, and rightfully belong to the Debtors.

183.    Parmar used the Debtors' money (stolen from the Debtors in connection with the Merger) to purchase the Broad Street Property and placed title thereto in DKP in order to make it appear that he is judgment proof and in an effort to hinder, delay and defraud his legitimate creditors such as the Debtors.  As a result, Parmar and the Parmar Laundering Entities have been unjustly enriched at the Debtors' expense.

184.    The Debtors did not receive reasonably equivalent value in exchange for the transfers they made in connection with the purchase of the Broad Street Property.

185.    The Debtors' financial conditions were significantly impacted by the purchase of the Broad Street Property.

186.    The Debtors were under no obligation to fund the purchase of the Broad Street Property, which resulted in a benefit to Parmar and the Parmar Laundering Entities. But for Parmar and Zaharis' fraudulent intent, the Debtors would not have done so.

**E.    The Riverside Boulevard Property**

187.    On February 8, 2017, only one week after the Merger was consummated, Parmar received an email from a real estate broker informing him that his $14,800,000 cash offer to purchase the Riverside Boulevard Property was accepted.

188.    Shortly thereafter, Parmar emailed Zaharis asking him to coordinate the creation of LLCs to acquire the Riverside Boulevard Property.

189.     In order to hide the fact that Parmar was buying an almost $15 million apartment (paid for in cash) only a few months after defendant Aquila Alpha purportedly commenced foreclosure proceedings against the Colts Neck Property (Parmar's main residence, upon information and belief) Parmar and Zaharis (a) created an elaborate web of numerous entities, including defendants Red Trust, Aquila Alshain and 21B One River Park, through whom Parmar purchased the Riverside Boulevard Property, and (b) took affirmative steps to ensure that the real estate brokers on the transaction did not disclose to others that Parmar was the buyer and did not include either Parmar or Zaharis on any emails with other individuals involved in the transaction.

190.    According to Parmar and Zaharis' plan, the purchaser of the property would be a trust managed by Parmar's sister, defendant Sharma, by and through defendants Red Trust, Aquila Alshain and 21B One River Park, as follows:  the property was allegedly being purchased for a portfolio investor, the Red Trust, a member of defendant Aquila Alshain.

Aquila Alshain, in turn, was allegedly a member of the signatory to the contract of sale (and property owner) 21B One River Park.

191.    In actuality, defendants Aquila Alshain and 21B One River Park are shell entities owned and controlled by Parmar and formed to launder, hide and/or secrete money and other assets and make it appear that Parmar is judgment proof in order to hinder, delay and defraud Parmar's legitimate creditors such as the Debtors.

192.    The purchase/sale of the Riverside Boulevard Property was finalized on April 7, 2017 for a total price of $15,074,100.00.

193.    The money used to purchase the Riverside Boulevard Property came from an M&T bank account held in the name of defendant Ranga, but, in actuality, was a portion of the Parmar Entity Shareholder Redemption Payments (and, specifically, a portion of the funds formerly held in the RB Escrow Account), is directly traceable thereto, and rightfully belong to the Debtors.

194.    Parmar used the Debtors' money (stolen from the Debtors in connection with the Merger) to purchase the Riverside Boulevard Property and placed title thereto in 21B One River Park in order to make it appear that he is judgment proof and in an effort to hinder, delay and defraud his legitimate creditors, such as the Debtors.  As a result, Parmar and the Parmar Laundering Entities were unjustly enriched at the Debtors' expense.

195.    The Debtors did not receive reasonably equivalent value in exchange for the transfers they made in connection with the purchase of the Riverside Boulevard Property.

196.    The Debtors' financial conditions were significantly impacted by the purchase of the Riverside Boulevard Property.

197.    The Debtors were under no obligation to fund the purchase of the Riverside Boulevard Property, which resulted in a benefit to Parmar and the Parmar Laundering Entities.  But for Parmar, Zaharis and Chivukula's fraudulent intent, the Debtors would not have done so.

## X.    The United States' Actions Against Parmar, Zaharis, Chivukula and the Parmar Real Property

198.    Upon the appointment of Mr. Dragelin as the Debtors' interim CEO and CFO, FTI Consulting Corp. commenced a thorough and detailed investigation into the Debtors and other related entities, and the Merger.  FTI very quickly uncovered the general parameters of the fraud alleged herein, and, after continued investigation, discovered the depth and extent of the fraud, fraudulent conveyances and laundering that are the subject of this adversary proceeding.

199.    Ultimately, FTI's investigation, the results of which were, upon information and belief, independently verified by the United States government pursuant to its own investigation and, ultimately, resulted in the filing, on May 16, 2018, of several complaints by the United States government against Parmar, Zaharis, Chivukula and the Parmar Real Property.

200.    Specifically, Parmar, Zaharis and Chivukula are charged with (a) fraud and securities fraud in the SEC's civil complaint, and (b) conspiracy to commit securities fraud and securities fraud in the DOJ's criminal complaint, based on the Sham Acquisitions, Merger and related allegations set forth herein.

201.    Furthermore, the DOJ also filed a verified complaint for forfeiture *in rem* against the Parmar Real Property, seeking forfeiture and turnover of same as a result of them being proceeds of Parmar's crimes and fraud, as alleged herein.

## COUNT I.

### TURNOVER
### (11 U.S.C. § 542)

202.   The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

**A.     The Parmar Shareholder Redemption Payments**

203.   The Parmar Shareholder Redemption Payments, or a portion thereof, are in the possession, custody or control of some of the defendants.

204.   The Parmar Shareholder Redemption Payments were stolen from the Debtors and rightfully constitute property of the Debtors' estates.

205.   The Parmar Shareholder Redemption Payments can be used to satisfy claims of the Debtors' legitimate creditors.

206.   The Parmar Shareholder Redemption Payments are valued at over $100 million, and, therefore are not of inconsequential value or benefit to the Debtors' estates.

207.   The Parmar Shareholder Redemption Payments, or any portion thereof in the custody, possession and/or control of any of the defendants, should be turned over to the Debtors pursuant 11 U.S.C. § 542.

**B.     The Parmar Real Property**

208.   The Parmar Real Property is in the possession, custody or control of some of the defendants.

209.   The Parmar Real Property and Colts Neck Property Mortgage were purchased with monies that rightfully belong to the Debtors and rightfully constitute property of the Debtors' estates.

210.    The Parmar Real Property and the Colts Neck Property Mortgage can be used to satisfy claims of the Debtors' legitimate creditors.

211.    The Parmar Real Property and the Colts Neck Property Mortgage are valued at over $25 million and, therefore, are not of inconsequential value or benefit to the Debtors' estates.

212.    The Parmar Real Property and the Colts Neck Mortgage should be turned over to the Debtors pursuant to 11 U.S.C. § 542.

## COUNT II.

## TURNOVER OF THE YC ESCROWED FUNDS
## (11 U.S.C. § 543)

213.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

214.    The YC Escrowed Funds are in the possession, custody or control of the Escrow Agent.

215.    By letter dated March 19, 2018, the Debtors' former counsel advised the Escrow Agent of the commencement of these chapter 11 cases.

216.    The YC Escrowed Funds were stolen from the Debtors and rightfully constitute property of the Debtors' estates.

217.    Upon information and belief, the conditions precedent necessary to release the YC Escrowed Funds have not occurred, and the YC Escrowed Funds remain in the custody, possession and control of the Escrow Agent.

218.    The YC Escrowed Funds can be used to satisfy claims of the Debtors' legitimate creditors.

219.    The YC Escrowed Funds are valued at approximately $55 million, and, therefore are not of inconsequential value or benefit to the Debtors' estates.

220.    The YC Escrowed Funds should be turned over by the Escrow Agent to the Debtors pursuant 11 U.S.C. § 543.

## COUNT III.

## UNJUST ENRICHMENT

221.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

### A.    The Parmar Shareholder Redemption Payments

222.    Some of the defendants have received, or will receive, a benefit from the transfer of the Parmar Shareholder Redemption Payments at the Debtors' expense.

223.    The Parmar Shareholder Redemption Payments rightfully belong to the Debtors' estates.

224.    It is against equity and good conscience to permit any of the defendants to retain the Parmar Shareholder Redemption Payments.

225.    The defendants have been unjustly enriched, or will be unjustly enriched, at the Debtors' expense as a result of the theft of the Parmar Shareholder Redemption Payments.

226.    By reason of the foregoing, the Debtors are entitled to an order from this Court instructing any defendant with custody, possession and/or control over the Parmar Shareholder Redemption Payments to immediately turnover same to the Debtors.

**B.**    **The Parmar Real Property**

227.    Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar have received a benefit from the transfer and purchase of the Parmar Real Property and Colts Neck Property Mortgage at the Debtors' expense.

228.    The Parmar Real Property and Colts Neck Property Mortgage rightfully belong to the Debtors.

229.    It is against equity and good conscience to permit Parmar, the Parmar Laundering Entities, Sharma and/or Harry Parmar to retain the Parmar Real Property and Colts Neck Property Mortgage.

230.    Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar have been unjustly enriched at the Debtors' expense.

231.    By reason of the foregoing, the Debtors are entitled to an order from this Court instructing Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar to immediately turnover the Parmar Real Property and Colts Neck Property Mortgage to the Debtors.

**COUNT IV.**

**<u>CONVERSION</u>**

232.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

**A.**    **The Parmar Shareholder Redemption Payments**

233.    The Debtors are the rightful owners of the Parmar Shareholder Redemption Payments.

234.     The defendants have unlawfully and without authorization assumed and exercised dominion and control over the Parmar Shareholder Redemption Payments to the exclusion of the Debtors, and inconsistent with the Debtors' rights as the rightful owners.

235.     The defendants' exercise of dominion and control over the Parmar Shareholder Redemption Payments has unjustifiably denied the Debtors' the right to use, consume, exploit and profit from same.

236.     The Debtors have demanded return of the Parmar Shareholder Redemption Payments.

237.     The defendants have refused to return the Parmar Shareholder Redemption Payments to the Debtors.

238.     By reason of the foregoing, the Debtors are entitled to an order from this Court instructing any defendants with custody, possession and/or control over the Parmar Shareholder Redemption Payments to immediately turnover same to the Debtors.

**B.     The Parmar Real Property**

239.     The Parmar Real Property and the Colts Neck Mortgage were purchased with money that rightfully belongs to the Debtors and, therefore, the Debtors are the rightful owners of the Parmar Real Property and the Colts Neck Mortgage.

240.     The defendants have unlawfully and without authorization assumed and exercised dominion and control over the Parmar Real Property and the Colts Neck Mortgage to the exclusion of the Debtors, and inconsistent with the Debtors' rights as the rightful owners.

241.    The defendants' exercise of dominion and control over the Parmar Shareholder Real Property and Colts Neck Mortgage has unjustifiably denied the Debtors' the right to use, consume, exploit and profit from same.

242.    The Debtors have demanded return of the Parmar Real Property and Colts Neck Mortgage.

243.    The defendants have refused to return the Parmar Real Property and the Colts Neck Mortgage to the Debtors.

244.    By reason of the foregoing, the Debtors are entitled to an order from this Court instructing any defendants with custody, possession and/or control over the Parmar Real Property and the Colts Neck Mortgage to immediately turnover same to the Debtors.

**COUNT V.**

**<u>REPLEVIN</u>**

245.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

246.    The Debtors have a superior interest in and to the Parmar Shareholder Redemption Payments as such money was stolen from the Debtors and is property of the Debtors' estates.

247.    The defendants are wrongfully retaining custody, possession or control over the Parmar Shareholder Redemption Payments.

248.    The Debtors are unaware of any valid defenses.

249.    By reason of the foregoing, the Debtors are entitled to an order from this Court instructing any defendants with custody, possession and/or control over the Parmar Shareholder Redemption Payments to immediately turnover same to the Debtors.

## COUNT VI.

### INTENTIONAL FRAUDULENT TRANSFER
### (11 U.S.C. §§ 548(a)(1)(A) and 550)

250.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

### A.    The Parmar Shareholder Redemption Payments

251.    In or around January 2017, CC Holdco, on CHT's behalf, transferred the Merger Proceeds to Capita.    Thereafter, Capita and CC Holdco transferred the Merger Proceeds, as alleged above.

252.    Certain of the Merger Proceeds were paid, or due to be paid, to the Parmar Shareholder Entities and constitute the Parmar Shareholder Redemption Payments.

253.    CHT entered into and executed the transactions in connection with the Merger with knowledge of the effect such transactions would have on the future creditors of CHT and those created by the Merger, and with the intent to hinder, delay or defraud such creditors.

254.    The Debtors did not receive reasonably equivalent value for incurring the Merger Liens that secured the funding of the Parmar Shareholder Redemption Payments.

255.    The transfer of the Parmar Shareholder Redemption Payments occurred within two years of the Petition Date.

256.    The transfer of the Parmar Shareholder Redemption Payments should be avoided and recovered from the defendants pursuant to 11 U.S.C. §§ 548(a)(1)(A), and 550(a).

### B.    The Parmar Real Property

257.    Parmar and the Parmar Laundering Entities purchased the Parmar Real Property and the Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies that rightfully belong to the Debtors.

258.    Parmar and the Parmar Laundering Entities purchased the Parmar Real Property and the Colts Neck Property Mortgage with knowledge of the effect the purchase would have on present and future creditors, and with the actual intent to hinder, delay and defraud such creditors.

259.    The Debtors did not receive reasonably equivalent value in exchange for the purchase of the Parmar Real Property or Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies that rightfully belong to the Debtors.

260.    The purchase of the Parmar Real Property and Colts Neck Property Mortgage occurred within two years of the Petition Date.

261.    The Parmar Real Property and the Colts Neck Mortgage should be recovered pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550(a).

### COUNT VII.

### CONSTRUCTIVE FRAUDULENT TRANSFER
### (11 U.S.C. §§ 548(a)(1)(B) and 550)

262.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

### A.    The Parmar Shareholder Redemption Payments

263.    In or around January 2017, CC Holdco, on CHT's behalf, transferred the Merger Proceeds to Capita.    Thereafter, Capita and CC Holdco transferred the Merger Proceeds, as alleged above.

264.    Certain of the Merger Proceeds were paid, or due to be paid, to the Parmar Shareholder Entities and constitute the Parmar Shareholder Redemption Payments.

265.    The Debtors did not receive reasonably equivalent value for incurring the Merger Liens that secured the funding of the Parmar Shareholder Redemption Payments.

266.    At the time the Merger Financing was transferred, the Debtors were either insolvent or became insolvent as a result of the Merger transaction.  Specifically, (i) the Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (ii) the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

267.    The transfer of the Parmar Shareholder Redemption Payments occurred within two years of the Petition Date.

268.    The Parmar Shareholder Redemption Payments should be avoided and recovered from the defendants, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

**B.    The Parmar Real Property**

269.    Parmar and the Parmar Laundering Entities purchased the Parmar Real Property and Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies which rightfully belong to the Debtors.

270.    The Debtors did not receive reasonably equivalent value in exchange for the purchase of the Parmar Real Property and Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies which rightfully belong to the Debtors.

271.     At the time the Parmar Real Property and Colts Neck Property Mortgage were purchased, the Debtors were either insolvent or became insolvent as a result thereof. Specifically, (i) the Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (ii) the Debtors intended to incur, or believed or reasonably should have believed they would incur, debts that would be beyond their ability to pay as such debts matured.

272.     The purchase of the Parmar Real Property and Colts Neck Property Mortgage occurred within two years of the Petition Date.

273.     The Parmar Real Property and Colts Neck Property Mortgage should be recovered pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

## COUNT VIII.

### ACTUAL FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544 and 550 and 6 Del. C. § 1304(a)(1))

274.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

### A.     The Parmar Shareholder Redemption Payments

275.     In or around January 2017, CC Holdco, on CHT's behalf, transferred the Merger Proceeds to Capita.   Thereafter, Capita and CC Holdco transferred the Merger Proceeds, as alleged above.

276.     Certain of the Merger Proceeds were paid, or due to be paid, to the Parmar Shareholder Entities and constitute the Parmar Shareholder Redemption Payments.

277.     CHT approved the Merger and entered into and executed the transactions in connection therewith with knowledge of the effect such payments would have on the future

-51-

creditors of CHT or those created by the Merger, and with the intent to hinder, delay or defraud such creditors.

278.    The Debtors did not receive reasonably equivalent value for incurring the Merger Liens that secured the funding of the Parmar Shareholder Redemption Payments.

279.    The transfer of the Parmar Shareholder Redemption Payments occurred within four years of the Petition Date.

280.    The Parmar Shareholder Redemption Payments should be avoided and recovered from the defendants pursuant to 11 U.S.C. §§ 544 and 550 and §§ 1304(a)(1) of the DUFTA.

## B.    The Parmar Real Property

281.    Parmar and the Parmar Laundering Entities purchased the Parmar Real Property and the Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies which rightfully belong to the Debtors.

282.    Parmar and the Parmar Laundering Entities purchased the Parmar Real Property and the Colts Neck Property Mortgage with knowledge of the effect the purchase would have on present and future creditors, and with the actual intent to hinder, delay and defraud such creditors.

283.    The Debtors did not receive reasonably equivalent value in exchange for the purchase of the Parmar Real Property and the Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies which rightfully belong to the Debtors.

284.    The purchase of the Parmar Real Property and the Colts Neck Property Mortgage occurred within four years of the Petition Date.

285.    The Parmar Real Property and the Colts Neck Property Mortgage should be recovered pursuant to 11 U.S.C. §§ 544 and 550 and § 1304(a)(1) of the DUFTA.

## COUNT IX.

### CONSTRUCTIVE FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544 and 550 and 6 Del. C. §§ 1304(a)(2) and 1305(a))

286.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

### A.    The Parmar Shareholder Redemption Payments

287.    In or around January 2017, CC Holdco, on CHT's behalf, transferred the Merger Proceeds to Capita.    Thereafter, Capita and CC Holdco transferred the Merger Proceeds as alleged above.

288.    Certain of the Merger Proceeds were paid, or due to be paid, to the Parmar Shareholder Entities and constitute the Parmar Shareholder Redemption Payments.

289.    The Debtors did not receive reasonably equivalent value for the incurring the Merger Liens that secured the funding of the Parmar Shareholder Redemption Payments.

290.    At the time the Merger Financing was transferred, the Debtors were either insolvent or became insolvent as a result of the Merger transaction.    Specifically, (i) the Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (ii) the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

291.    The transfer of the Parmar Shareholder Redemption Payments occurred within four years of the Petition Date.

292.    The Parmar Shareholder Redemption Payments should be avoided and recovered from the defendants pursuant to 11 U.S.C. §§ 544 and 550 and §§ 1304(a)(2) and 1305(a) of the DUFTA.

**B.    The Parmar Real Property**

293.    Parmar and the Parmar Laundering Entities purchased the Parmar Real Property and the Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies which rightfully belong to the Debtors.

294.    The Debtors did not receive reasonably equivalent value in exchange for the purchase of the Parmar Real Property and the Colts Neck Property Mortgage using Parmar Shareholder Redemption Payments or other monies which rightfully belong to the Debtors.

295.    At the time the Parmar Real Property and the Colts Neck Property Mortgage was purchased, the Debtors were either insolvent or became insolvent as a result thereof. Specifically, (i) the Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (ii) the Debtors intended to incur, or believed or reasonably should have believed they would incur, debts that would be beyond their ability to pay as such debts matured.

296.    The purchase of the Parmar Real Property and the Colts Neck Property Mortgage occurred within two years of the Petition Date.

297.    The Parmar Real Property and the Colts Neck Property Mortgage should be avoided recovered pursuant to 11 U.S.C. §§ 544 and 550 and §§ 1304(a)(2) and 1305(a) of the DUFTA.

## COUNT X.

## CONSTRUCTIVE TRUST
## (11 U.S.C. § 105(a))

298.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

299.    The Board Member Defendants had a fiduciary duty to the Debtors.

300.    The Board Member Defendants assured the Debtors that they could and would receive value in connection with the Merger, and, in reliance thereon, the Debtors incurred millions of dollars in debt or otherwise paid millions of dollars, including Parmar Shareholder Redemption Payments, to finance the Merger.

### A.    The Parmar Shareholder Redemption Payments

301.    The defendants received, or will receive, the Parmar Shareholder Redemption Payments and as a result have been, or will be, unfairly and unjustly enriched.

302.    The Parmar Shareholder Redemption Payments are or will be in the possession, custody, or control of the defendants.

303.    As a result, Plaintiffs are entitled to the imposition of a constructive trust for their benefit on the Parmar Shareholder Redemption Payments in the possession, custody, or control of the defendants.

### B.    The Parmar Real Property

304.    Upon information and belief, Parmar and the Parmar Laundering Entities used the Debtors' money, or money that, but for Parmar and Zaharis' fraud, could have otherwise been used to pay Parmar's legitimate creditors such as the Debtors.

305.    Parmar and the Parmar Laundering Entities should not be permitted to engage in conduct to defraud the Debtors out of millions of dollars, and then use the Debtors' money to purchase property or otherwise fraudulently secrete assets.

306.    As a result, Plaintiffs are entitled to the imposition of a constructive trust for their benefit on the Parmar Real Property and the Colts Neck Property Mortgage.

### COUNT XI.

### PERMANENT INJUNCTION
### (11 U.S.C. § 105(a))

307.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

**A.    The Parmar Shareholder Redemption Payments**

308.    Plaintiffs believe that it is imminent that the DOJ may seek to seize on the YC Escrowed Funds.

309.    Plaintiffs believe that it is imminent that the remainder of the Parmar Shareholder Redemption Payments will be imminently disseminated by the defendants.

310.    Plaintiffs will suffer irreparable harm absent the issuance of a permanent injunction preventing the defendants from conveying the Parmar Shareholder Redemption Payments to another person or entity.

311.    Plaintiffs have sufficiently demonstrated that they will be successful on the merits of their claims.

312.    Alternatively, Plaintiffs have set forth sufficiently serious questions going to the merits of their claims a fair ground for litigation.

313.    The balance of the hardships tips in Plaintiffs' favor because the defendants would suffer no harm by the issuance of the requested injunction, whereas the Debtors, their

estates and their creditors will suffer great harm if the defendants convey the Parmar Shareholder Redemption Payments to any person or entity.

314.    Accordingly, this Court should permanently enjoin the defendants from conveying the Parmar Shareholder Redemption Payments to any person or entity other than the Debtors.

### B.    The Parmar Real Property

315.    Plaintiffs believe that it is imminent that Parmar, the Parmar Laundering Entities, Sharma and/or Harry Parmar will transfer, secrete or otherwise hypothecate the Parmar Real Property and the Colts Neck Property Mortgage.

316.    Plaintiffs will suffer irreparable harm absent the issuance of a permanent injunction preventing Parmar, the Parmar Laundering Entities, Sharma and/or Harry Parmar from conveying the Parmar Real Property and/or the Colts Neck Property Mortgage to another person or entity.

317.    Plaintiffs have sufficiently demonstrated that they will be successful on the merits of their claims.

318.    Alternatively, Plaintiffs have set forth sufficiently serious questions going to the merits of their claims to make such claims a fair ground for litigation.

319.    The balance of the hardships tips in Plaintiffs' favor because Parmar, the Parmar Laundering Entities Sharma and Harry Parmar would suffer no harm by the issuance of the requested injunction, whereas the Debtors, their estates and their creditors will suffer great harm if the Parmar Real Property and/or the Colts Neck Property Mortgage is transferred, secreted, hypothecated or in any way interfered with.

320.    Accordingly, this Court should permanently enjoin Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar from transferring, secreting, hypothecating or in any way interfering with the Parmar Real Property and/or the Colts Neck Property Mortgage other than to the Debtors.

## COUNT XII.

## CONSPIRACY BASED FRAUD

321.    Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

322.    The Board Member Defendants, Bakshi, Parmar Shareholder Entities, and Parmar Laundering Entities (together, the "Co-Conspirator Defendants") have conspired together and have combined both omissions of material fact that they had a duty to disclose and active misrepresentations of material fact in order to defraud the Debtors by, among other things, converting and/or otherwise fraudulently transferring the Debtors' assets.

323.    Evidence of the agreement include, among other things, the close relationship between the Co-Conspirator Defendants and the intercompany transfers and purchases between and among the Parmar Laundering Entities, which were orchestrated by Parmar, Zaharis, Chivukula and Bakshi.

324.    The Debtors materially relied on these omissions and misrepresentations.

325.    The Debtors were damaged as a result thereof.

326.    Based on the foregoing, the Debtors are entitled to recover an amount to be determined at trial, but no less than $100 million.

## COUNT XIII.

### BREACH OF FIDUCIARY DUTY

327.    Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

328.    At all relevant times, the Debtors were insolvent and/or in the vicinity or zone of insolvency.

329.    The Board Member Defendants owed fiduciary duties to the Debtors and their creditors.

330.    The Board Member Defendants breached their fiduciary duties (including, without limitation, their duty of loyalty) to the Debtors and their creditors, by among other things:

> (a)    failing to act in good faith or acting intentionally or knowingly by permitting the Debtors to (i) engage in the Sham Acquisitions, and (ii) secure the Parmar Shareholder Redemption Payments and additional Merger Financing (including by the granting of the Merger Liens), which constituted theft from the Debtors, unlawful fraudulent transfers and/or improper transfers;

> (b)    continuing to receive compensation and/or other benefits from the Debtors;

> (c)    continuing the Debtors' business operations for the purpose of providing substantial benefit to themselves and others (at the expense of the Debtors) in the form of the theft and/or transfers described herein;

(d)    consciously and intentionally abdicating their duties to the Debtors and their creditors; and

(e)    acting only in the interest of themselves, the Parmar Shareholder Entities and/or the Parmar Laundering Entities at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

331.    The Debtors and their creditors were harmed by the Board Member Defendants' breaches of their fiduciary duties.

332.    Based on the foregoing, the Debtors are entitled to recover an amount to be determined at trial, but no less than $100 million.

## COUNT XIV.

## <u>ILLEGAL DIVIDEND</u>

333.    Plaintiffs restate and reallage the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

334.    The Debtors provided cash and/or property to the shareholders of CHT as a result of the Merger and other transfers described herein.  To the extent such cash or property is deemed *de facto* dividends on account of CHT's equity interest in the Debtors, the Board Member Defendants are personally liable for the amount of such dividends due to their willful or negligent approval of the transfer of such dividends, while the Debtors lacked sufficient surplus or net profits or were otherwise insolvent, in violation of Delaware's General Corporation Law, including, without limitation, to §§ 170, 172, 173 and 174.

335.    The Debtors are presently, and at all relevant times were, insolvent.

336.    Based on the foregoing, the Debtors are entitled to recover an amount to be determined at trial, but no less than $100 million.

## COUNT XV.

## <u>DECLARATORY JUDGMENT</u>

337. Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

338. This matter constitutes an actual case in controversy between the Debtors and the defendants.

**A.     The Parmar Shareholder Redemption Payments**

339. By virtue of the foregoing, the Debtors have superior rights to and interests in the Parmar Shareholder Redemption Payments over all of the defendants.

340. The Debtors are entitled to a judgment from this Court determining and declaring that the Debtors have a superior interest over all of the defendants in and to the Parmar Shareholder Redemption Payments.

**B.     The Parmar Real Property**

341. By virtue of the foregoing, the Debtors have superior rights to and interests in the Parmar Real Property and the Colts Neck Property Mortgage over Parmar and the Parmar Laundering Entities.

342. The Debtors are entitled to a judgment from this Court determining and declaring that the Debtors have superior interests over Parmar and the Parmar Laundering Entities in and to the Parmar Real Property and the Colts Neck Property Mortgage.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, by reason of the foregoing, Plaintiffs respectfully request that judgment be entered in their favor and against the defendants as follows:

> (a)     on Count I, against (i) all defendants, directing immediate turnover to the Debtors of the Parmar Shareholder Redemption Payments

pursuant to 11 U.S.C. § 542, (ii) Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar, directing immediate turnover to the Debtors of the Parmar Real Property and the Colts Neck Property Mortgage;

(b)    on Count II, against the Escrow Agent, directing immediate turnover to the Debtors of the YC Escrowed Funds, pursuant to 11 U.S.C. § 543;

(c)    on Count III, against (i) all defendants, directing immediate turnover to the Debtors of the Parmar Shareholder Redemption Payments, (ii) Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar, directing immediate turnover to the Debtors of the Parmar Real Property and the Colts Neck Property Mortgage;

(d)    on Count IV, against (i) all defendants, directing immediate turnover to the Debtors of the Parmar Shareholder Redemption Payments, (ii) Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar, directing immediate turnover to the Debtors of the Parmar Real Property and the Colts Neck Property Mortgage;

(e)    on Count V, against all defendants, directing immediate turnover to the Debtors of the Parmar Shareholder Redemption Payments;

(f)    on Count VI, pursuant to 11 U.S.C. §§ 548 and 550, finding against the Board Member Defendants, the Parmar Shareholder Entities and the Parmar Laundering Entities (i) that the transfer of the Parmar Shareholder Redemption Payments was an actual fraudulent transfer,

avoiding the transfer, and entering judgment in an amount to be determined at trial, but no less than $100 million, plus interest thereon, and (ii) that the purchases of the Parmar Real Property and Colts Neck Property Mortgage were fraudulent, directing turnover of the Parmar Real Property and Colts Neck Property Mortgage to the Debtors, and entering a judgment in an amount to be determined at trial, but no less than $25 million, plus interest thereon;

(g)    on Count VII, pursuant to §§ 548 and 550, finding against the Board Member Defendants, the Parmar Shareholder Entities and the Parmar Laundering Entities (i) that the transfer of the Parmar Shareholder Redemption Payments was a constructive fraudulent transfer, avoiding the transfer, and entering judgment in an amount to be determined at trial, but no less than $100 million, plus interest thereon, and (ii) that the purchases of the Parmar Real Property and Colts Neck Property Mortgage were fraudulent, directing turnover of the Parmar Real Property and Colts Neck Property Mortgage to the Debtors, and entering a judgment in an amount to be determined at trial, but no less than $25 million, plus interest thereon;

(h)    on Count VIII, pursuant to §§ 544 and 550 and 6 Del. C. § 1304(a)(1), finding against the Board Member Defendants, the Parmar Shareholder Entities and the Parmar Laundering Entities (i) that the transfer of the Parmar Shareholder Redemption Payments was an actual fraudulent transfer, and entering judgment in an amount to be

determined at trial, but no less than $100 million, plus interest thereon, and (ii) that the purchases of the Parmar Real Property and Colts Neck Property Mortgage were fraudulent, directing turnover of the Parmar Real Property and Colts Neck Property Mortgage to the Debtors, and entering a judgment in an amount to be determined at trial, but no less than $25 million, plus interest thereon;

(i)     on Count IX, pursuant to §§ 544 and 550 and 6 Del. C. §§ 1304(a)(2) and 1305(a), finding against the Board Member Defendants, the Parmar Shareholder Entities and the Parmar Laundering Entities (i) that the transfer of the Parmar Shareholder Redemption Payments was a constructive fraudulent transfer, avoiding the transfer, and entering judgment in an amount to be determined at trial, but no less than $100 million, plus interest thereon, and (ii) that the purchases of the Parmar Real Property and Colts Neck Property Mortgage were fraudulent, directing turnover of the Parmar Real Property and Colts Neck Property Mortgage to the Debtors, and entering a judgment in an amount to be determined at trial, but no less than $25 million, plus interest thereon;

(j)     on Count X, against (i) all defendants, imposing a constructive trust over the Parmar Shareholder Redemption Payments in the possession, custody or control of the defendants, and (ii) Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar, imposing a

constructive trust over the Parmar Real Property and the Colts Neck Property Mortgage;

(k)    on Count XI, against (i) all defendants, permanently enjoining the defendants from conveying the Parmar Shareholder Redemption Payments to any person or entity or from seizing same, and (ii) Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar, permanently enjoining Parmar, the Parmar Laundering Entities, Sharma and Harry Parmar from transferring, secreting, hypothecating or in any way interfering with the Parmar Real Property and/or the Colts Neck Property Mortgage;

(l)    on Count XII, against the Co-Conspirator Defendants, in an amount to be determined at trial, but no less than $100 million, plus interest thereon;

(m)     on Count XIII, against the Board Member Defendants, in an amount to be determined at trial, but no less than $100 million, plus interest thereon;

(n)    on Count XIV, against the Board Member Defendants, in an amount to be determined at trial, but no less than $100 million, plus interest thereon;

(o)    on Count XV, determining and declaring that the Debtors have superior rights in and to the Parmar Shareholder Redemption Payments and the Parmar Real Property and the Colts Neck Property Mortgage as against all defendants;

(p)     for Plaintiffs' attorneys' fees and costs; and

(q)     for such other and further relief as the Court deems equitable, just and

proper.

Dated:   New York, New York
         June 1, 2018

                                    **HAHN & HESSEN LLP**


                                    By:     /s/ *John P. Amato*
                                            John P. Amato
                                            Mark T. Power
                                            Joseph Orbach
                                            Annie P. Kubic

                                    488 Madison Avenue
                                    New York, New York 10022
                                    Telephone: (212) 478-7200
                                    jamato@hahnhessen.com
                                    mpower@hahnhessen.com
                                    jorbach@hahnhessen.com
                                    akubic@hahnhessen.com

                                    *Special Counsel and Conflicts Counsel*
                                    *to Plaintiffs*