**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALPHA CEPHEUS, LLC, FIRST UNITED HEALTH, LLC, CONSTELLATION HEALTH, LLC, NAYA CONSTELLATION HEALTH, LLC and CONSTELLATION HEALTH INVESTMENT, LLC, | Case No. 2:18-cv-14322 (MCA) (MAH) |
| | Hon. Madeline Cox Arleo |
| | Magistrate Judge Michael A. Hammer |
| Plaintiffs, | |
| v. | |
| CHINH CHU, TRUC TO, DOUGLAS NEWTON, JAMES STEPIEN, VICTOR CARDONA, and JOHN DOE 1-10, | |
| Defendants. | |

**DEFENDANTS CHINH CHU AND DOUGLAS NEWTON'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE
COMPLAINT**

**Table of Contents**

Table of Contents ...................................................................................................... i

Table of Authorities ................................................................................................. ii

Introduction ............................................................................................................. 1

Factual Background ................................................................................................. 4

    A.    The Go-Private Transaction ............................................................. 4

    B.    Parmar's Fraud and the CHT Bankruptcy ...................................... 6

    C.    The Criminal and SEC Charges Against Parmar ........................... 7

    D.    The Allegations of the Complaint .................................................. 8

Argument ................................................................................................................. 9

I.    Plaintiffs' RICO Cause of Action Does Not State a Claim. ........................ 9

    A.    Plaintiffs' RICO Theories Are Not Cognizable. ............................ 9

        1.    Plaintiffs cannot assert derivative claims based on alleged harm to CHT .. 9

        2.    Plaintiffs cannot assert claims based on alleged harm to Parmar. ............ 11

        3.    The PSLRA bars Plaintiffs' RICO claim. ................................. 14

    B.    The Complaint Fails to Plead a Pattern of Racketeering. ..................... 15

    C.    The RICO Cause of Action Fails to Plausibly Plead a Violation of Any Substantive RICO Predicate. ......................................... 17

        1.    The Fraud Predicates are incoherent, contradicted by the governing documents, and lack the specificity Rule 9(b) requires. .......................... 18

        2.    The Parmar Predicates Do Not Substantiate Plausible Wrongdoing by Chu or Newton ............................................................................. 26

II.    The Complaint Fails To State a Claim Under The Stored Communications Act or Wiretap Act ............................................................................................................. 28

III.    The Complaint Should Be Dismissed With Prejudice ................................. 30

Conclusion ............................................................................................................. 30

i

## Table of Authorities

### <u>Cases</u>

*Amos v. Franklin Fin. Servs. Corp.*,
    No. 10-1285, 2011 WL 5903875 (M.D. Pa. Nov. 22, 2011),
    *aff'd*, 509 F. App'x 165 (3d Cir. 2013) ................................................................11

*Anderson v. Ballou*,
    2012 WL 3027679 (E.D. Ky. Jul. 24, 2012) ................................................28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................17, 19

*Bank of China, New York Branch v. NBM LLC*,
    359 F.3d 171 (2d Cir. 2004) ................................................................22

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................19

*Birdsall v. Rivera*,
    No. 16-4796, 2017 WL 5951620 (D.N.J. Nov. 30, 2017) (Arleo, J.) ................14

*Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*,
    87 F. App'x 227 (3d Cir. 2003) ................................................................25

*Brandt v. Rossi*,
    2012 WL 359736, (D.N.J. Feb. 2, 2012) ................................................................4

*Calcasieu Marine Nat. Bank v. Grant*,
    943 F.2d 1453 (5th Cir. 1991) ................................................................15

*Conte v. Newsday, Inc.*,
    703 F. Supp. 2d 126 (E.D.N.Y. 2010) ................................................................23

*Cosmetic Gallery, Inc. v. Schoeneman Corp.*,
    495 F.3d 46 (3d Cir. 2007) ................................................................23, 26

*Davies v. GetFugu, Inc.*,
    No. 09-8724, 2010 WL 11597458 (C.D. Cal. Aug. 26, 2010) ................14

*Devon Drive Lionville, LP v. Parke Bancorp, Inc.*,
    2016 WL 7475816 (E.D. Pa. Dec. 29, 2016) ................................................25, 26

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016) ................................................................11

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
  492 U.S. 229 (1989) ............................................................................................15, 16

*Harrison Beverage Co. v. Dribeck Importers, Inc.*,
  133 F.R.D. 463 (D. N.J. 1990) ...................................................................................30

*Hemi Group, LLC v. City of N.Y.*,
  559 U.S. 1 (2010) ......................................................................................................13

*Hindes v. Castle*,
  937 F.2d 868 (3d Cir. 1991) ......................................................................................17

*Hollis-Arrington v. PHH Mortg. Corp.*,
  205 F. App'x 48 (3d Cir. 2006) .................................................................................30

*Holmes v. Securities Investor Prot. Corp.*,
  503 U.S. 258 (1992) ............................................................................................13, 19

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ..........................................................................4, 18, 26

*In re Conex Holdings, LLC*,
  514 B.R. 405 (D. Del. 2014) ................................................................................18, 24

*In re Nice Systems, Ltd. Securities Litigation*,
  135 F. Supp. 2d 551 (D.N.J. 2001) ...........................................................................19

*In re Sunrise Sec. Litig.*,
  916 F.2d 874 (3d Cir. 1990) ......................................................................................11

*Irish v. Ferguson*,
  970 F. Supp. 2d 317 (M.D. Pa. 2013) ........................................................................10

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
  926 F.2d 1406 (3d Cir. 1991) ..............................................................................16, 18

*Lamon v. Tilton*,
  2009 WL 1884361 (E.D. Ca. Jun. 30, 2009) .....................................................24, 26, 27

*Levinson v. PSCC Servs., Inc.*,
  No. 3:09-00269, 2009 WL 5184363 (D. Conn. Dec. 23, 2009) .................................15

*Ling v. Deutsche Bank*,
  No. 04-4566(HB), 2005 WL 1244689 (S.D.N.Y. May 26, 2005) ..............................15

*Lum v. Bank of Am.*,
  361 F.3d 217 (3d Cir. 2004) ................................................................................18, 26

iii

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000)...........................................................................12, 13

*Marshall-Silver Constr. Co. v. Mendel*,
    894 F.2d 593 (3d Cir. 1990)................................................................................16

*Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................................................23

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010)................................................................................17

*Menasco, Inc. v. Wasserman*,
    886 F.2d 681 (4th Cir. 1989) ..............................................................................15

*Midwest Grinding Co. v. Spitz*,
    976 F.2d 1016 (7th Cir. 1992) ............................................................................15

*Munsif v. Cassel*,
    331 F. App'x 954 (3d Cir. 2009) ........................................................................17

*Neder v. United States*,
    527 U.S. 1 (1999).........................................................................................18, 21

*PBA Local No. 38 v. Woodbridge Police Dep't*,
    832 F. Supp. 808 (D.N.J. 1993) .........................................................................30

*Penn Mont Sec. v. Frucher*,
    502 F. Supp. 2d 443 (E.D. Pa. 2007) .................................................................11

*RBS Holdings, Inc. v. Wells Fargo Century, Inc.*,
    485 F. Supp. 2d 472 (S.D.N.Y. 2007).................................................................20

*Santiago v. Warminster Tp.*,
    629 F.3d 121 (3d Cir. 2010)................................................................................18

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985)............................................................................................17

*Sheridan v. NGK Metals Corp.*,
    609 F.3d 239 (3d Cir. 2010)................................................................................29

*Standard Fire Ins. Co. v. MTU Detroit Diesel, Inc.*,
    2009 WL 2568199 (D. N.J. Aug. 13, 2009) .......................................................30

*Tabas v. Tabas*,
    47 F.3d 1280 (3d Cir. 1995)................................................................................17

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................21

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009)........................................................................................23

*Travelers Indem. Co. v. Cephalon, Inc.*,
  620 F. App'x 82 (3d Cir. 2015) ...............................................................18, 21

*United States v. Faulkner*,
  439 F.3d 1221 (10th Cir. 2006) ....................................................................29

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*,
  286 F. Supp. 3d 634 (S.D.N.Y. 2017)......................................................14, 15

### **Statutes**

18 U.S.C. § 1343 ...............................................................................................18

18 U.S.C. § 1344 ...............................................................................................18

18 U.S.C. § 1512 ...............................................................................................27

18 U.S.C. § 157..........................................................................................18, 22

18 U.S.C. § 1961 ........................................................................................15, 17

18 U.S.C. § 1962 ...............................................................................................17

18 U.S.C. § 1964 ........................................................................................12, 14

18 U.S.C. § 2510 ...............................................................................................29

18 U.S.C. § 2511 ........................................................................................28, 29

18 U.S.C. § 2701 ...............................................................................................28

### **Other Authorities**

Wright & Miller, *Federal Practice and Procedure*, § 1286 (3d ed. 2004)....................................19

Wright & Miller, *Federal Practice and Procedure,* § 1363, (2d ed. 1990)..............................4, 24

### **Rules**

Fed. R. Civ. P. 9(b) .............................................................................................3

Fed. R. Evid. 201(b)(2) ......................................................................................4

v

Defendants Chinh Chu and Douglas Newton respectfully submit this memorandum of law in support of their Motion to Dismiss the Complaint in this action.

## Introduction

Plaintiffs in this case are five limited liability companies that own direct or indirect interests in a now-bankrupt medical billing company, Constellation Health Technologies, Inc. (together with its affiliates, "CHT"). The individual standing behind these five LLCs, Parmjit "Paul" Parmar, is a criminal defendant in this District and a defendant in a Securities and Exchange Commission ("SEC") action pending in this Court. Government lawyers charge Parmar with an elaborate, premeditated fraud that misrepresented the value of CHT and ultimately resulted in CHT's bankruptcy. The criminal and SEC charges against Parmar recognize the victim of this fraud was CC Capital Management LLC (together with its affiliates "CC Capital"), a private investment firm controlled by Defendant Chinh Chu. According to government lawyers, Parmar's lies induced CC Capital to enter into a transaction to acquire control of CHT on January 30, 2017 (the "Go-Private Transaction"). Now that Parmar's fraud has unraveled, CC Capital, as well as the consortium of banks that financed the Go-Private Transaction, stand to lose tens of millions of dollars.

In this case, Parmar seeks to distract from the criminal and civil charges against him by filing a RICO complaint based on fanciful, unsubstantiated, and fabricated allegations. The Complaint spins a conspiracy theory that posits that federal prosecutors, the SEC, and the debtors in the CHT bankruptcy are all wrong in concluding that Parmar and his co-conspirators perpetrated a fraud; Chu is somehow the true wrongdoer; CC Capital is not a victim and instead a racketeering enterprise; and Parmar is actually the "real" victim. In asserting this theory, the Complaint

1

repurposes nearly identical allegations that Parmar has asserted in other litigations, including voluminous filings in the SEC Action and in the CHT bankruptcy.

The Complaint ignores overwhelming evidence of Parmar's criminality, including Parmar's emails with confederates discussing how to cut and paste false bank statements. The Complaint also hides from the Court the substance of the documentation underlying Plaintiffs' claims, including the governing credit agreement with CHT's lenders, the relevant filings and orders in the CHT bankruptcy, and the final transaction documents executed by Parmar and Plaintiffs in the Go-Private Transaction. This documentation, which is referred to in the Complaint and available in related public pleadings and court records, is properly before the Court on this motion to dismiss. It further demonstrates that the notion of fraud or racketeering involving Chu and Newton is absurd.

In short, the Complaint—including its "kompromat" theories, salacious pictures, and irresponsible assertions of death threats, hacking, and other unsubstantiated wrongful conduct—is an abusive pleading. And as a matter of law, none of its claims against Defendants Chu and Newton are cognizable. First, despite presenting no less than seven supposed predicate acts, the Complaint does not offer any legal basis for the five plaintiff LLCs to seek recovery under the RICO statute. The Complaint purports to assert RICO theories that Plaintiffs do not have standing to bring because they rely on supposed harm to *CHT* the company or *Parmar* personally—not direct injuries to the *LLCs* that are the actual parties before the Court. This claim also improperly tries to convert a single commercial transaction into evidence of an ongoing RICO enterprise, notwithstanding the strict requirements of the RICO "pattern" element. The claim further ignores the PSLRA prohibition on using RICO to recover for breaches of duty coincident with a securities transaction. And, even putting each of these independently fatal legal defects aside, Plaintiffs fail

2

to state a claim upon which relief can be granted for any of their alleged RICO predicate acts.  On their face, these allegations do not suffice to show wrongdoing by Chu or Newton.  And the three predicate acts sounding in supposed fraud do not even try to allege material misrepresentations with the particularity required under Federal Rule of Civil Procedure 9(b).

Second, Plaintiffs cannot state a claim based on conclusory accusations of improper access to electronic communications.  Under either the Stored Communications Act or the Wiretap Act, the Complaint offers nothing to plausibly allege Chu's or Newton's involvement in any supposed wrongful conduct.  Moreover, as with the RICO count, Plaintiffs have no standing to assert invasion of privacy claims based on supposed "hacking" of *Parmar*'s personal emails through his *personal* wireless network.

Finally, Plaintiffs cannot save their claims based on a laundry list of purported grievances that have no connection to this case.  If, for example, Parmar believes he is innocent of securities fraud, he can offer whatever proof he thinks he has in the criminal and SEC proceedings against him.  If Parmer believes the CHT bankruptcy is being mishandled, he has had—and will continue to have—ample opportunity to raise any objections with the bankruptcy court.  Likewise, if Parmar really thinks CHT's directors approved the Go-Private Transaction for the wrong reasons or at an unjustifiable price, this issue arises out of whatever fiduciary and other duties that these directors and their advisors may have owed CHT's shareholders.  This Court, however, should not accept Plaintiffs' invitation to assess the adequacy of the legal theories pleaded in the Complaint on the basis of such patently irrelevant allegations.  Indeed, the vast majority of the supposed lies and wrongdoing that the Complaint over-heatedly describes are not only gratuitous, they predate the January 30, 2017 date that Plaintiffs concede is the earliest possible starting point for any racketeering activity. *See* Compl. at 2 n.1.

3

**Factual Background**[1]

A.       The Go-Private Transaction

Defendant Chinh Chu is the founder and Senior Managing Director of CC Capital, a private

investment firm.  *See* Compl ¶¶ 33, 40.  Previously, Chu held senior roles at Blackstone Group

L.P.  *Id*.  Defendant Douglas Newton is a Senior Managing Director of CC Capital.  *Id*. ¶ 35.

On January 30, 2017, in the so-called "Go-Private Transaction," CC Capital acquired a

majority interest in CHT.  Before the transaction, CHT was a public company and Parmar, through

four of the plaintiffs, held a controlling interest and was CHT's Chief Executive Officer.  *Id*. ¶¶ 4-

5, 29-32, 48.  Parmar transferred his control rights to CC Capital in the Go-Private Transaction

and, according to a CHT bankruptcy filing, entities with which he was affiliated received

approximately $100 million as consideration.  Declaration of Eric Brenner ("Brenner Decl.") Ex.

A ¶ 6; Compl. ¶ 153.[2]

---

[1] In addition to the allegations of the Complaint, Defendants' brief refers to the transaction documents in the Go-Private Transaction, filings in the CHT Bankruptcy, and the criminal and SEC charges against Parmar, all of which are referenced in Plaintiffs' pleadings and can be considered by the Court at the motion to dismiss stage.  *See In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997); *see also Brandt v. Rossi*, 2012 WL 359736, at *1 n.1 (D.N.J. Feb. 2, 2012) (court may take judicial notice of docket entries in related cases, including criminal complaints and indictments); Fed. R. Evid. 201(b)(2).  It is well established the court need not accept as true allegations from the Complaint that are "contradicted by facts that can be judicially noticed or by any other allegations or exhibits attached to or incorporated in the pleading."  Wright & Miller, *Federal Practice and Procedure,* § 1363, at 464-65 (2d ed. 1990).

[2] As a formal matter, in anticipation of the Go-Private Transaction, Parmar established CHT Holdco, LLC ("CHT Holdco") as the parent of CHT, with Plaintiff Alpha Cepheus, LLC ("Alpha Cepheus"), its original sole member.  In parallel, CC Capital formed CC Capital CHT Holdco LLC ("CC Holdco") to acquire a controlling interest in CHT Holdco.  To effect the Go-Private Transaction, CC Holdco disbursed the purchase price to CHT's existing shareholders; CHT Holdco acquired all of the outstanding shares of CHT; and CC Holdco replaced Alpha Cepheus as CHT Holdco's controlling and managing member.  *See generally In re Orion HealthCare Corp.*, 18-71748-ast, Dkt. 18 ¶ 16 (E.D.N.Y. Bankr. May 16, 2018).  Alpha Cepheus continues to hold a

To finance the Go-Private Transaction, CC Capital and its investors contributed approximately $82.5 million, and a consortium of financial institutions including Bank of America, N.A. (the "CHT Lenders") provided another approximately $130 million.  Compl. ¶ 156.  To obtain the $130 million in financing, CHT's largest subsidiary, Orion HealthCorp, Inc. ("Orion"), entered into an agreement with the CHT Lenders (the "Credit Agreement").  *See* Brenner Decl. Ex. B (the "Credit Agreement"); *see generally* Compl. ¶¶ 140-41, 156b.  Pursuant to the Credit Agreement, Orion, as Borrower, warranted the accuracy of its financial statements, Credit Agreement § 5.05(a), and the good faith of its budgets, *id*. § 5.05(d).  The Credit Agreement does not include any representations from Chu, Newton, or anyone else associated with CC Capital, nor does it suggest that the CHT Lenders were relying on such representations as opposed to financial information and representations provided by the entities (Orion, and CHT as Guarantor) undertaking the borrowing, and their representatives.

As acknowledged in the Complaint and corroborated by prosecutors, to induce CC Capital to consummate the Go-Private Transaction, Parmar provided CC Capital and its officers with, and represented to the accuracy of, extensive documentation regarding CHT's purported financial condition, performance, business operations, and valuation.  Compl. ¶¶ 96-100; Decl Ex. C ("Criminal Complaint") ¶¶ 9-10.  Additionally, Plaintiffs First United Health and Constellation Health, and Parmar in his individual capacity, entered into Voting and Support Agreements and Releases of Claims dated November 24, 2016 with CHT and CHT Holdco.  The release discharged CHT, CHT Holdco, and each of their respective affiliates, directors,

---

minority stake in CHT through CHT Holdco.  Compl. ¶ 28.  The other four plaintiffs hold interests in Alpha Cepheus.  *Id*. ¶¶ 29-32.

successors, and assigns (the "Released Parties"), among others, from any claims "occurring at any time at or prior to the Closing with respect to the Company … or the Merger."  Decl. Ex. D (the "Voting and Support Agreements") § 4(d)(i); *see also id.* § 4(d)(v) (covenant not to sue)). The release covers all Plaintiffs in this case as releasors and Chu and Newton (in their roles as officers and representatives of affiliates of CHT Holdco) as releasees.  *Id.*

      B.     Parmar's Fraud and the CHT Bankruptcy

On or about September 14, 2017, the Board accepted Parmar's resignation as CEO of CHT, Compl. ¶ 164, and Parmar resigned as a director thereafter, *id*. ¶ 169.

In connection with these circumstances, the CHT Board engaged a forensic accounting firm, FTI, to investigate the scope of the issues and the risk to the company.  Compl. ¶ 184.  FTI concluded that Parmar and his co-conspirators had engaged in a "large, complex, and brazen fraud that was subject to a complex and deliberate concealment effort" that "was years in the making." Brenner Decl. Ex. E ("Dragelin Decl.") ¶ 9; *see also id.* ¶¶ 88-103.

On March 16, 2018, CHT and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the Eastern District of New York.  The debtors in the CHT Bankruptcy (the "CHT Debtors") attributed the need to file for bankruptcy to Parmar's fraudulent conduct.  Dragelin Decl ¶ 4.  The CHT Debtors ultimately filed an adversary proceeding against Parmar and certain of his affiliates alleging fraud and theft in connection in the Go-Private Transaction.  Brenner Decl. Ex. A ¶¶ 1, 9.  The CHT Bankruptcy is administered by Judge Alan S. Trust of the Eastern District of New York Bankruptcy Court.  CHT's bankruptcy counsel is DLA Piper LLP, which does not represent CC Capital.  *Id.* Ex. F, at 2.  There is an active creditor's committee in the CHT Bankruptcy, which does not include representatives of CC Capital.  *Id.* Ex. G at 1.  Parmar and his affiliates have participated regularly

6

in the bankruptcy proceedings, making numerous filings and motions, including to object to bidding procedures for the disposal of CHT's assets that are also the target of certain allegations in this case.[3]   The Complaint does not, because it cannot, cite any decision by Judge Trust recognizing any of Plaintiffs' or Parmar's bankruptcy objections as legitimate.

      C.    <u>The Criminal and SEC Charges Against Parmar</u>

      On May 16, 2018, the United States Attorney's Office for the District of New Jersey (the "USAO") brought securities fraud charges against Parmar based on the Go-Private Transaction. Compl. ¶ 219.  In a Criminal Complaint, the USAO described CC Capital (identified as the "Private Investment Firm") as a victim of Parmar's fraud.   Criminal Complaint ¶ 2.   The Criminal Complaint identifies several of Parmar's tactics, including but not limited to: "(1) creating fictitious operating companies that [CHT] purportedly acquired in sham acquisitions that the co-conspirators simply made up; (2) falsifying and, in some cases, wholly fabricating bank records of subsidiary entities in order to generate a phony picture of [CHT's] revenue streams; [and] (3) generating fake income streams and, in some cases, fabricating customers of [CHT] and its subsidiaries." *Id.* ¶ 4.

      In May 2016, the Securities and Exchange Commission ("SEC") also brought a parallel civil action charging Parmar with securities fraud and recognizing that CC Capital was the victim of Parmar's schemes.  Decl. Ex. K ("SEC Complaint") ¶ 1; Compl. ¶ 219.

---

[3] *See, e.g.,* Brenner Decl. Exs H (Dkt. 231), I (Dkt. 132), J (Dkt. 561).

On December 13, 2018, a grand jury indicted Parmar for conspiracy to commit securities fraud, the substantive crime of securities fraud, and wire fraud in connection with the Go-Private Transaction.  Decl. Ex. L.

        D.        <u>The Allegations of the Complaint</u>

The Complaint, which Plaintiffs style a "counterattack" by Parmar, Compl. ¶ 21, tracks similar conspiratorial and over-the-top filings by Parmar in this Court seeking dismissal of the SEC Complaint, and in the Bankruptcy Court seeking dismissal of an adversary complaint and seeking appointment of an examiner.[4]  The Complaint insists on Parmar's "innocence" and supposed status as a "victim," but Plaintiffs do not mention key evidence of Parmar's criminality, like the emails cited in the Criminal Complaint in which Parmar and his co-conspirators sent false "bank statements in excel and pdf" back and forth to each other, discussed how to "cut and paste" elements of those fake documents, and debated whether they should insert a false wire transfer on page 1 or 2 of a falsified statement.  Criminal Complaint ¶¶ 15-16, 18-32.

The Complaint tries to frame the litany of Parmar's asserted grievances as a RICO action asserted by five LLCs that either once held, or currently hold, direct or indirect interests in CHT. The RICO cause of action rests on seven purported predicate acts (Count 1).  Three predicate acts allege purported fraudulent schemes sounding in bank fraud, bankruptcy fraud, and wire fraud (the "Fraud Predicates").  The other four predicate acts are based on alleged witness tampering, obstruction of justice, and extortion supposedly directed at Parmar, but which Plaintiffs now seek to assert in his stead (the "Parmar Predicates").  In addition to the RICO count, Plaintiffs assert

---

[4] *See, e.g.*, *United States v. Parmjit Parmar*, Case No. 2:18-cv-09284-MCA-MAH, Dkt. 12 (D. N.J. Aug. 16, 2018) (Parmar's 526 page motion to dismiss); Brenner Decl. Ex. J.

causes of action for supposed violations of the Stored Communications Act ("SCA") (Count 2) and Wire Tapping (Count 3).

**Argument**

**I.      Plaintiffs' RICO Cause of Action Does Not State a Claim.**

Plaintiffs' RICO cause of action rests on theories that are not cognizable under the RICO statute, *see* Section I(A), below, and do not satisfy the "pattern" requirement that is core to any RICO claim, *see* Section I(B), below.  Plaintiffs' substantive RICO predicates are also insufficient to state a plausible claim for relief because the relevant allegations are fantastical, wholly conclusory, and contradicted by documentation incorporated into the Complaint by reference.  *See* Section I(C), below.  Each of these deficiencies is an independent reason to dismiss Count 1 under the strict standards of the RICO statute.

    A.      Plaintiffs' RICO Theories Are Not Cognizable.

Plaintiffs' RICO cause of action is conceptually infirm, even without regard to its many specific pleading deficiencies.  Because the claim relies on ***indirect*** theories of injury, Plaintiffs lack standing to bring the claim and could never establish proximate cause for any of the alleged predicate acts.  Moreover, the claim is barred by statute because—despite Plaintiffs' claims otherwise—it asserts wrongdoing in a securities transaction.

    *1.      Plaintiffs cannot assert derivative claims based on alleged harm to CHT.*

Plaintiffs lack standing and cannot establish proximate cause with respect to their first, second and fourth RICO predicate acts for bank, bankruptcy, and wire fraud.  These predicates impermissibly assert ***derivative*** claims arising out of alleged harm to CHT, the company, and not ***direct*** injury to Plaintiffs.

9

The Complaint tries to obscure this issue by repeatedly charging Defendants with "stealing valuable assets belonging to Plaintiffs." Compl. ¶ 2; *see also id*. ¶¶ 24, 243, 245, 247, 248d, 249, 251, 253, 255. But nothing has been "stolen" from any of the Plaintiffs, each of which holds the same direct or indirect interests in CHT that they always did. Plaintiffs' real complaint is that alleged harm to CHT resulted in a decline in its value which had the ***indirect*** effect of causing a decline in the value of the stakes of CHT's interest holders, like Plaintiffs. Thus, in their bank fraud theory, Plaintiffs complain that they were damaged because the financing in the Go-Private Transaction allegedly "saddl[ed]" ***CHT*** "with enormous and unnecessary debt." *Id*. ¶ 243. Plaintiffs further claim harm through alleged bankruptcy fraud because "***CHT's assets*** were" supposedly "sold at auction to straw purchasers on Defendants' behalf for significantly less than the actual value." *Id*. ¶ 248d (emphasis added). And, the alleged wire fraud supposedly resulted in approximately $20 million "vanish[ing] in the Go-Private Transaction.[5]" *Id*. ¶ 244(d). But such alleged injuries—i.e., too much debt for CHT and too little cash for CHT—only indirectly impact Plaintiffs in the same manner as all other holders of interests in CHT.

Even accepting the misconceived assumption that Defendants—as opposed to Parmar— are somehow responsible for CHT's loss of value, it is axiomatic that Plaintiffs lack standing to bring RICO claims premised on indirect injuries suffered as a result of their interests in CHT. *See Irish v. Ferguson*, 970 F. Supp. 2d 317, 349-52 (M.D. Pa. 2013) (plaintiff LLC member did not have standing to assert alleged RICO claim asserting: (1) looting LLC into bankruptcy; (2) buying assets below market value; (3) borrowing money personally and repaying funds from LLC; (4)

---

[5] To the extent Plaintiffs' claim standing to assert the wire fraud predicate because they (and not CHT) were harmed by the supposedly missing $20 million, their claim fails for the separate reason that it is barred by the PSLRA. *See* Section I(A)(3), below.

profiting without reimbursing LLC; (5) duping LLC into making loans).  Under Third Circuit law,

such injuries are derivative, and therefore not actionable by a shareholder, because they are "not

direct and distinct from any injury sustained by the corporation and shareholders generally."  *In re*

*Sunrise Sec. Litig.*, 916 F.2d 874, 880-81, n.7 (3d Cir. 1990).

The indirectness of Plaintiffs' claimed injuries also vitiates proximate cause.  "Based on

the requirement that a direct relationship be shown, shareholder RICO claims based on injuries to

the corporation fail for lack of causation.  The claim belongs to the corporation, and any injury to

the shareholder, flowing only indirectly from the injury to the corporation, has no proximate causal

relationship to the defendant's conduct."  *Amos v. Franklin Fin. Servs. Corp.*, No. 10-1285, 2011

WL 5903875, at *6 (M.D. Pa. Nov. 22, 2011), *aff'd*, 509 F. App'x 165 (3d Cir. 2013); *Penn Mont*

*Sec. v. Frucher*, 502 F. Supp. 2d 443, 467 (E.D. Pa. 2007) ("The necessary middle step between

the violation and any harm to [shareholder plaintiff], namely, the injury to the corporation,

precludes a finding of proximate causation because the harm is too attenuated.  Therefore, a

derivative injury to a shareholder also fails to satisfy the proximate cause requirement under

RICO.").

### 2.    *Plaintiffs cannot assert claims based on alleged harm to Parmar.*

Plaintiffs also lack standing and cannot establish proximate cause with respect to their

third, fifth, sixth, and seventh RICO predicate acts for obstruction, extortion, and witness

tampering.  "The burden to establish standing rests with the plaintiffs." *Finkelman v. Nat'l Football*

*League*, 810 F.3d 187, 194 (3d Cir. 2016).  To properly allege the standing requirement of  injury-

in-fact, "a plaintiff must claim the invasion of a concrete and particularized legally protected

interest resulting in harm that is actual or imminent, not conjectural or hypothetical."  *Id.* (internal

citation and quotation marks omitted).  "To be sufficiently 'particularized,' an injury must 'affect

the plaintiff in a *personal and individual way*.'" *Id.*  A RICO plaintiff must also show injury to

business or property by reason of a predicate act.  *See Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d

Cir. 2000) ("Apart from the Article III constitutional and prudential standing requirements . . .

plaintiffs seeking recovery under RICO must satisfy additional standing criterion" set forth in 18

U.S.C. § 1964(c)).

Here, if "Chu and Altorelli attempted to extort *Parmar*" then the proper party to assert such

a claim is *Parmar*.  Compl. ¶ 246(b) (emphasis added).  If *Parmar* "was arrested, falsely charged,

and held without bail" as a result of a "false anonymous tip" that *Parmar* "was a flight risk," this

too is a claim that *Parmar* needs to bring, not five LLCs with which he is affiliated.  *Id.* ¶ 250(e),

252(g).  And if *Parmar* really thinks he can show that "Defendants conspired and attempted to,

with the intent to influence, delay or prevent the testimony of *Parmar* and others," then, again, it

is incumbent on *Parmar* (or the unnamed "others") to bear the burden of filing such a claim.  *Id.*

¶ 254(a) (emphasis added); *cf. Alpha Cepheus, LLC v. Chinh Chu*, Case No. 2:18-cv-14322-MCA-

MAH, Docket No. 21, at 1 (D.N.J. Oct. 29, 2018) ("29 October Order") (recognizing in context of

preliminary injunction motion raising supposed witness harassment issues that "Plaintiffs have

failed to establish that they have standing to request relief since the corporate Plaintiffs have not

demonstrated harm").

Plaintiffs' lack of standing is not saved by the allegation that Defendants intended for their

alleged wrongdoing to prevent "Parmar from actively participating in the bankruptcy proceedings"

and "keeping silent . . . in judicial proceedings," thus impeding Plaintiffs from exposing

Defendants' supposed wrongdoing.  Compl. ¶¶ 251, 255.  Far from being "silent," Parmar has not

hesitated to make all manner of questionable filings in the CHT Bankruptcy, the SEC Action, and

in this case.  Regardless, Plaintiffs have alleged no concrete harm to their business or property

12

stemming from any purported "witness tampering" or "obstruction of justice."  The speculative theory that Plaintiffs *may* have been injured because Parmar has not been as active in defending their legal interests as he may have been absent prosecution is insufficient to establish standing under the RICO statute as a matter of law.  *Maio*, 221 F.3d at 495 (Where the "theory of present economic loss require[d] a significant degree of factual speculation," it is insufficient to establish standing under the RICO statute.).

For the same reasons, any hypothesized impact on Plaintiffs is too attenuated to show proximate cause.  *See Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (rejecting RICO claim because theory of injury was "too remote" to satisfy RICO's proximate cause requirement). The proximate cause requirement precludes recovery to a "plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992).  Here, Parmar's willingness to participate in any judicial proceeding is a function of his independent decision-making about how to react to supposed wrongdoing targeting him in his personal capacity.

Plaintiffs' "extortion" allegations highlight this point.  The Complaint asserts that Defendants threatened Parmar with arrest unless he paid $10 million and transferred his interests in CHT to CC Capital.  But Plaintiffs concede that Parmar "refused to capitulate" to these supposed demands.  Compl. ¶ 246b.  These allegations are fabricated, as Defendants will show if necessary. But in any event, what matters is that these allegations reinforce that the supposed "extortion" was directed at ***Parmar*** and—because of his independent decision-making as a non-plaintiff—the five LLCs that brought this litigation ***did not even suffer harm***: they continue to hold the same direct or indirect interests in CHT that they held before any alleged extortive activity, and never paid $10

13

million or any other amount.  The Parmar Predicates are too indirect and attenuated to any alleged

harm suffered by these Plaintiffs to sustain a RICO claim in their name.

3.    *The PSLRA bars Plaintiffs' RICO claim.*

Finally, Count 1 fails because the alleged RICO conspiracy impermissibly coincides with

a securities transaction.  The Private Securities Litigation Reform Act ("PSLRA") "amended the

RICO act to eliminate the possibility of using conduct actionable as securities fraud as an

underlying predicate act to establish a RICO violation."  *Birdsall v. Rivera*, No. 16-4796, 2017

WL 5951620, at *4 (D.N.J. Nov. 30, 2017) (Arleo, J.) (citation omitted); *see* 18 U.S.C.A. § 1964.

A "single securities transaction that coincides with the fraudulent scheme can be the death knell

of a RICO claim."  *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634,

650, 651 (S.D.N.Y. 2017); *see also Davies v. GetFugu, Inc.*, No. 09-8724, 2010 WL 11597458, at

*5 (C.D. Cal. Aug. 26, 2010).

Plaintiffs suggest the PSLRA prohibition is irrelevant because "the pattern of racketeering

activity alleged here begins on January 31, 2017" when the CHT deal closed.  Compl. at 2 n.1.

But this timeline is inconsistent with the allegations in Count 1.  The wire fraud allegations accuse

Defendants of using "a variety of methods to manipulate the closing documents and funds flow

requirements" in the Go-Private Transaction "to fraudulently induce Plaintiffs into contributing a

much larger percentage of their equity than necessary, so that Defendants could take additional

money out of the transaction."  Compl. ¶ 244(b) (emphasis added).  Thus, the wire fraud predicate

is expressly based on ***pre-closing*** fraud; and Plaintiffs' allegation that they "contribut[ed]" too

much stock in the Go-Private Transaction, and Defendants took "additional money" out as

consequence, is precisely the kind of securities fraud theory that, under the PSLRA, precludes a

RICO claim.  *Zohar*, 286 F. Supp. 3d at 651 (dismissing RICO case about "post-investment looting and the concealment thereof" because actions coincided with purchase or sale of securities).

Moreover, where "the Complaint alleges a single, ongoing fraudulent scheme, all of Defendants' alleged acts must be considered together." *Id.* at 648; *see Levinson v. PSCC Servs., Inc.*, No. 3:09-00269, 2009 WL 5184363, at *7 (D. Conn. Dec. 23, 2009) (explaining that when determining whether the PSLRA precludes a RICO claim, courts consider the alleged fraudulent scheme as a whole).  And where "one predicate act" that is part of the scheme "alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the PSLRA bar." *See Ling v. Deutsche Bank*, No. 04-4566(HB), 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005).  Plaintiffs' alleged "ongoing," "large, complex and brazen fraudulent scheme" is therefore subject to the PSLRA bar in full, and should be dismissed accordingly.  *See* Compl. ¶¶ 1-2.

      **B.**    <u>The Complaint Fails to Plead a Pattern of Racketeering.</u>

Count 1 should also be dismissed because it improperly tries to spin a single commercial transaction into a broad conspiracy theory that somehow transforms CC Capital into a criminal enterprise.  The RICO statute does not contemplate such distortions.  *See, e.g.*, *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025-26 (7th Cir. 1992) ("RICO has not federalized every state common-law cause of action available to remedy business deals gone sour."); *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1463 (5th Cir. 1991) (Congress "did not intend to extend RICO to every fraudulent commercial transaction").

The "pattern" requirement of the RICO statute ensures courts can filter out such meritless claims so that "only a party engaging in widespread fraud would be subject to" RICO treble damages.  *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989).  A RICO cause of action requires well-pleaded allegations of at least two distinct acts of racketeering, with sufficient

15

"relation and continuity" between them. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989); 18 U.S.C. § 1961(5).   The "pattern" requirement is "more stringent . . . than proof simply of two predicates;" it requires "the showing of a relationship" between the predicates and "the threat of continuing activity," *H.J. Inc.*, 492 U.S. at 237, 239.

Here, the gravamen of the Complaint is that CC Capital unfairly benefitted from the Go-Private Transaction, while other interested parties—CHT, the CHT Lenders, Parmar, and Plaintiffs—somehow suffered.  Even accepting these allegations as true, they do not support the inference that CC Capital was a criminal enterprise engaging in widespread and ongoing racketeering conduct.

In *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991), the Third Circuit rejected an attempt to paint a leveraged buyout and subsequent bankruptcy as a RICO conspiracy. As here, the *Kehr* plaintiffs alleged misrepresentations regarding the financing of the acquisition over many years.  The court found that the alleged scheme to defraud the plaintiffs in the acquisition of Kehr, including by sending false account statements, did not sufficiently allege a "pattern of racketeering activity." *Id.* at 1417.  And the *Kehr* court rejected plaintiffs' attempts to draw in many years of purportedly related conduct, insisting the proper focus was only on the period of plausibly alleged criminal activity. *Id.* at 1418.  Ultimately, *Kehr* held that allegations "involv[ing] a short-term attempt to force a single entity into bankruptcy, and contain[ing] no additional threat of continued criminal activity" fail to plead a RICO violation. *Id.*

Here, similarly, Plaintiffs' RICO count centers on a leveraged transaction in which a single entity was supposedly acquired, and driven to bankruptcy, on allegedly false pretenses.  But even accepting these outlandish allegations *arguendo*, a single busted deal does not a RICO conspiracy make. *See Marshall-Silver Constr. Co. v. Mendel*, 894 F.2d 593, 589 (3d Cir. 1990) (fraud and

extortion over seven months to force the bankruptcy of a single entity showed "neither long-term criminal conduct nor the threat thereof'"), *overruled on other grounds by Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995); *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 610-11 (3d Cir. 1991) (allegation that defendants threatened plaintiffs to obtain specific parcels of property within a short amount of time, did not establish "continuity under an open-ended scheme" without specific future threats); *see also Hindes v. Castle*, 937 F.2d 868, 875 (3d Cir. 1991).

Indeed, in this Circuit, there is a strict rule that "conduct lasting no more than twelve months d[oes] not meet the standard for closed-ended continuity" required under the RICO "pattern" element. *Tabas*, 47 F.3d at 1293. Plaintiffs allege the RICO scheme at issue began on or around January 31, 2017. Compl. at 2 n.1. And the only alleged RICO predicate acts that extend into 2018 are for bankruptcy fraud and witness tampering, which Plaintiffs lack standing to assert, *see* Section I(A)(2), *supra*, and which are wholly unsubstantiated and implausible, *see* Section I(C)(1)(b), *infra*. Any remaining allegations in the Complaint fail to establish continuity.

C.    The RICO Cause of Action Fails to Plausibly Plead a Violation of Any Substantive RICO Predicate.

A properly pled RICO claim must allege two distinct acts of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); 18 U.S.C. § 1962(c). "Racketeering activity" is defined to include specified federal crimes, or predicate acts. *See* 18 U.S.C. § 1961(1). The predicate act allegations must be based on "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted); *Mayer v. Belichick*, 605 F.3d 223, 229-30 (3d Cir. 2010) (allegations "must be enough to raise a right to relief above the speculative level"); *Munsif v. Cassel*, 331 F. App'x 954, 958 (3d Cir. 2009) (dismissing RICO complaint where "allegations do

17

not suggest a plausible claim … that the defendant participated through a pattern of racketeering activity").   Courts must use common sense and judicial experience to evaluate plausibility, and, where the allegations "do not nudge a plaintiff's claim into the territory of plausibility," they are "insufficient to withstand a motion to dismiss."  *In re Conex Holdings, LLC*, 514 B.R. 405, 414 (D. Del. 2014); *see also Santiago v. Warminster Tp.*, 629 F.3d 121, 132-34 (3d Cir. 2010) ("Allegations that are 'merely consistent with a defendant's liability' or show the 'mere possibility of misconduct' are not enough.").   Here, neither the three Fraud Predicates nor the four Parmar Predicates state plausible claims for relief against Defendants Chu and Newton.   For this reason too, Count 1 should be dismissed.

       1.     *The Fraud Predicates are incoherent, contradicted by the governing documents, and lack the specificity Rule 9(b) requires.*

The core element of each of the Fraud Predicates is a "scheme or artifice to defraud," which must be pled with particularity in compliance with Federal Rule of Civil Procedure 9(b).[6]  *In re Burlington Coat Factory*, 114 F.3d at 1417.  To make out a scheme to defraud, the Complaint must "specify when, where, or to whom" any misrepresentations were made, *Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 86 (3d Cir. 2015), and "the general content of the misrepresentation."  *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004).  Furthermore, any alleged misrepresentation must be "material" to the fraudulent scheme.  *Neder v. United States*, 527 U.S. 1, 24-25 (1999).

When, as here, a plaintiff alleges fraud in a complex financial transaction, the plaintiff must also explain within the proper business context how the specific misrepresentations were material

---

[6] *See* 18 U.S.C. § 1344; 18 U.S.C. § 157; 18 U.S.C. § 1343.

to the transaction.  *See In re Burlington Coat Factory*, 114 F.3d at 1417-18; *Lum*, 361 F.3d at 225; *see also Kehr Packages*, 926 F.2d at 1416.  In addition, like all allegations in a federal complaint, Plaintiffs' Fraud Predicates must be based on "factual content that allows the court to draw the reasonable inference that the defendants are liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57, 570 (2007)) (citations omitted).  "[C]onclusory allegations of law, unsupported factual assertions, and unwarranted inferences do not have to be accepted by the federal court as true."  Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1286 (3d ed. 2004).

Here, the Complaint is replete with descriptions of Defendants' purportedly objectionable conduct, conjecture about Defendants' motives, and salacious insinuations about their character. *See* Compl. ¶¶ 46, 60.  But it remains wholly conclusory as to falsity.  The Fraud Predicates fail to allege a single material, actionable misrepresentation by Defendants Chu or Newton with the particularity required by Rule 9(b).  Nor have Plaintiffs alleged—nor could they allege, based on the context of the Go-Private Transaction—that any misrepresentations were the proximate cause of their injuries.  *See generally Holmes*, 503 U.S. at 268.   Thus, as set forth below, the Complaint falls short of the "measure of substantiation into" Plaintiffs' allegations of "bank fraud, wire fraud, or bankruptcy fraud" necessary to state a claim.  *In re Nice Systems, Ltd. Securities Litigation*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001).

a. *Bank fraud.*  Plaintiffs' bank fraud theory is that Chu and Newton misled the CHT Lenders through (i) "fraudulent misrepresentations that CHT would be the borrower [in the Go-Private Transaction], although Defendants were not authorized to speak on CHT's behalf," and (ii) "knowingly submit[ting] false results from their due diligence investigation in order have Bank

of America provide financing."  Compl. ¶ 242(a).  These allegations are beyond implausible, including based on documentation that is before the Court contradicting this claim.

First, the bank fraud predicate ignores Plaintiffs' concession that their case rests solely on conduct post-dating the Go-Private Transaction.  Compl. at 2 n.1.  By definition, any "fraud" to induce the banks to lend in this transaction would have had to *precede* the date the deal closed. *See generally id.* ¶¶ 132-141 (alleging acts of bank fraud preceding January 31, 2017).

Second, the bank fraud predicate has been released by Plaintiffs in connection with the Go-Private Transaction.  In the Voting and Support Agreements, Plaintiffs discharged Chu and Newton from claims "occurring at any time at or prior to the Closing with respect to the Company, the shares of Common Stock, or the Merger" in a contractual release. Brenner Decl. Ex. D § 4(d)(i).[7]  This release, intended specifically to prevent stockholders in CHT from asserting claims arising out of the closing against individuals such as these Defendants, is applicable here.

Third, the assertion that the CHT Lenders were somehow misled about whether "CHT would be the borrower" is contradicted by the governing Credit Agreement, which leaves no doubt that Orion—a CHT subsidiary—was indeed the borrower.  Credit Agreement at 1.  Nor does CHT claim otherwise.  Despite Plaintiffs' suggestion of lack of authority, CHT (through Orion) has acknowledged its debt under the Credit Agreement in the CHT Bankruptcy.  Dragelin Decl. ¶ 9. The banks were not duped about a fact that is indisputably true.

Fourth, Plaintiffs' allegations that the CHT Lenders relied on false financial information from *Chu and Newton* in deciding to enter into the Credit Agreement is deficient under Rule 9(b)

---

[7] *See generally RBS Holdings, Inc. v. Wells Fargo Century, Inc.*, 485 F. Supp. 2d 472 (S.D.N.Y. 2007) (granting motion to dismiss and noting that plaintiff "cannot avoid the Court's consideration of [the release] simply by failing to explicitly reference it" in the complaint).

and implausible under *Iqbal*.  Plaintiffs' theory again contradicts the Credit Agreement:  CC Capital was not a party to the agreement, which does not remotely suggest that the CHT Lenders were relying on information from anyone other than CHT to decide whether to lend $140 million. To the contrary, provision after provision shows it was the accuracy of the financial results from CHT that mattered.  Credit Agreement § 5.05(a), (d); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (the Court may consider "documents incorporated into the complaint by reference," and need not accept contradictory factual allegations).  Plaintiffs do not plead a single fact that suggests otherwise, let alone articulates with the particularity required under Rule 9(b), (i) a specific misrepresentation to the CHT Lenders attributable to Chu and Newton, (ii) precisely why any allegedly fraudulent communications by these two individuals was misleading, or (iii) how the CHT Lenders relied on any such communications.  *See Neder*, 527 U.S. at 25; *cf. Travelers Indem. Co.*, 620 F. App'x at 86.  And, of course, Plaintiffs' bank fraud theory also directly contradicts the conclusions of the USAO, the SEC, and CHT itself, all of whom have charged **Parmar**—not Chu, Newton, or anyone else at CC Capital—with furnishing fraudulent financial statements in the Go-Private Transaction, including to the CHT Lenders.

<u>Finally</u>, Plaintiffs' fraud theory cannot be reconciled with their allegation that "the banks made no effort to conduct any due diligence" in connection with the Credit Agreement because "of a secret deal that Chinh Chu had negotiated with BofA."  Compl. ¶ 134; *see also id.* ¶ 133 (claiming banks issued commitment letter "without BofA conducting any due diligence of its own").  This "deal" is invented.[8]  Regardless, if there really was an "extraordinary lack of inquiry"

---

[8] *See, e.g.*, Brenner Decl. Ex. M (Dkt. 594) at 4-5 (filing by Bank of America noting that "Parmar has not cited any evidence in support of his farfetched allegation" of a "secret deal with Chinh Chu" and noting numerous cases finding allegations of such deals "implausible").

by the CHT Lenders as Plaintiffs claim, Compl. ¶ 134, then Plaintiffs can never prove these lenders relied on supposedly false financial information provided by the Defendants. This defeats proximate cause. *See, e.g.*, *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 177 (2d Cir. 2004) (to establish proximate cause under the federal bank fraud statute, the Bank must have "reasonably relied on defendants' purported misrepresentations—i.e., the representations that the defendants made to the Bank in order to obtain the loans").

b. *Bankruptcy fraud.* To plead a bankruptcy fraud claim, Plaintiffs must allege deceit in a bankruptcy submission or otherwise in relation to a bankruptcy proceeding. 18 U.S.C. § 157 (1)–(3). Here, Plaintiffs offer numerous complaints about, *e.g.*, the circumstances of CHT's bankruptcy filing, submissions in the CHT bankruptcy that blame Parmar for CHT's dire financial circumstances, the auction procedures governing the sale of certain CHT assets, and the schedules identifying what CHT owed to whom. Compl. ¶¶ 193-94. Plaintiffs even complain the CHT bankruptcy petition was "fraudulent" because it was "filed in the Eastern District of New York." *Id*. ¶ 193(a). Such issues are the bread and butter disputes of bankruptcy courts. But whatever their merits as potential objections in the CHT Bankruptcy, such complaints do not state a claim of bankruptcy fraud against these Defendants in this Court.

First, it is beyond implausible for Plaintiffs to allege fraud in connection with these issues when the Complaint does not identify a single instance when the bankruptcy judge with jurisdiction and expertise found merit in any of the issues Plaintiffs identify—let alone that there was the kind of flagrant misconduct that Plaintiffs assert as "racketeering." Absent *any* such corroborative findings, Plaintiffs' unsubstantiated allegations of bankruptcy fraud are simply an improper end run around Judge Trust in complaining about issue after issue that are squarely within

22

his purview.  *Cf. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151-52 (2009) (a party cannot collaterally assail the orders of one federal court in another district).

Second, cutting through all the hyperbole, none of Plaintiffs' claims of bankruptcy fraud tie to ***any*** representations, false or otherwise, by Chu and Newton.  "Thus, the alleged predicate acts involving fraud are not pled with sufficient particularity and cannot support plaintiff's RICO claim."  *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 137 (E.D.N.Y. 2010) (dismissing RICO complaint based on bank and wire fraud for failure to allege the specific fraudulent statements with particularity).  Plaintiffs cannot save their claim through repeated conclusory assertion that CHT's advisors, such as their bankruptcy counsel at DLA, were working "at Chinh Chu's direction" or that CHT "was controlled by Chinh Chu" in bankruptcy.  Compl. ¶¶ 185, 193c, 194.  As Plaintiffs have not plausibly alleged bankruptcy fraud by ***anyone***, there is no wrongdoing to attribute to Chu and Newton.  Regardless, Plaintiffs' "control" theory fails because it is yet another conspiracy theory unsubstantiated by supporting evidence.  For example, Judge Trust entered an order in the CHT Bankruptcy finding that "DLA is a 'disinterested person,'" under the Bankruptcy Code and recognizing that DLA had "no connection" with CC Capital, or Chu, or Newton.  Brenner Decl. Ex. F, at 2; *see also id.*, Ex. N at ¶ 17 (CHT Creditors' Committee lauding CHT's retention of "highly reputable and experienced professionals who would not collectively throw away reputations built over decades in order to perpetrate the fraud alleged by Parmar").

"If the factual context renders respondents' claim implausible" then a plaintiff "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 51 (3d Cir. 2007) (citing *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Here, Plaintiffs offer no such evidence, let alone a persuasive explanation for how Chu's scheme would even be possible

given the ongoing oversight procedures in a chapter 11 case and the rights of Plaintiffs and other stakeholders to raise such issues if they actually had merit. *In re Conex Holdings, LLC*, 514 B.R. at 414 (unsupported allegations that individuals were involved with or participated in certain transactions fail to withstand a motion to dismiss).

Finally, Plaintiffs do not state a claim of bankruptcy fraud based on their unsupported suggestion that "[o]n information and belief" Chu surreptitiously controlled "stalking horse" bidders for certain of CHT's assets in Section 363 auctions in the CHT Bankruptcy (the "363 Sales"). Compl. ¶ 203. The 363 Sales procedures required "Each Potential Bidder" to "fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, including the names and addresses of any members or individuals with an interest in the entity, and the complete terms of any such participation." Brenner Decl. Ex. O at 6. None of the bidders identified any relationship with Chu or Newton or CC Capital. And at the end of the 363 Sales Judge Trust found the bidding was "non-collusive, formulated and implemented in good faith," and "substantively and procedurally fair to all parties and obtained the highest or otherwise best value for the Purchase assets." *Id.*, Ex. P at ¶ D. Plaintiffs' conclusory allegations of wrongdoing do not offer a scintilla of evidence to the contrary. This court need "not accept as true allegations that are contradicted by facts that can be judicially noticed," Wright & Miller, *Federal Practice and Procedure*, § 1363, at 464-65, and which defy "common sense and judicial experience," *Lamon v. Tilton*, 2009 WL 1884361, at *3 (E.D. Ca. Jun. 30, 2009).[9]

---

[9] Healthtek, which "purchased CHT's remaining assets," Compl. ¶ 204, has also "unequivocally denie[d] any accusations it colluded with Mr. Chu" and affirmatively "state[d] that neither it nor any of its management, principals or investors has any relationship with Mr. Chu whatsoever." Brenner Ex. Q, at ¶ 2.

c. *Wire fraud.*  Plaintiffs also fail to plead wire fraud.  <u>First</u>, like the bank fraud theory, this predicate ignores Plaintiffs' concession that "the pattern of racketeering activity alleged here begins on January 31, 2017."  Compl. at 2 n.1.  By definition, if the closing and funds flow documents affected the Go-Private Transaction as Plaintiffs claim, the impact would have been *before* the January 30, 2017 closing. This timing issue is fatal.

<u>Second</u>, like the bank fraud theory, this predicate is also barred by the release in the Voting and Support Agreements because it asserts pre-closing claims with respect to the Merger.  Brenner Decl. Ex. D § 4(d)(i).  The wire fraud theory is also inconsistent with a separate non-reliance provision in those same agreements in which Parmar, on behalf of affiliates like Plaintiffs, disclaimed reliance upon "any statement, representation or warranty, oral or written, express or implied," by CC Capital and its representatives, except for certain irrelevant exceptions.  *Id.*

<u>Third</u>, Plaintiffs' wire fraud theory must be dismissed because they do not "identify any particular mail or wire transmissions or allege how any mail or wire transmissions are connected to a fraudulent scheme."  *Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003); *see also Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, 2016 WL 7475816, at *12 (E.D. Pa. Dec. 29, 2016) (concluding that "[w]hile the Complaint sets out the overall fraudulent scheme with great detail, it lacks sufficient detail as to the date, place or time" of the alleged wire fraud). Plaintiffs claim that "approximately $20 million simply vanished, or was unlawfully misappropriated by Defendants" in the Go-Private Transaction.  Compl. ¶ 244(d). But, as support, Plaintiffs only assert vaguely that unnamed "documents" regarding the funding for the Go-Private Transaction are somehow inconsistent with unspecified statements in which Defendants claimed that "that CC Capital contributed $88,687,476.20 in cash to this transaction." *Id*. ¶ 244(c).  Plaintiffs do not identify the specific documents or statements at issue. *See Lum*, 361

F.3d at 225; *Devon Drive Lionville, LP*, 2016 WL 7475816, at *12. Nor do they tie any specific misrepresentations to ***these defendants***. It is utterly implausible that $20 million went "missing" or was "misappropriated" and only Parmar and Plaintiffs have noticed—notwithstanding the scores of lawyers, investigators, law enforcement professionals, and CHT stakeholders that have been reviewing the Go-Private Transaction with a fine tooth comb. Once again, Plaintiffs cannot sustain a patently improbable theory with nothing more than conclusory claims of wrongdoing that do not meet the standards of Rule 9(b). *See Lamon*, 2009 WL 1884361, at *3 (dismiss as implausible claims based on "an elaborate and seemingly coordinated conspiracy").

2.    *The Parmar Predicates Do Not Substantiate Plausible Wrongdoing by Chu or Newton.*

Plaintiffs cannot save their RICO claim through over-the-top allegations of obstruction of justice, witness tampering, and extortion by Chu and Newton. As discussed, Plaintiffs do not have standing to assert these claims on behalf of ***Parmar***. *See* Section I(A)(2), above. Regardless, Plaintiffs have not grounded these claims in well-pleaded facts "that make their theoretically viable claim plausible". *In re Burlington Coat Factory*, 114 F.3d at 1418; *see also Cosmetic Gallery*, 495 F.3d at 51 ("If the factual context renders respondents' claim implausible" then plaintiffs "must come forward with more persuasive evidence to support their claim than would otherwise be necessary" (citations omitted).)

For example, Plaintiffs blame Chu and Newton for Parmar's arrest on securities fraud charges and his initial inability to obtain bail. Compl. ¶¶ 220, 224, 227. Yet Plaintiffs offer no specifics about what if anything Chu and Newton falsely said to federal authorities before Parmar's arrests, when they said it, or why any information they offered to authorities was false. On the bail issue, Plaintiffs' entire theory rests on a supposedly critical anonymous tip that "originated

26

from London, UK," where Defendant Truc To allegedly "maintains a residence and citizenship." *Id*. ¶ 252g. This bald supposition is grossly insufficient to sustain a claim, let alone a claim against Chu and Newton. The witness tampering predicate act is equally devoid of substance: the only specifics offered are that a car driven by Defendant Stepien followed one of Parmar's associates onto allegedly "private property, before speeding away and throwing gravel on her by spinning his tires." *Id*. ¶ 254(a). These bare facts do not establish knowing or intentional intimidation to prevent testimony; the claim does not even provide a reason to believe the unnamed individual would be a relevant witness in any official proceeding. 18 U.S.C. § 1512(b). And, as the Court recognized in connection with similar allegations in Plaintiffs' Order to Show Cause application, Chu cannot be charged with this conduct based on the conclusory assertion that Stepien was acting at his direction absent any substantiation of Chu's involvement. October 29 Order, at 1.

Finally, Plaintiffs' extortion claim rests on irresponsible and salacious assertions that "Parmar received multiple death threats from Defendants," including involving "Chinese Mafia" who would supposedly "chase" Parmar "in jail." Compl. ¶¶ 179-79. The Complaint concedes that "Parmar reported these incidents to the FBI at the time." *Id*. ¶ 181. But Plaintiffs offer no reason why law enforcement would ignore such sordid threats of murder if these threats actually had an evidentiary basis. Plaintiffs similarly propound the dubious theory that Chu had the power to "ensure that Parmar was arrested by the FBI," *id*. ¶ 246(a), or, by contrast, "get the FBI to stop their investigation," *id.* ¶ 177, without providing any plausible reason (let alone evidence) to believe that Chu somehow pulls the strings of federal law enforcement.

Plaintiffs' claims cannot be reconciled with common sense and judicial experience. They need not, and should not, be accepted with zero substantiation. *Lamon v. Tilton* is instructive. In that case, Plaintiff alleged a vast conspiracy between prison guards, medical practitioners, and staff

to execute a "shadow-policy" of illegal acts to "discourage him from proceeding with his litigation activities." 2009 WL 1884361, at *3.   Similarly, in *Anderson v. Ballou*, a plaintiff alleged a conspiracy between various actors to cause his arrest without probable cause. 2012 WL 3027679, at *5-6 (E.D. Ky. Jul. 24, 2012).   Courts in both cases summarily dismissed the claims as conclusory and implausible.  Dismissal is likewise appropriate here.

## II.     The Complaint Fails To State a Claim Under The Stored Communications Act or Wiretap Act

Plaintiffs' second and third causes of action allege violations of the Stored Communications Act ("SCA") and the Federal Wiretap Act ("Wiretap Act").   These statutes provide criminal penalties for anyone who accesses and obtains electronic communications without authorization.  *See generally* 18 U.S.C. § 2701; 18 U.S.C. § 2511(1)(a).   For their SCA claim, Plaintiffs allege lawyers and investigators for CHT improperly accessed a corporate email server after Parmar's termination from CHT.  Compl. ¶¶ 261-65.   For their Wiretap Act claim, Plaintiffs allege that Defendants James Stepien and Victor Cardona accessed Parmar's private emails by hacking Parmar's residential wireless connection.  *Id*. ¶¶ 268-273.   Both causes of action should be dismissed because they do not state a claim upon which relief can be granted.

First, neither the SCA claim nor the Wiretap Act claim plausibly accuses Chu or Newton of having anything to do with the supposed wrongful conduct.   The SCA claim does not even try: it does not reference Chu or Newton at all and makes no claim that they (or any other named Defendant) obtained access, unauthorized or otherwise, to the CHT server (or any other email of Parmar's).   Tellingly, other individuals—John Altorelli and Timothy Dragelin—are inaccurately characterized as "Defendants" in this cause of action.  Compl. ¶ 263.  But Chu and Newton are

nowhere to be found, and are entitled to dismissal on this basis alone. *See Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 263 n. 27 (3d Cir. 2010).

Second, the Wiretap Act claim is based on supposed wrongful conduct by others, namely Defendants Stepien and Cardona, and not Chu or Newton. *See* Compl. ¶ 237. Plaintiffs offer nothing to support an inference that Chu or Newton are responsible for any supposed "hacking" (even assuming it is true). *Cf.* October 29 Order at 2. And the only reference to Chu in connection with this count is the claim that it "appears" that he "is after Parmar's privileged communications," Compl. ¶ 273, and has received "Plaintiffs' electronic communications," *id*. Such conclusory and unsupported allegations do not support the serious accusations Plaintiffs try to make against Chu. And for Newton there are no relevant allegations at all.

Finally, the Wiretap Act claim should be dismissed because Plaintiffs do not have standing as an "aggrieved person" who "was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11); *see also United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (standing under 18 U.S.C. § 2511 requires that the plaintiff "show that (1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises").

Here, there is no evidence that ***Plaintiffs*** were parties to the communications allegedly at issue (i.e., ***Parmar's*** personal emails), or that they were targets of any alleged taps (which were supposedly directed at ***Parmar's*** personal wireless network), or that the interceptions occurred on their premises (as opposed to at ***Parmar's*** personal residence). Compl. ¶ 269. The bare statement that the "stolen communications were made by Parmar in his capacity as manager of Plaintiffs," *id*. ¶ 270, cannot confer standing when those Plaintiffs have not suffered an injury-in-fact stemming from any of the alleged privacy breaches. *See, e.g.*, *PBA Local No. 38 v. Woodbridge*

29

*Police Dep't*, 832 F. Supp. 808, 822 (D.N.J. 1993) (dismissing claims by union for lack of standing

to challenge interception of phone calls of individual union members in part because union could

not "identify any specific injury to the [union] that might have come from allegedly intercepted

conversations"); *see also* October 29 Order at 1 (denying Plaintiffs Motion for a Preliminary

Injunction because they lacked standing to litigate alleged harms to Parmar).

## III.    The Complaint Should Be Dismissed With Prejudice

Finally, the Complaint should be dismissed in its entirety with prejudice and without

leave to amend because the fundamental defects in Plaintiffs' allegations cannot be cured.  No

amount of additional outrageous allegations could establish standing for these Plaintiffs to pursue

legal theories on Parmar's behalf or based on alleged harm to CHT.  *See Standard Fire Ins. Co.*

*v. MTU Detroit Diesel, Inc.*, 2009 WL 2568199, at *5 (D. N.J. Aug. 13, 2009) (amendment

would be futile due to lack of standing).  Nor can Plaintiffs alter the plain reality that Parmar's

fraud caused CHT's demise, and, despite ample effort in multiple courts, Plaintiffs and Parmar

can identify no evidence that supports their conclusory assertions of criminal activity by Chu or

Newton.  *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468-69 (D. N.J.

1990) (leave to amend denied where amendment would be "frivolous or advance[] a claim or

defense that is legally insufficient on its face").  In these circumstances, an amended complaint

would only serve to advance Parmar's campaign of vexatious and abusive litigation.  *See Hollis-*

*Arrington v. PHH Mortg. Corp.*, 205 F. App'x 48, 54 (3d Cir. 2006) (affirming denial of leave

for vexatious litigant to amend frivolous RICO action).

## Conclusion

For the foregoing reasons, Defendants Chu and Newton respectfully submit that the Court

should dismiss the Complaint and put an end to an abusive litigation.

Dated: January 25, 2019

Respectfully submitted,

_____/s/ James E. Cecchi_____
James E. Cecchi
Caroline F. Bartlett
CARELLA, BYRNE, CECCHI, OLSTEIN,
   BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone:  973-994-1700
Facsimile:  973-994-1744
jcecchi@carellabyrne.com

Eric Brenner
Julian Beach
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone:  212-446-2300
Facsimile:  212-446-2350
ebrenner@bsfllp.com

Joseph Alm (*pro hac vice pending*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jalm@bsfllp.com

31