UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X
ALPHA CEPHEUS, LLC
FIRST UNITED HEALTH, LLC,
CONSTELLATION HEALTH, LLC
NAYA CONSTELLATION HEALTH, LLC,
CONSTELLATION HEALTH INVESTMENT,
LLC, and
PAUL PARMAR

                   Plaintiffs,                     **Docket No.: 18-cv-14322**

      -against-                            **AMENDED**
                                                **COMPLAINT**
CHINH CHU,
TRUC TO,
DOUGLAS NEWTON,
ANTONIO SCHIENA,
MULTI OPERATIONAL SECURITY AGENCY
INTELLIGENCE COMPANY,
WARREN ERNST,
JAMES STEPIEN,
VICTOR CARDONA,
CC CAPITAL CHT HOLDCO LLC,
CHT HOLDCO LLC, and
JOHN DOE 1-10,

                  Defendants.
--------------------------------------------------------X


Plaintiffs, ALPHA CEPHEUS, LLC, FIRST UNITED HEALTH, LLC,

CONSTELLATION HEALTH, LLC, NAYA CONSTELLATION HEALTH, LLC,

CONSTELLATION HEALTH INVESTMENT, LLC, and PAUL PARMAR, by

and through counsel, respectfully submits this Amended Complaint as follows:

1

**INTRODUCTION**

1.     This is an action against Chinh Chu, ("Chu"), and the various members and associates of CC Capital, LLC ("CC Capital" or the "Enterprise") for their unlawful and corrupt actions undertaken as part of an ongoing scheme to unlawfully enrich themselves at Plaintiffs' expense.

2.     Defendants have planned, orchestrating, and executed a large, complex and brazen fraudulent scheme with the target objective of artificially devaluing and, ultimately, stealing valuable assets belonging to Plaintiffs – namely their ownership interest in a profitable medical billing company, Constellation Healthcare Technologies, LLC ("CHT"), and its numerous wholly owned subsidiaries (together with CHT, the "CHT Group").  Defendants have been, and are continuing to pursue this objective, on behalf of CC Capital, through a pattern of racketeering activity that is violative of various state and federal statutes.

3.     Plaintiffs, who are shareholders in CHT, have suffered immense damages by Defendants' pattern of illegal activity that began around January 2017[1] and continues through the date of this Complaint.  Although he holds no ownership

---

[1] Defendants' pattern of illegal activity actually began much earlier, around January 2016.  However, due to the restrictions of 18 U.S.C. §1964(c), which provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a [civil racketeering conspiracy]," the pattern of racketeering activity alleged here begins on January 31, 2017.  However, if the current FBI and DOJ investigations result in the arrest and criminal convictions of Defendants, Plaintiffs reserve the right to amend their pleadings to include the offenses of conviction in the pattern of racketeering activity, as permitted by 18 U.S.C. §1964(c).

interest in Plaintiffs, Paul Parmar ("Parmar"), the former CEO of CHT, is the manager of all Plaintiffs.

4.     CHT was a publicly traded company on the London Stock Exchange's Alternative Investment Market ("AIM").  Plaintiffs, First United Health, LLC, Constellation Health, LLC, Naya Constellation Health, LLC, and Constellation Health Investment, LLC (collectively "Parmar Parties") owned a controlling interest of approximately 68% of CHT with the remainder being held by other public shareholders.

5.     Beginning in January 2016, Defendants Chu, Truc To, and Douglas Newton ("Newton"), on behalf of CC Capital, commenced a plan to acquire a controlling interest in CHT and deregistering CHT's stock with the AIM in a "going private" transaction.  The proposed transaction would result in the CHT Group becoming privately held corporations with 50.4% of CHT's stock being owned by CC Capital controlled entities and the remaining 49.6% being owned by Parmar Parties, through a new entity, Plaintiff Alpha Cepheus, LCC (the "Subject Transaction").  Because Parmar managed Plaintiffs, he was considered part of the buyers' group and recused from decision making on CHTs behalf for the transaction during the negotiation and due diligence process.

6.     Due diligence is an investigation or audit of a potential investment or product to confirm and validate all facts, such as reviewing all financial records, plus

anything else deemed material. It refers to the care a reasonable person should take before entering into an agreement or a financial transaction with another party. As part of this transaction, CC Capital expended over $7 million on hiring the best investigators, attorneys, accountants, and consulting firms to completely review CHT's financials.

7.     During the due diligence process, Defendants discovered vulnerabilities in CHT's record keeping that they could exploit after consummating the going private transaction through a pattern of unlawful and corrupt activity to enrich CC Capital and its members, at Plaintiffs' and CHT's expense. Specifically, Defendants discovered that three subsidiaries that had been formed for the purpose of purchasing new subsidiaries were actually empty shell corporations with little to no customers, revenue, or value (the "Empty Shells"). There had been some press releases that gave inaccurate information about the empty shells that may have created a public impression that CHT was continuing to grow, even though some of the intended acquisitions had not closed as early as expected.

8.     The empty shells did not have any significant effect on the value of CHT and certainly did not cause any valuation models to show an artificial inflation of the value. The true value of this information was its value to Defendants as damaging material that could be used against CHT and its officers for blackmail, discrediting negative publicity, or to ensure loyalty, as Defendants wished. The

4

techniques employed by Defendants is reminiscent of Russian political strategies of using compromising materials or "Kompromat" to control or destroy political enemies.

9.     The existence and status of the empty shells was very easy for Defendants to determine, as the materials provided during the due diligence process clearly showed, through the structure, assets, collections, employees, offices, insurance policies and other documents and data that the empty shells were empty. They had been created to hold acquisitions that had not yet materialized, but later did.

10.     The data was so clear and unequivocal that any first-year accounting student would immediately identify the empty shells.

11.     While such a condition would normally delay or derail an acquisition, Defendants made a conscious decision to proceed with the Subject Transaction.  On information and belief, this decision was based on the following:

   a.   Defendants could use the Kompromat to strongarm a deal at a
        significantly reduced price, while easily fending off potentially
        higher bidders under the threat of revealing what they knew.

   b.   Defendants could use their relationships with the banks and
        leverage over CHT's officers to have the deal primarily funded
        through bank financing and, moreover, put the financing on CHT

itself and/or its subsidiaries.  Thus, CC Capital would get all of the benefit of the financing, but none of the liability.

c. Although the deal called for CC Capital to get a 51.4% interest in CHT, they could use the Kompromat as leverage after closing to force out the officers and minority shareholders to turn their 50.4% into 100% without paying any additional compensation.

d. If all else failed and the leverage failed to produce the desired results, Defendants could release the Kompromat and sideline CHT's leadership and Plaintiffs, while taking advantage of the unique financing structure to put CHT into bankruptcy and steal all the company's assets and/or get tax credits by declaring losses.

12.    In preparing the documents for the closing, Defendants intentionally withheld several documents from CHT including the due diligence report and, notably, the credit agreement with the banks.  Throughout the process, CHT management never interacted or worked with the bank to get the loans done, nor were they kept updated on the details of the negotiations on the credit agreements. Instead, the entire credit process was conducted by Defendants in a manner designed to intentionally exclude CHT.  It wasn't until months after closing that the full credit agreement was finally disclosed.  Incredibly, the withheld pages from the final credit

agreement demonstrated that Defendants were not in any way misled by the empty shells and provided the banks with accurate information about the empty shells which the Defendants later falsely claimed they had not been given.

13.   Defendants' plan was not without some speedbumps.  First, a reporter from the Financial Times almost derailed the deal by writing about the Empty Shells, requiring a short delay in closing and a frantic propaganda effort by Defendants to keep the deal on track.  Then, Parmar refused to go along with Defendant's corrupt plan to steal the remaining 49.6% of CHT from Plaintiffs and had to be forced out. Even after being forced out, Parmar continued to be a thorn in Defendants' side and an obstacle to their corrupt goals.

14.   John Altorelli ("Altorelli") is Chu's personal attorney and "clean up guy," who was paid $575,000 from the proceeds of the going private transaction, even though he was not involved in the transaction.  Altorelli began to take an active role in Defendants' illegal schemes after closing and was Chu's point man for various attempts to threaten and extort Parmar, as well as to coordinate and oversee the filing of a fraudulent bankruptcy proceeding that Defendants used to steal all of the assets of CHT for a fraction of their actual value, while leaving the banks with mountains of uncollectible debt and Plaintiffs with zero consideration for their valuable assets that were taken from them.

15.     Defendants first tried to threaten and extort Parmar into simply forfeiting Plaintiff's interest in CHT to the Enterprise.  These threats included two thinly veiled death threats.  After these intimidation tactics failed to produce Parmar's compliance, Defendants launched a new plan to permanently sideline him. Defendants illegally gained access to Parmar's personal email communications and used them to create a false narrative around the Kompromat that could be presented to law enforcement officials from the Department of Justice ("DOJ"), Federal Bureau of Investigations ("FBI") and U.S. Attorney's Office for the District of New Jersey ("USAO-NJ") and U.S. Securities and Exchange Commission ("SEC") for the purpose of causing them to falsely arrest Parmar, while concealing Defendants' own criminal activity.

16.     In a classic case of half-truths or deception through strategic cropping, Defendants presented DOJ with a select few reports and documents that would mislead them into believing that Parmar was the architect of a fraudulent scheme. Allowing DOJ to see the entire picture would not have served Defendants' corrupt purpose and would have actually put the DOJ's crosshairs on the Defendants themselves.  So, just like cropped photos that can mislead for their lack of larger context, Defendants withheld a much larger cache of documents that would have revealed to the DOJ a much larger scheme and a much different set of criminal defendants.



17.    Defendants took advantage of the DOJ investigators unfamiliarity with the depth of detail associated with a $7 million due diligence process and misled investigators into believing that Defendants were fooled by a few inaccurate excel spreadsheets, PowerPoint presentations and emailed statements, rather that the mountains of data provided by CHT and reviewed by CC Capital's crack due diligence team.

18.    Defendant's corrupt designs bore fruit, as Parmar was arrested, the funds from the going private transaction seized, and Parmar was remanded to the Essex County Correctional Facility.  On information and belief, Defendants actively participated in ensuring Parmar's remand by providing an anonymous and knowingly false "tip" to the FBI that Parmar intended to flee the country.

19.    Simultaneously, Defendants instituted a fraudulent bankruptcy proceeding for CHT and its subsidiaries, coordinated by Chu and Altorelli.

Defendants' objective was to use this bankruptcy to sell all CHT's assets to entities that were secretly funded and controlled by Defendants. These sales occurred in two separate fraudulent sham auctions that were set up and timed to ensure that no legitimate offers, other than those arranged by Defendants, could be presented.

20.     Defendants' efforts to steal the assets of CHT were successful, as Parmar was incarcerated, surrounded by violent gang members and unable to mount an effective opposition to these sham auctions.

21.     One aspect that Defendants had not prepared for was Parmar's indomitable spirit and refusal to go to jail quietly. After appealing the denial of bail and demonstrating the abject falsehood of the anonymous "tip," Parmar was released and, finally able to access his files and meaningfully participate in his own defense. Parmar filed motions to dismiss two civil lawsuits that had been brought as companion cases to his criminal case, as well as cross-claims in a bankruptcy adversary proceeding. In these filings, Parmar demonstrated, with significant documentary exhibits, that it was Defendants who had committed criminal acts, not Parmar. This public revelation caused Defendants to become completely unhinged and become even more brazen in their criminal activities.

22.     Defendants Chu and Newton then hired and directed Defendant Antonio Schiena and his company, Multi Operational Security Agency Intelligence

Company ("MOSAIC") to illegally surveil, intimidate, and threaten Parmar, the manager and associates of the Plaintiff entities.

23.   While parties engaged in litigation routinely hire licensed private investigators to surveil each other, Chu and Newton's decision to hire Schiena and MOSAIC is chilling because MOSAIC is not a licensed private investigative agency, it is a private military contractor – mercenaries ordinarily hired to assist in combat operations against the Islamic State.

24.   MOSAIC then sent out a team of thugs, including convicted felon Defendants James Stepien ("Stepien") and off-duty police officers Warren Ernst ("Ernst") and Victor Cardona ("Cardona") to pretend to be private investigators and perform constant surveillance on Parmar, his family and friends.  It is undisputable that state law prohibits these three individuals from performing any private investigative functions in the State of New Jersey.  These thugs made no effort to be discreet, as the true purpose of this surveillance was to intimidate and frighten Parmar and remind him of the death threats that were previously issued by Defendants.   Parmar and his friends and family routinely saw cars following them in and out of Parmar's residence.

25.   In addition to the unlawful surveillance and intimidation activities, members of the MOSAIC team, at the direction of Chu and Newton, hacked into Wi-Fi server at Parmar's home and downloaded large amounts of Parmar and

11

Plaintiff's data.  Given Defendants' demonstrated history of illegally downloading Parmar's stored email communications to use against him, including attorney-client communications, there is a substantial likelihood that they are again attempting to gain access to his privileged communications as a way of illegally and corruptly anticipating and thwarting his efforts to defend himself.

26.    On information and belief, one of the systems which Defendants illegally accessed was the telephone system at Parmar's home, so that they could illegally eavesdrop on Parmar's phone calls, including privileged attorney-client communications.  Because the telephone system had been set up as a Voice over Internet Protocol ("VoIP") and therefore vulnerable to Defendants' cyber attacks, Parmar switched the telephone system to a traditional analog system, because it would require a more difficult and easily detectible physical intrusion, rather than Wi-Fi access. Defendants responded by physically destroying the phone lines to Parmar's home.

27.    As a direct result of Defendants' pattern of illegal activity, Plaintiffs have suffered and continue to suffer immense damages through the seizure of funds that were to be paid to Plaintiffs in the Subject Transaction, and the intentional devaluation the CHT Group and fraudulent sale of all CHT's assets without providing any compensation and the unlawful arrest, detention and prosecution of Parmar, along with significant negative publicity.

28.     Before Defendants began their corrupt pattern of illegal activity, Plaintiffs were 68% shareholders in a very profitable, debt-free, publicly traded company, with the value of their equity being $148,800,000[2] at the publicly traded value or significantly more, using valuations for a fair private sale, in addition to the significant value of their contracts with CHT.  As a direct result of Defendant's unlawful activity, Plaintiffs have lost all those assets, plus significant additional damages, in an amount to be determined by a jury.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. §1964.

30.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b)(2) or 28 U.S.C. § 1391(b )(3).

## THE PARTIES

31.     Plaintiff Alpha Cepheus, LLC ("AC") is a limited liability company, organized under the laws of the state of Delaware, with its primary offices in New Jersey.  AC was created as part of the going private transaction and is a 49.6% shareholder in CHT.

32.     Plaintiff First United Health, LLC ("FUH") is a limited liability company, organized under the laws of the state of Delaware, with its primary offices

---

[2] Just before the going private, CHT was trading at $2.40/share and Plaintiff's owned approximately 62,000,000 shares.

in New Jersey.  FUH was a public shareholder of CHT before going private and is currently a shareholder in AC.

33.     Plaintiff Constellation Health, LLC ("CH") is a limited liability company, organized under the laws of the state of Delaware, with its primary offices in New Jersey.  CH was a public shareholder of CHT before going private and is currently a shareholder in AC.

34.     Plaintiff Naya Constellation Health, LLC ("Naya") is a limited liability company, organized under the laws of the state of Delaware, with its primary offices in New Jersey.  Naya was a public shareholder of CHT before going private and is currently a shareholder in AC.

35.     Plaintiff Constellation Health Investment, LLC ("CHI") is a limited liability company, organized under the laws of the state of Delaware, with its primary offices in New Jersey.  CHI was a public shareholder of CHT before going private and is currently a shareholder in AC.

36.     Plaintiff Paul Parmar is the manager of the Plaintiff entities and was the CEO of CHT.  He is a resident of Monmouth County, New Jersey.

37.     Chinh Chu is the Senior Managing Director and Founder of CC Capital. He is a resident of New York County, New York.

38.     Truc To was a partner at KPMG who oversaw the due diligence of the CHT go private transaction.  After the deal closed, he became the Chief Financial Officer ("CFO") of CHT.  He is a resident of Monmouth County, New Jersey.

39.     Douglas Newton is a Senior Managing Director at CC Capital.  He is a resident of New York County, New York.

40.     Antonio Schiena is a self-described "superpower for hire" and "former veteran of the African intelligence and paramilitary community," who now runs MOSAIC.

41.     Multi  Operational  Security  Agency  Intelligence  Company ("MOSAIC") is a private military contracting company, which purports to maintain offices in London and Washington, D.C.

42.     Warren Ernst is a detective with the Sea Gate Police Department, who moonlights as a private investigator.  He is licensed in the State of New York, but not New Jersey.  He is a resident of Queens County, New York.

43.     James Stepien has been illegally posing as a private investigator but is not licensed.  He is currently on probation, having pleaded guilty on March 16, 2015 to theft/extortion and sentenced to five-years' probation.  He is a resident of Passaic County, New Jersey.

44.     Victor Cardona is a detective with the New York City Police Department who has been illegally posing as a private investigator but is not licensed.  He is a resident of Queens County, New York.

45.     CC Capital CHT Holdco LLC, is a limited liability company, organized under the laws of the state of Delaware, with its primary offices in New York and is a subsidiary of CC Capital.

46.     CHT Holdco LLC, is a limited liability company, organized under the laws of the state of Delaware, with its primary offices in New York.  CC Capital, through various entities has a controlling interest in CHT Holdco LLC

## FACTUAL BACKGROUND

At all times relevant to this Complaint, unless otherwise indicated:

## The Enterprise

47.     At all times relevant to this Complaint, all Defendants, as well as others known and unknown, were members and associates of CC Capital.

48.     CC Capital, including its leadership, employees, and associated entities and individuals, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which engaged in, and the activities of which affected, interstate and foreign commerce. CC Capital is an organized group based in New York City that operated in the District of New Jersey and elsewhere and constituted an ongoing organization whose

16

members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

49.    CC Capital was founded in or about 2016, when Chu left Blackstone to begin his own private investment firm.

## Methods and Means of the Enterprise

50.    The principle purpose of CC Capital was to generate money for its members, partners and associates.  This purpose was implemented by members, partners, and associates of CC Capital through various criminal activities, including extortion, wire fraud, securities fraud[3], bankruptcy fraud and obstruction of justice.

51.    Before launching CC Capital, Chu spent 25 years working at Blackstone, focusing on building its Private Equity business.  Fashioning himself as a "master deal maker," Chu closed some significant deals on his way to becoming a billionaire and purchasing an apartment that takes up two floors of Trump World Tower and a large yacht.

52.    Chu has publicly stated that he credits his success to his "ability to transcend adversity."  Unfortunately, Chu's methods of transcending adversity are not always legal or ethical.  While many of CC Capital's acquisitions can be, and

---

[3] Pursuant to 18 U.S.C. §1964(c), Defendants' illegal securities fraud activities are not included as racketeering acts a part of their pattern of racketeering activity. However, Defendants' securities fraud offenses are relevant to understand the context of several of the other racketeering acts.  For example, Defendants have committed multiple acts of insider trading, both as part of the going private, as well as collateral to the bankruptcy fraud.

are made legally and ethically, Chu's prioritization of winning over ethics and legality means that when faced with adversity, the rules go out the window and, even if he must spend vast sums of money to do so, the only rule that applies is that Chu and CC Capital must win at all costs.

53.     To facilitate the goals of the enterprise, Chu has assembled a team of people who have an almost cult-like loyalty to Chu.  He purchases their loyalty through a variety of methods including, but not limited to, arranging for wild sex parties in his apartment and on his yacht.  One of the key features of Chu's parties are a number of topless and very young models, who he plies with drugs and alcohol, even though several are under the legal drinking age.



54.     As a result, these people readily follow Chu's instructions without hesitation, or concern for the legal or ethical implications of their actions.  These actions are all designed to enhance the wealth and position of CC Capital, while degrading and destroying any outsider who threatens the safety and security of CC Capital and its boss, Chinh Chu.

55.     One of Chu's most significant assets is former KPMG partner, Truc To. A fellow Vietnamese immigrant, Truc To was Chu's go-to person at KPMG to perform due diligence for his acquisitions.  Although capable in his job, the true value of Truc To was that his loyalty to Chu took priority over his loyalty to KPMG or his ethical and legal obligations.  Based in Atlanta, Georgia, whenever Truc To travelled to New York to perform work for Chu, he would stay as a guest in Chu's home, where Chu would lavish him with VIP treatment. As a result, Truc To's due diligence reports were guaranteed to reflect whatever Chu wanted them to reflect, rather than a fair, honest and fact-based report.

56.     Altorelli, used to be a high-powered corporate lawyer for Dewey LeBoeuf, who fled just before the firm collapsed.  A controversial character, formerly linked to Russian spy Anna Chapman, Altorelli faced multiple lawsuits after the fall of Dewey and filed bankruptcy.  After leaving Dewey, he joined DLA Piper, but, on information and belief, was unable to generate the same volume of business, as he had done at Dewey.  This was likely due to the significant

19

reputational damage he suffered as a result of both the fall of Dewey, as well as his association with a Russian spy.  In May 2016, Altorelli left DLA Piper and did not seek a position at a new law firm, instead starting a solo practice, almost exclusively working for Chinh Chu and CC Capital.  As Chu is substantially Altorelli's sole source of income and his only path to recovery after his bankruptcy woes, Altorelli has demonstrated his willingness to violate his ethical and legal responsibilities on Chu and CC Capital's behalf.  Chu refers to Altorelli as his "clean up guy."

### Background of CHT

57.   In 2012, Parmar, Plaintiffs, and other investors acquired Orion Healthcorp, Inc. ("Orion"), a medical billing, collections, and practice management service company.  Orion was later merged into CHT.  Parmar served as CEO of CHT.

58.   Parmar's vision for CHT was to provide physician back office services, including billing and collections.  While this industry is traditionally populated by smaller "mom and pop" service companies, Parmar saw an opportunity to create a much larger corporation that could provide much better service at a lower price.  He developed CHT into a sophisticated platform to provide these services.

59.   Although CHT's platform was the best and most efficient in the industry, CHT struggled to gain new physician customers because of the difficulty in convincing independent practicing physicians to leave their existing service

20

providers.  Parmar decided that the best way to grow CHT's business was by implementing a strategy of acquiring smaller service providers.  The value of these acquisitions to CHT is primarily in their customer lists and relationships, as these medical practices would then be serviced by the main CHT platform.

60.    As CHT grew through these acquisitions, CHT went public on the AIM to help raise money to fund the acquisitions.

61.    Both before and after going public, CHT followed a common pattern to acquire and incorporate these new subsidiaries.  First, CHT formed a new subsidiary LLC, with the intention of filling this shell with the new acquisition.  Then, CHT would execute a merger agreement between the seller and the shell to place the new subsidiary into that shell.  This practice was followed for every acquisition of CHT.

62.    The majority of these shells were filled, but two remained unfilled, Phoenix Health, LLC ("Phoenix"), and MDRX Medical Billing, LLC ("MDRX").  A third, Northstar First Health, LLC ("Northstar"), was filled, but with a smaller subsidiary than expected.  Phoenix and MDRX remained empty shells.

63.    During the time that CHT was a publicly traded company, there were three secondary offerings, which were intended to raise money to fund potential acquisitions.

64.    In conjunction with these raise-ups, several press releases were issued by CHT, some of which were accurate and others which were not.  Some of the

inaccurate press releases indicated that MDRX, Phoenix, and Northstar were filled, but in reality, they were not to be filled until a later time. Although these press releases were not accurate, they did not in any way overstate the value of CHT because there were actual acquisitions that corresponded to those raise-ups.

65. CHT announced the acquisition of Northstar on September 16, 2015. In reality, Northstar was an acquisition shell that had been filled with Vachette Business Services, LLC ("Vachette").

66. Similarly, CHT announced the acquisition of Phoenix on September 18, 2015. However, Phoenix was also an acquisition shell. Later, when CHT acquired Allegiance Consulting Associates, LLC ("ACA") and Allegiance Billing & Consulting, LLC ("ABC") these acquisitions were placed into another acquisition shell called VEGA Medical Professionals, LLC ("VEGA") instead of Phoenix.

67. ACA and ABC actually had a much higher revenue than the Phoenix claimed revenue. When combined with the performance of Vachette, these three acquisitions actually performed better than the expected performances of Northstar and Phoenix.

68. On February 10, 2016, CHT issued a press release announcing the acquisition of MDRX. Like Phoenix and Northstar, MDRX was also an acquisition shell and the actual company that was being acquired by CHT was called New York Network Management, LLC ("NYNM"). NYNM's performance would

22

significantly outpace the MDRX expectations and was the acquisition that was intended to fill the MDRX shell.  Although this deal was set to close in 2016, the acquisition was delayed, at the behest of Chinh Chu, until after the closing of the go private, at which point it was put into a different shell, NYNM Acquisition, LLC.

69.     On information and belief, Chinh Chu intentionally delayed the NYNM acquisition both to keep the CHT enterprise value down for the go private transaction, as well as to ensure that MDRX remained an empty shell so that, as discussed below, he could later make false accusations of fraud against Parmar. Although not part of the pattern of racketeering activity, Defendants knew about and actively concealed the impending NYNM acquisition from the public shareholders of CHT at the time of the going private.  Defendants used this insider information to get a much lower price for CHT than was fair and proper.

## CC Capital Seeks to Acquire CHT

70.     Parmar and Chu first met in September 2015 on Chu's yacht.  They were introduced through mutual friends.  At the time, Parmar was considering taking CHT off the AIM through a going private transaction.  However, Chu stated that he would not be interested in CHT as it was "too small" for him.

71.     In January 2016, Chu began to show interest in bidding for CHT.  He reviewed public data for approximately 6-8 weeks before giving a verbal offer of

23

£1.77/share, which he shortly followed up with a term sheet.  At the time, CHT shares were trading on the AIM for approximately £1.60.

72.    From the beginning, Parmar conveyed to Chu that he was not sure if the company was in the right stage for acquisition and felt that if he had another 12 to 18 months, he could sort out several issues.

73.    At this same meeting, Parmar informed Chu and Newton about several pending acquisitions, including ABC, ACA and NYNM, that were getting ready to close.  Chu and Newton instructed Parmar to not do those acquisitions and hold them and close them after the go private transaction.

74.    Parmar was also very upfront with Chu and Newton that the Parmar parties did not want to sell any equity. This created some conflict, as Chu wanted Parmar parties to sell down all their equity. After much negotiation, a resolution was reached where Parmar parties would retain 49.6% ownership and give limited voting rights to CC Capital on the equity they continue to hold.

75.    There were more than three occasions when Parmar formally announced to Chu, Newton, and their team that he did not want to proceed with the deal.  On each occasion, Chu used emotional and economic blackmail to get Parmar back to the table. On one such occasion Chu promised Parmar Parties an 8% ownership in CC Capital and another 8% ownership in his new SPAC. He told Parmar that he would love for him to work with him as his partner at CC Capital and

started involving Parmar in every transaction CC Capital was exploring. During this time Parmar looked at several transactions and conducted meetings on behalf of CC Capital with acquisitions CC Capital was exploring.

76.     CHT's board hired Stifel Bank to advise on the going private process and Stifel advised that Chu's bid was very low, but it was the start of a process and they recommended bringing in additional players to bid.

77.     Parmar and Chu met for breakfast to discuss and Chu considered raising his bid to £1.92, but wanted Parmar to personally contribute $10 million towards the purchase.  When this was presented to the board of CHT, the board advised that if Parmar intended to contribute to the bid, he would be recused from all bid evaluation discussions, as he is part of the buying group.  Parmar agreed to this recusal.

78.     From approximately April 2016 going forward, Parmar was removed from the decision-making process on CHT's side of the negotiations and the board formed an independent committee to evaluate all bids.

79.     Mark Feuer was elected chairman of the independent committee and Kirkland & Ellis, LLP was hired as attorneys and advisors to the independent committee.   CHT then hired Duff & Phelps Corp. ("D&P") to perform an independent evaluation to write a fairness opinion.

80.    At Chinh Chu's direction, CC Capital hired KPMG to perform the due diligence on the acquisition of CHT.  Chinh Chu directed the hiring of then-KPMG partner Truc To to head the due diligence efforts.

81.    Immediately, Chu began trying to manipulate the process by attempting to influence the paperwork that was being prepared for D&P to review.  Chu wanted CHT to provide a watered-down model with no acquisitions, no projected growth, and an increase in anticipated future costs.  Chu made no secret of his desire to ensure that D&P's valuation of CHT was as low as possible.  For example, Chu became enraged when he discovered that someone had put a draft financial model on the DropBox server that showed 5% growth for CHT and demanded that this be lowered to an implausibly low 1.2% annual growth.

82.    It was after this incident that Roger Aguinaldo came to Parmar to explain how the CC Capital enterprise operated.  He explained that "in Chinh's world, nothing reaches Chinh.  People below take the fall for all mistakes and they cannot allow Chinh's prestigious career to be blackmarked."

83.    Sensing that he may have gotten in over his head with a potential buyer that seemed to operate more like an organized crime family than an investment firm, Parmar decided to stop the sale.  Parmar informed Newton that he did not want to proceed with the deal.  While he did not go into specifics, Parmar explicitly told

Newton that there were problems and that he did not want to risk becoming the first person to put a black mark on Chu's record, as Roger had warned him about.

84.    On August 17, 2016, D&P submitted their initial report, entitled "Discussion Materials Prepared for the Special Committee of the Board of Directors. This report contains several errors or omissions which effectively resulted in an undervaluation of CHT:

a.    On Page 5, the analysis of the "Total Enterprise Value" lists $28.3 million of debt in the form of loans, but these loans had already been repaid.  At Chinh Chu's direction, these loans were repaid on July 11, 2016, to avoid a potential audit by the lender, but left on the valuation report as debts resulting in a diminution of the enterprise value.  On information and belief, this error may have been influenced by Chinh Chu, as he wrote in an email to Parmar "Let's chat when you are free. I have an idea regarding the loan."  This email was sent on July 14, 2016, three days after the loans were paid off.

b.    On page 7, in a chart entitled "Historical and Projected Financial Performance," D&P outlined the annual revenues, growth and EBITDA for CHT from 2012 to the present, with projections through 2021.  Although CHT had shown significant growth

from 2013 through 2016, the projections for future growth were set extraordinarily low, at 1.2% projected annual growth, rather than the 35-50% ordinarily expected from a growth company.

   c.  The 2017 projected revenue was an artificially low $140.4 million.

85.   The D&P report showed that the value of CHT was far greater than Chinh Chu wanted to pay:

   a.  On page 12, D&P provided their valuation ranges using several different valuation methods on a chart, annotating CC Capital's bid with a red line, well below any calculated valuation range.  CC Capital's bid of £2.11/share was over 25% less than the lowest end of the valuation range using the discounted cash flow method of £2.83.[4]

   b.  Because CC Capital's offer was so far below any price on which D&P could issue a fairness opinion, they suggested many alternative buyers on pages 21-27.

86.   On August 23, 2016, the Special Committee held a telephone conference to discuss the D&P report.  Parmar was present briefly in the beginning

---

[4] Although these numbers were unacceptable at the time, the offer would have become even less palatable as time went on, because of the decreasing exchange rate of British Pounds to Dollars.

to present his views, but was then excused from the deliberations, as he was a member of the buyers' group. The committee discussed the matter with D&P and "that the Proposal was not fair based on the standalone value of the Corporation as reflected in management's forecasts and that Mr. Feuer should reiterate to the buyer group that the Proposal remains too low and that the Committee would not approve a transaction at the price of the current Proposal."

87.    At that time, Parmar was desperately searching for a way to gracefully exit the train that Chinh Chu had started rolling down the hill and end the going private process. Parmar felt that it would still be a good idea for CHT to go private, but that he needed more time and, potentially, a different buyer to make it work. In particular, Parmar knew the following:

    a.  CHT's agreements to acquire ACA and ABC were set to close in September 2016. These acquisitions more than made up the difference of any inaccurate statements about Phoenix and Northstar.

    b.  CHT was very close to finalizing an agreement to acquire NYNM, which was significantly more valuable than any inaccurate statements about MDRX. However, Chu was pressuring Parmar to delay this deal until after the closing of the going private.

c.   The D&P report had been manipulated to understate the value of CHT and an accurate total enterprise value would have been at or above $600 million.

d.   Chu's desired price for the going private was less than 50% of the actual value of the company, and Chu was using the inaccurate statements about MDRX, Phoenix and Northstar as leverage to pressure Parmar into closing the deal at such an unreasonably low price.

88.   If Parmar could delay the going private process long enough to close ACA, ABC and NYNM, then the D&P valuation would increase significantly, and CHT would be in a much stronger negotiating position, without any of the vulnerabilities that currently existed.

89.   Parmar communicated to Chinh Chu that the deal was dead.

**Chu Revives the Deal**

90.   Disappointed by this turn of events, Chu dispatched Newton to visit Parmar at his home and convince him to revive the transaction with CC Capital. Newton informed Parmar that Chu was offering to let Parmar use his yacht and insisted that for the next several days, Parmar use the yacht as an office during the day to work on reviving the bid and have parties at night.

91.     Parmar went to Chu's yacht, along with Sam Zaharis, where he met Newton and Pavan Bakshi.  Newton and Bakshi spend all day working to try to convince Parmar to revive the transaction.  Parmar reiterated to Newton that there were problems with CHT and that he did not want to be the first to tarnish Chu's record.

92.     Parmar was honest with Newton and told him that Parmar wanted time to resolve the CHT issues and finish a few more acquisitions before CHT was ready to sell.  Parmar said that this would take approximately 18-24 months.  Newton responded that Chu did not want to drop the deal and that they would be happy to work out any of CHT's issues with Parmar once they became partners.

93.     The following day, Chu invited Parmar to his office to look at another deal he is working on.  During this visit, Chu took Parmar aside to explain why his low offer would still be very profitable to Parmar personally.  Chu promised Parmar the following:

       a.  CC Capital will commit to $400 million in additional financing for CHT without any dilution to shareholders.

       b.  CC Capital would provide CHT with access to a large number of new clients.

       c.  Chu would make Parmar a partner in CC Capital

    d. Chu would make Parmar a partner in a new $10 billion fund that Chu was forming called (ironically) Northstar.

94.    In exchange for these things, Chu wanted Parmar to assist in pushing the deal through at the current bid price.  Parmar responded by informing Chu of the objections that D&P had already raised to the fairness of the bid.  Parmar further informed Chu that Kirkland and D&P had advised the independent committee that they believed that they could find new bidders willing to pay more than double Chu's offer.

95.    Recognizing that the D&P report had created a larger problem that could not be solved by influencing Parmar alone, Chu set out to improperly and corruptly influence members of the independent committee.  First, Chu began to feign interest in acquiring an unrelated company that was owned by Mark Feuer, the chairman of the independent committee.  Chu and Feuer engaged in extensive negotiations for this potential acquisition.  Chu's actions were designed to and, in fact did cause, a serious ethical violation and conflict of interest to ensure that Feuer would support Chu's bid.

96.    At approximately the same time, Parmar received a phone call from Newton asking Parmar to consider increasing the compensation for the independent committee members.  Parmar responded that the committee members were already being highly compensated at approximately $100,000 each for their participation in

six meetings.  Newton then explained that he had been speaking with one of the committee members about the transaction and that this committee member had expressed to Newton his desire for additional compensation.

97.     Despite Chu's efforts to improperly influence the committee, it became clear that a deal would not be possible as long as D&P and Kirkland were still involved.

98.     Chu then hatched a plan to withdraw CC Capital's bid, at which point, Parmar would necessarily have to dissolve the independent committee and terminate the advisors, as there were no active bids to consider.  Thereafter, CC Capital would submit a new bid and CHT would form a new committee with new advisors.

99.     With Chu's corrupt plan set, he had CC Capital withdraw its offer.  As CHT officially had no bids to evaluate, Parmar dissolved the independent committee and terminated D&P and Kirkland & Ellis. On September 12, 2016, he emailed Chinh Chu, saying that he "wanted to inform you both and CC Capital that Special Committee was disbanded."

100.   The next day, September 13, 2016, at Chinh Chu's direction, Parmar forwarded a copy of the D&P report by emailing it to Andrew Barnett, an analyst at CC Capital.

101.   Upon learning that the report had been emailed, and therefore was able to be tracked, Chu became apoplectic at Parmar, screaming that this action alone has

derailed the deal, as CC Capital could be subject to a class action lawsuit for being privy to the valuation methodology and analysis prior to winning the bid.  After consulting with his attorneys, Chu informed Parmar that once the deal had been finalized, Parmar would need to "accidentally" drop a copy of the report into the repository where all documents generated by the transaction are available to all parties.  This way, CC Capital could falsely, but plausibly claim that this is how they got access to the document, but only after the deal was final.

102.   With the first independent committee dissolved, Chu set about ensuring that the new independent committee would bend to his will.  He had Bakshi introduce Parmar to representatives from SunTrust Robinson Humphrey ("SunTrust") and McGuire Woods as potential advisors for the next independent committee.  Bakshi assured Parmar that SunTrust would issue a fairness opinion in accordance with Chu's desires.

103.   Bakshi brought Tarun Mehta, an executive from SunTrust, to meet Parmar at his home and review the D&P report.  After review, the SunTrust executive said that he saw no issues with presenting a new report with a valuation in the range that Chu desired.

104.  Mehta also told Parmar stories of Chu and his reputation for vindictiveness to go out of his way to harm anyone who does not go along with him.

He explained that this is why everyone on Wall Street will not bid against Chu, when they see that he has made an unusually low bid.

105.   Mehta explained that much of Chu's power comes from his access to funds to execute large transactions and a large stable of people who work for various banks and other institutions who are loyal to him because of the fees that he generates for them, as long as the go along with his plans.  He further intimated that the "fees" were not limited to the normal, legal and ethical fees associated with transactions, but rather included gifts, kickbacks, bribes, prostitutes, drugs, and other improper forms of compensation.

106.   This executive's explanation of how Chu was able to manipulate other institutions is consistent with Parmar's own observations, as Chu had explained to Parmar that Bank of America ("BofA") did not want to finance the CHT deal at all, but Chu offered to make them managers on a new Special Purpose Acquisition Company ("SPAC"), which gave them $38 million in fees, so that they would agree to finance the CHT deal on Chu's terms.  Chu explained that the team at BofA that they were dealing with all owed their jobs to Chu and that he was responsible for them generating over $500 million in fees for BofA on Chu's transactions for 2015 alone.

107.   The likelihood of this is bolstered by the fact that entire credit agreement and commitment from BofA was negotiated directly with Chu and BofA

35

commitment letters were included in CC Capital bids as early as July 2016, well before the due diligence process had made any significant progress. As discussed more fully *supra,* no audit was performed, even though the credit agreement required it, the credit agreements were never disclosed to Parmar, despite his signature appearing on it, and BofA had absolutely no communications with Parmar or anyone else at CHT until April 2017, well after the due diligence had been completed and the deal had closed.

### Problems in the Due Diligence Process

108.   Simultaneous with all the above described transactions, Truc To of KPMG was conducting due diligence on the deal. Through his due diligence, there were several documents produced which show that Chinh Chu and Truc To had actual knowledge that the empty shells had no assets, revenue or employees.

109.   On July 21, 2016, Chinh Chu and the team at CC Capital and McKinsey were given a demonstration and access to PARCS, CHT's proprietary internal database management software system used to bridge different processes and accurately track all data, collections and fees. All the data in PARCS is accurate and was available to Chinh Chu and Truc To throughout the due diligence process.

110.   On or about mid-August 2016, Truc To sent CHT a request for detailed collections data. Truc To then sent another request for all data on two randomly selected months, December 2015 and June 2016, to perform an in depth audit. On

August 25, 2017, Melodie Kraljev, head of operations for Orion, sent Truc To the requested data from the selected months.  As the empty shells had no collections data, none was provided.

111.   The total collections from these spreadsheets was $177,702,244.31 for December 2015 and $134,498,514.52 for June 2016.  As CHT's contracts with the various medical offices provided for 2-7.5% of these collections, with a companywide average of about 5%, this results in monthly revenues to CHT of $8,885,112.22 for December 2015[5] and $6,724,925.73 for June 2016.

112.   After CHT provided complete and accurate data to Truc To and KPMG, they had actual knowledge that the annual revenue of CHT was less than $100 million.  While Truc To and his team asked many follow up questions to verify the data, they never asked about the lack of any data from MDRX and Phoenix or the fact that the total revenue seemed unaffected by the alleged MDRX and Phoenix acquisitions.

113.   Several other indications Truc To and Chinh Chu knew that the empty shells were indeed empty:

    a.   CHT provided payroll records on every subsidiary except the empty shells.

---

[5] In the medical billing industry, collections are always higher later in the year, as patients go to the doctors more readily after meeting their deductible.

    b.  CHT provided lease documents and other information on the physical offices of every subsidiary except the empty shells.[6]

    c.  CHT provided tax returns and other tax filings on every subsidiary except the empty shells.

    d.  The insurance policies provided did not cover any of the empty shells.

114.  On August 5, 2016, Chinh Chu met with Arvind Walia, CEO of Orion, and Melodie Kraljev to discuss the operations of CHT and all subsidiaries.  During this meeting, Arvind Walia informed Chinh Chu that, as CEO, he has no knowledge of Phoenix or MDRX, as these subsidiaries of Orion had never been put under his control.

115.  Despite many requests, Chinh Chu never permitted Parmar to review the final KPMG report.

116.  On or about August 2016, a reporter at the Financial Times began asking about the legitimacy of the acquisitions of Phoenix, Northstar and MDRX, the empty shells.  Thinking that there was no possible way for the deal to be consummated with this information becoming public, Parmar was again shocked to learn that Chu wasn't going to let this derail the deal.

---

[6] This point should have been even more glaring to the highly experienced and highly paid team from KPMG, as a simple google search for the address listed for MDRX, 166 High Street, Akron Ohio does not even exist.  The closest address, 166 S. High Street, is Akron's City Hall, where the mayor's office is.

117.   Without ever explicitly acknowledging to each other what they both knew to be true about the empty shells, Chu directed his public relations firm to try to kill the Financial Times story and let the deal proceed to closing.

118.   Chu told the reporters that he was "comfortable" with proceedings, having spent $7 million and three months work on due diligence alone.  While these statements delayed Financial Times from reporting the obvious flaws in CHT, ultimately it did not stop the public disclosure of these issues just prior to the closing.

**Chu Pushes the Deal Through**

119.   On or about September 14, 2016, Chu submitted a new offer to purchase CHT.   In response, CHT organized a board meeting to discuss the following three issues:

    a.   CC Capital's new offer, which was a few pennies higher than the previous offer, but still less than half of the lowest price D&P reported as fair.

    b.   CHT had repaid its outstanding loans.  The repayment of this loan should have increased the value of CHT by $23 million above the valuations calculated by D&P.

    c.   CHT was in the process of acquiring Allegiance Consulting Associates, LLC ("ACA") and Allegiance Billing & Consulting, LLC ("ABC") using internal cash.   This acquisition would

39

significantly increase the revenue to CHT, and therefore also increase the value of CHT approximately $30 million above the D&P valuations.

120.   The impact of the repayment of the loan and the acquisition should have increased the minimum fair price of CHT from D&P's estimate of $500 million to $553 million.  However, CC Capital's offer was in the $275 million range.  This disparity caused significant debate among the board of CHT.

121.   Mark Feuer, having been conflicted by Chu's attempt to purchase his company, advocated for the CC Capital deal and argued that the D&P estimates were never officially presented to the board and therefore were not binding.  Other board members responded that, notwithstanding the lack of official presentment, they had heard the numbers and felt duty bound not to accept any offer below the D&P estimate.  Although D&P had been terminated, the board refused to entertain any lower offer, unless they were presented with a new, formal fairness report, prepared by a consultant with equal competency and reputation to D&P.

122.   Mark Feuer's advocacy on Chu's behalf resulted in him being accused of being conflicted by the other board members.  Although Feuer denied any conflict, he offered to resign.

123.   Bakshi took this opportunity to recommend SunTrust and McGuire Woods as advisors to the new independent committee.  The board agreed and formed a new independent committee with SunTrust and McGuire Woods.

124.   On September 14, 2016, Parmar emailed Mehta to inform him that CHT had received a bid from CC Capital and to inquire whether SunTrust was interested in being hired as the independent advisor and providing a fairness opinion.  Mehta responded within 20 minutes that SunTrust was interested, and, in his response, he revealed that he knew much more about the proposed deal than Parmar had disclosed in his introductory email, by noting that Parmar was an "interested party" and so SunTrust must deal directly with the Special Committee. CHT retained SunTrust the next day, September 15, 2016.

125.   The board further appointed John Johnston as the chairman to the committee, the same committee member who had previously discussed increasing the board's compensation with Newton.  Johnston was almost removed from the committee for this reason, but the board ultimately decided to leave him in this position with instructions not to have any more discussions with CC Capital about his compensation.  Dr. Zimberg and David Clark are appointed as co-chairs of the committee.

126.   Four days after SunTrust is retained, SunTrust executive Tarun Mehta calls Parmar seeking an urgent face-to-face meeting.  When they meet later that day,

Mehta explains that SunTrust will be unable to provide a fairness report in the range that Chu desired and that their initial calculations show that their estimate will actually be approximately 30% higher than D&P.  Mehta stated that SunTrust's position was complicated by the fact that Johnston had put on the record what the D&P estimates were and the fact that this estimate did not account for the repaid loan or the ABC/ACA acquisitions.

127.   Mehta explained that he would rather resign than submit a report that would upset Chu.  He did not, under any circumstances, want to find himself on the wrong side of Chu, but he wanted to give Parmar the courtesy of heads up and to explain the true reasoning before making SunTrust's resignation public.

128.   Parmar asked Mehta to delay announcing their resignation so that he could speak with Chu and figure out how to deal with this development.  Mehta responded that it would be impossible for SunTrust to continue without having to disclose at least preliminary findings.  Parmar asked Mehta to stop all meetings with the independent committee and give him two days to discuss the matter with Chu, which Mehta agreed to.

129.   Parmar consulted with Chu, who suggested that Parmar demand an immediate vote on Chu's offer by the board.  Parmar did as Chu suggested but, predictably, the board rejected the offer, reiterating their belief that accepting such a low offer would violate their fiduciary duties.

130.   SunTrust resigned on September 26, 2016 and, as a result, no fairness opinion was ever obtained.

131.   Undeterred, Chu made several further attempts to push the deal through.  He first offered the shareholders 7-year promissory notes for $40 million, which would effectively raise the purchase price to $315 million, still well below the D&P valuation.  Next, he tried to influence Parmar not to pursue any other potential investors.  When Parmar tries presenting one of Chu's new offers to the board, they unanimously reject it and all board members offer to resign.

132.   The potential resignations, and the significant delays that would result, send Chu into overdrive, trying to find any way to get the deal closed now.  He tells Parmar that, at this point, he will not accept the possibility of the deal falling through.

133.   After another slight increase of 2 cents/share, McGuire Woods informs Chu that they will not allow any more votes unless Chu agrees to give them indemnity.  Chu revises the offer to include a full release and indemnity for McGuire Woods and all of the board members.  The board indicates that if Chu revises the offer further to include additional compensation for the board members, they will accept the offer.  Chu makes these changes and the board votes to accept the offer for CC Capital to purchase CHT.

### Sham "Go-Shop" Period

134.   The deal was approved on November 24, 2016, with CHT Holdco, LLC purchasing CHT at a price of $2.93/share in cash, plus $0.43/share in promissory notes, for a total of approximately $309.4 million for the entire company.   CHT Holdco, LLC was, and still is, owned by CC Capital and Plaintiffs.   The deal was to be financed up to $145 million by Bank of America Merrill Lynch, with the remainder being paid in cash by CC Capital and Plaintiffs.   Plaintiffs' portion was to be deducted from the proceeds of the sale of their shares of CHT.

135.   The agreement provided for a brief "go shop" period.   While a "go shop" period ordinarily allows a public company to seek out better offers before going private, here, Chu then set the terms of the "go shop" period to ensure that no other buyer could outbid him.

136.   Early in the process, the special committee began to express concerns over the fairness opinion process and, protecting themselves from potential claims that they were violating their fiduciary duty by accepting CC Capital's unreasonably low offer.   The committee wanted to add a "go-shop" period to the transaction, to ensure that they were getting the best offer on the market.

137.   Chinh Chu agreed to the go shop provision, but immediately set about controlling the terms to ensure that no legitimate competing bids could be presented. He emailed the Committee on July 19, 2016, saying:

We understand and agree with the point that you made regarding the Board's fiduciary responsibility.  Regarding this point, we would be amenable to a 4 week "Go-Shop" period post the execution of the Purchase Agreement (terms of such Go-Shop to be contained in the signed transaction) -- enables the company to entertain other potential offers for Constellation.  As you may appreciate, we would not be amenable to the company initiating a market check prior to us executing a transaction – if the Company pursues a market check, we will stop our work and withdraw our offer at that time.  The rationale is that a Go Shop enables the Board to exercise its fiduciary duty and a market check will be very disruptive to the Company as the company barely has the bandwidth to handle our diligence.

Deals are based on momentum and we do not want to put the deal at risk with lengthy delays.  We are incurring millions of dollars of expense as part of our due diligence process and welcome expeditious progress in reaching a conclusion to our process.

138.   After the Duff & Phelps report revealed the inadequacy of CC Capital's offer, the Special Committee, advised by attorneys at Kirkland & Ellis, wanted to perform a market check. Chinh Chu countered with a "modified market check."  He first sent his proposal to Parmar on August 23, 2016, before refining it to send to the Special Committee on August 25, 2016.

139.   On September 6, 2016, Chinh Chu pushed for an answer to his proposed "modified market check" and attorneys from Kirkland & Ellis confirmed that it had been rejected by the Special Committee.

140.   Attorneys from Kirkland & Ellis, counsel to the Special Committee, objected to Chinh Chu's extraordinary demands and explained that it would not be

a legitimate go shop, as the rules had been set up to dissuade anyone from submitting a legitimate bid.  This is why Kirkland & Ellis was terminated along with Duff & Phelps.

141.   The provisions of the "go shop" period were set up by Chu to ensure that no other buyer could outbid him.  A breakup fee of $20 million was set, to be paid to CC Capital, if CHT accepted any other offer and CC Capital was given the right to counter any competing bids.  This put CC Capital in a protected position, as any other bidder would have to beat CC Capital by over $20 million.  For example, if another party bid $400 million, CC Capital's counter would only need to exceed $380 million.  Finally, an extraordinarily short period of 30-days was set, insufficient for any other bidders to complete any of the research required to submit a competent bid.

142.   Even under these conditions, CHT received much higher offers from two credible bidders in two weeks. On December 24, 2016, CHT received an offer from Flexpoint Ford, at a total enterprise value of $365 million.

143.   Although this offer was only communicated to CHT's Special Committee, not CC Capital or Parmar, within hours Chinh Chu sent a message through a mutual contact, Tomer Vardi to Parmar that Chinh Chu was aware of the offer and its terms and that he didn't think it was "too big of a concern."  This was

news to Parmar, as he had not heard about the Flexpoint Ford offer and apparently Chinh Chu could get information on competing bids before even Parmar could.

144.  To prevent the board from accepting these higher and better offers, Chinh Chu sent a letter to the board to instruct them that he interpreted Flexpoint Ford's bid as not being superior, falsely claiming that Flexpoint Ford "does not have "committed" financing."  In reality, Flexpoint Ford is a far larger private equity firm than CC Capital and required no financing to close the proposed CHT deal and thus was "not subject to a financing contingency," as the Merger Agreement required.

145.  Chu's efforts to improperly and corruptly influence the bidding process was fruitful, as his originally accepted bid is the one that was ultimately closed on.

### Fraudulent Proxy Agreements

146.  On November 24, 2016, to facilitate the going private transaction, "Voting and Support Agreement and Release of Claims" (the "Proxy Agreement") were prepared and presented to all shareholders of CHT, including Plaintiffs, to sign.

147.  On order to close on the going private transaction, stockholders representing at least 89% of the issued and outstanding shares of Common Stock were required to agree.

148.  While proxy agreements are standard for these types of transactions, the proxy agreements in this transaction were very different.  Prepared by

representatives of CC Capital, these Proxy Agreements were fraudulent in several respects and unenforceable in others.  Specifically:

    a.  This agreement made representations that the Board and Special Committee of CHT had determined that "entering into [the agreement with CC Capital] is advisable and in the best interest of the Company and its stockholders."  However, this agreement failed to disclose the following:

        i.  Duff & Phelps performed a valuation that demonstrated that the price was well below what could be considered fair or "advisable and in the best interest of the Company and its stockholders."

        ii.  Suntrust refused to issue a fairness opinion and resigned. The reason for this resignation was because Suntrust knew that they would never be able to ethically a minimum fairness opinion that would support CC Capital's offer, as it was numerically impossible to reach a valuation that was any lower than D&P.

        iii.  Despite their efforts, the Board and Special Committee were never able to convince any reputable entity to issue a

fairness opinion which would be substantially below D&P numbers and in agreement with CC offer.

iv. NYNM was a scheduled acquisition for which all due diligence and sources work was finished, however the deal was stalled on direction of CC Capital.

v. The go-shop period produced three superior bids, which were disregarded by the Special Committee in favor of CC Capital's lower bid.

vi. The Special Committee refused to approve the agreement until they were granted indemnification.

vii. The members of the Special Committee requested and were given additional compensation to approve the deal

b. The Proxy Agreement provided for a release of claims all claims, "known or unknown, past, present or future." This provision is unenforceable for a number of reasons.

i. Delaware law provides that a release cannot apply to future conduct and there is no exception for future conduct arising out of, or contemplated by, the Proxy Agreement.

ii. As discussed above, the Proxy Agreement was entered into by fraud.

149.   Immediately, Parmar wrote to Newton to object to these agreements, as they went far beyond what is appropriate and customary.  Newton replied that the attorneys told them that it needed to be done this way.

150.   In an effort to further induce shareholders to sign the release they were given promissory notes and were told that if they did not agree to the release, the funds to fight any litigation and claims will come from the money will be deducted from these promissory notes.  However, subsequent actions by Defendants have rendered these promissory notes unrecoverable.  Thus, even if the Proxy Agreements were not fraudulently induced, the releases would now be void due to a lack of consideration and breach.

151.   On information and belief, Newton knew that these agreements were not customary and had been prepared in this way in anticipation of Defendants' future fraudulent activities.

152.   For example, the Proxy agreements and disclosures in this deal were markedly different from those used by CC Capital in other go private transactions, such as Dun & Bradstreet and Fidelity & Guarantee, both of which disclosed a fairness opinion and required no releases.  The Dun & Bradstreet proxy agreement further advised the shareholders that they had the right to conduct and independent appraisal.

153.   Predictably, the shareholders also objected to these forms and refused to sign them.  Chinh Chu personally called each one to convince them to sign.  On information and belief, Chinh Chu made further fraudulent misrepresentations to the shareholders on these calls in an effort to fraudulently induce them into signing.

154.   Chinh spoke to eight major shareholders before they agreed to sign the voting agreements.  Many voiced their opinion that the price was too low and at least two of them immediately stated that they will not sign the Proxy Agreement and would not vote in favor of the deal.

155.   One shareholder stated that, although the promissory notes and the entire deal structure was a mess, he wanted to have future business with CC Capital and offered to buy shares from market at any price to help Chu get the required 89% voting approval.  Chu assured him that CC Capital will move heaven and earth and conclude the transaction. Chu also agreed to meet with him and discuss other deals going forward.

156.   Chu and this investor also discussed a strategy to motivate the reluctant shareholders to sell their shares to him by withholding 30% from the sale price for US taxes, even though the shareholders are UK citizens and would have no US tax liability.  On information and belief, Defendants further agreed not to withhold any taxes from the sale of this particular investor's shares, which is documented on the funds flow spreadsheet.

## Bank of America Financing

157.   Separately, Chinh Chu interfaced directly with Bank of America ("BofA") to obtain financing for the deal.  BofA sent commitment letters, as early as August 9, 2016 committing to provide up to $120 million principle financing and another $15 million revolving credit facility.  These commitment letters were issued before KPMG had made any significant progress on the due diligence and without BofA conducting any due diligence of its own. BofA never communicated with Parmar, or any other member of CHT.  This lack of communication is especially curious, considering that the commitment letters made clear that BofA intended for CHT to be the borrower, not CC Capital.

158.   In the five months following this initial commitment letter, no audit was performed, even though the executed credit agreement required it, made no effort to conduct any due diligence, and had no communications with Parmar or anyone else at CHT.

159.   On information and belief, this extraordinary lack of inquiry, and BofA's willingness to lend such a significant sum of money to an entity with which they never communicated was because of a secret deal that Chinh Chu had negotiated with BofA.

160.   On November 16, 2016, Doug Newton ("Newton"), Senior Managing Director at CC Capital, sent an email, saying "Head of Lev Fin at BoA requested a

call with Chinh this evening – we are unsure re: what, but our thought is to get from Chinh another face to face commitment of support of our deal / diligence – will keep you posted." In this email, Newton may have revealed that BofA was not doing any audit or due diligence on the CHT deal because they were relying solely on the verbal assurances of Chinh Chu. On information and belief, Chinh Chu knew, consciously avoided or was reckless in not knowing, that these assurances were false, based on Chinh Chu and Truc To's actual knowledge of the true financial condition of CHT.

161.   During the process, there were several versions of the credit agreement prepared and reviewed between BofA and CC Capital, but Parmar and CHT were largely excluded from this process. A couple of earlier drafts of the credit agreement were emailed to Parmar, but always with the caveat that these drafts were missing large portions of what would be added to the final agreement.

162.   On the day before closing, Parmar was emailed a packet of signature pages, which would then be placed into all of the documents needed for closing. One of these signature pages was for the credit agreement, which Parmar had never read and was never provided with a final copy of the credit agreement until months after closing. The latest version which was provided to Parmar was annotated as "v7," whereas the executed copy was annotated "v12."

163.   Incredibly, the executed copy contains an additional 83 pages of schedules that were never provided to Parmar or anyone at CHT for review.

164.   Even more incredibly, these additional 83 pages demonstrate that CC Capital was fully aware that MDRX, Phoenix and Northstar were empty shells.  For example, the schedules establish that CC Capital was fully aware that MDRX, Phoenix and Northstar did not have any offices, CC Capital was fully aware that MDRX, Phoenix and Northstar had no insurance, and MDRX, Phoenix and Northstar did not have any revenue ("change in the carrying value of the earnouts for PPP, Northstar, Phoenix & MDRX" has no value annotated).

165.   Although CHT and Orion received no benefit from the BofA financing, Chu somehow found a way to have the banks put Orion as the borrower, thus saddling CHT with crushing debt with no consideration.

**Last Minute Delays**

166.   On December 27, 2016, a shareholder derivative lawsuit was filed in Delaware Chancery Court by Destra Targeted Unit Investment Trust ("Destra"), one of the major shareholders of CHT, alleging fraud and unlawful dilution of their interest in CHT.

167.   With a lawsuit such as this being filed a month prior to the scheduled closing date, ordinarily the closing should have been delayed and an audit conducted. Parmar went to Chu and asked for the closing to be delayed, so that he could try to resolve these issues, but Chu refused.  No audit was conducted and the closing date remained in place.

168.   The judge presiding over the Destra litigation ordered that, if the CC Capital deal closes, $56.25 million of the proceeds shall be placed into escrow to protect Destra's interests.

169.   As a result of the judge's order, Parmar wanted to stop the CC Capital deal from going forward and asked Chu to delay the closing for four months, so that he could resolve the outstanding issues.  Chu refused and told Parmar that he wanted to bring in another attorney to negotiate with Destra.  The attorney that Chu wanted to bring in was Altorelli, who he referred to as his "clean up guy."

170.   Although Altorelli attempted to negotiate with Destra, no progress was made.

171.   As a result of the allegations raised in the Destra lawsuit, reporters from the Financial Times intensified their inquiries to CC Capital and CHT about the empty shells.

172.   The inability to quickly resolve the Destra matter, along with the intensifying inquiries from Financial Times, led Parmar to reiterate his request to delay the deal.  Although he really wanted to cancel the deal altogether, Parmar thought that a delay would look better than an outright cancellation.

173.   Chu was unwilling to accept anything other than the closing of the deal, but agreed to a very short delay, as long as the closing would go forward within the

next 3-4 days.  A simple announcement was put out on January 26, 2017 that the closing was delayed because all of the conditions had not yet been met.

174.  Despite the best efforts of Chu and the public relations firms hired by CC Capital and CHT, the Financial Times published an article on January 26, 2017, the same day that the delay was announced, entitled "The Curious Case of Constellation Health and Blackstone's Former Top Deal Maker."  This article exposed the empty shells, detailing how they had been incorporated shortly before acquisition, that press releases touted their significant revenue over time periods before they were even incorporated, and the complete lack of any internet footprint prior to the acquisition announcement.  The article noted that "the cat's cradle of corporate entities and generalised opacity across Constellation's operations could be seen as a red flag to potential investors and financial journalists alike." However, the article notes Chu's history with Blackstone and closes by saying "[i]f anyone is/was in a position to kick Parmar's proverbial tyres, it was Chu. We must assume he knows what he's doing."

175.  Late that same night, Parmar received a call from Newton stating that Chu is "freaking out" about the bad press and needs to close the deal immediately. Parmar responded that this is a mistake and is not fair, but Newton was immoveable.

176.  Shortly thereafter, Parmar received a call from Chu, where he told Parmar that he was going to give him an additional $3.3 million in fees.  Chu stated

that he had figured out a way to pay Parmar to fix his problem, but the deal needed to close immediately.

### The Deal Closes

177.   On January 30, 2017, over the objections of Parmar, the CHT deal closed, resulting CC Capital gaining 51% interest in CHT and Plaintiffs retaining 49%.   Specifically, AC held 49% and the remaining Plaintiffs are all of the shareholders of AC.

178.   Prior to the going private, Plaintiffs owned approximately 68-70% of CHT.  However, a percentage of that stock was actually owned by Plaintiff's partners Pavan Bakshi and Destra.   Bakshi and Destra wanted to liquidate their shares, whereas Plaintiffs wanted to keep the majority of their shares.   Because CC Capital wanted a controlling interest in CHT, Plaintiffs needed to cash in approximately 35% of their shares.   Chu and Newton pressured Parmar on multiple occasions to cash out more, but Parmar refused.

179.   At closing, Bakshi was paid directly, whereas Destra's portion was wired to Plaintiff's then attorneys along with the proceeds of Plaintiff's cashed out shares and the deal fee to Parmar.  Bakshi received $7,843,621.72 and the remainder was wired to the escrow.  The majority of this money actually belonged to Destra.

180.   At closing, the final funds flow document showed a very different flow of funds than was anticipated in the prior documents, and very different from what the go-shop bidders thought they were bidding against:

a.   The cash contributed by CC Capital was lowered to $82,502,160.25 from the $88,687,476.20 originally anticipated.   Presumably, the $6,185,315.95 difference was pocketed by Chinh Chu.

b.   Of the $212,502,160.25 cash contributed at closing by CC Capital and BofA, $14,519,935.90 was used for various deal related fees, many of which are of questionable legitimacy.   For example:

   i.   $2,555,023.91 to Winston & Strawn, LLP, a law firm that represented CC Capital, several times larger than reasonable for a deal of this size and complexity.   On information and belief, Chinh Chu used this deal to pay off unrelated invoices to Winston & Strawn, LLP.

   ii.   $575,000 to Altorelli, Chinh Chu's personal attorney and "clean-up guy," who later admitted that he performed no services as part of the deal.

   iii.   $1,000,000 finder's fee paid to Chu's friend, Lawrence Robins, which was added unilaterally by Chu on the last day.

iv.    $350,000.00 to Richards, Layton & Finger, a Delaware law firm that represented CC Capital in the Destra litigation but had nothing to do with the transaction or with CHT.

v.    $8,125.00 to Elicit Insights Consulting, who played no role in the transaction.

vi.    $25,000.00 to CC Capital Management.  It was never disclosed that CC Capital Management would be getting paid any fees.

vii.    $30,000.00 to Parth Mehrotra, Chu's friend who had no involvement in the transaction.

viii.    $54,799.31 to Finsbury, the public relations firm that Defendants used to attempt to kill the Financial Times story.

181.  CC Capital was able to purchase a controlling interest in CHT for well below the actual value of the company because Chinh Chu and Truc To were fully aware of the irregularities in CHT's bookkeeping and value, but actively concealed their knowledge from everyone, including the banks.  On information and belief, although Chinh Chu is the founder and managing director of CC Capital, he did not use any of his own money for this transaction, instead getting the money from his investors and clients of CC Capital.  He also saddled CHT with an enormous amount of bank debt, although CHT received no consideration for that debt.

182.   Although the Plaintiff entities maintained just shy of a 50% interest in CHT, with Defendants controlling the majority of all voting rights, Alpha Cepheus did retain certain voting rights.  Namely:

[T]he following actions by the Company will require the consent of [Alpha Cepheus] (such consent not to be unreasonably withheld, conditioned or delayed):

(1) any subsequent material disposition of assets or business, in each case, directly by CHT or its subsidiaries, with EBITDA for the most recent 12 calendar months greater than 25% of CHT and its subsidiaries, on a consolidated basis, as of the date of such disposition;

(2) any subsequent material acquisition of, or material investment in, another entity or assets or business, in each case, directly by CHT or its subsidiaries, with EBITDA for the most recent 12 calendar months greater than 25% of the pro forma (giving effect to such acquisition) EBITDA (for the prior 12 calendar months immediately prior to the date giving effect to such acquisition) of CHT and its subsidiaries, on a consolidated basis, as of the date of such acquisition;

(3) a change in the nature of the business of CHT such that CHT, pro forma after giving effect to the change in business, would reasonably be expected to receive less than 50% of its revenues from the RCM Industry in the 12-month period immediately following such change;

(4) with respect to the Company or CHT, the filing of a voluntary petition in bankruptcy, the filing of a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation relating to bankruptcy, the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator or of all or any

60

substantial part of its properties;

(5) the making of capital expenditures by CHT and its Subsidiaries that depart from those set forth in the annual plan, the operating budget or the capital budget of CHT by more than $5 million in the aggregate in any single fiscal year;

(6) any merger or consolidation of the Company or CHT with or into another Person, or sale of substantially all the assets of CHT to any other Person, or any other transaction, in each case, that results in a Change of Control of CHT;

(7) the liquidation or dissolution of the Company; and

(8) the formation of any direct Subsidiary of the Company (other than CHT); and

([9]) the amendment, modification or change of the rights or preferences, duties or powers of the Class A Units set forth herein if such amendment, modification or change materially disproportionally and materially adversely affects the rights, preferences, duties or powers of the Class A Units set forth herein;

### Chu Pushes Parmar Out After Closing

183.   Beginning the day after the closing, Parmar gets the cold shoulder from Chu and the other members of CC Capital, as Chu and Newton do not respond to Parmar's emails.

184.   Unbeknownst to Parmar at the time, Chu began to grill other members of CHT, asking if they are aware of any problems with CHT's books or if they are aware of any fraud.  These are inquiries that Chu should have made during the due diligence phase or, at a minimum, prior to closing.  However, in retrospect it is clear

that Chu was fully aware of the empty shells well before closing, but needed a pretext to pretend that he only discovered them after closing.

185.   That same day, Chu then informed Parmar that they needed to create a CEO search committee to identify Parmar's replacement and they needed to hire Truc To as CFO of CHT.  Both of these pronouncements were shocking to Parmar.

186.   Parmar had negotiated extensively with Chu about his compensation to remain as CEO of CHT.  Although Chu initially wanted to give Parmar a 33% pay cut, they eventually agreed that he would remain as CEO, at the same compensation as when CHT was a public company and was expected to remain in that position.

187.   Chu's edict to hire Truc To was far more baffling and ominous, as Truc To may have been good in his job at KPMG, but was underqualified to serve as CFO of CHT.  Moreover, the compensation package that Chu wanted to give Truc To was greater than that given to Parmar – equal salary, but Truc To would also receive stock options.  The outsized compensation for an unqualified candidate, who had been the head of the due diligence team from KPMG reeked of impropriety.  On information and belief, Truc To received this job as a result of an unethical, corrupt, and illegal pact between Truc To and Chu to improperly manipulate the due diligence process to fit with Chu's larger fraudulent scheme.

188.   In July 2017, Parmar was traveling to Los Angeles for meetings related to the potential acquisition of NACO by CHT.  Parmar received a call from Chu,

demanding an immediate meeting.  Parmar informed Chu that he was working on the NACO acquisition and would be back in a few days.  Initially, Chu seemed satisfied with this answer, but then called back a few hours later to direct Parmar to cancel the trip and return immediately for a meeting.

189.   Upon his return, he met with Chu, who tersely informed Parmar that he "accepts" Parmar's resignation.  This came as a shock to Parmar, who had never indicated any desire to resign and certainly did not want to resign.  Chu went on to explain that he was going to give Parmar a very favorable severance package, including a 3-year consulting contract for $1 million per year and that he wanted Parmar to continue to help with the mergers and acquisitions.  Chu explained that, moving forward, Parmar should deal with Altorelli on the severance agreement.

190.   Chu did not wait for Parmar to agree to these terms and immediately cut him off from all lines of communication.  Chu, Truc To and Altorelli began conducting CHT meetings while excluding Parmar.  When Parmar asked why he was being excluded, even though he had not yet resigned or been terminated, Chu responded that he wanted to be more involved in operations going forward.

191.   During this time-period, multiple employees contacted Parmar to inform him that they had been approached by Truc To, who informed them that they were aware that Parmar and Zaharis had been stealing money and faking the books

and asking for any information that they may have.  So, Parmar confronted Chu about this.

192.   When Parmar asked Chu about Truc To's actions, Chu lied and claimed that this was not happening.  Parmar followed up by showing Chu text messages he had with Truc To, where Truc To not only admitted to doing this, but stated that he was only following orders and had been given the script by Chu.  Chu was visibly embarrassed by this and apologized, telling Parmar that Altorelli directed Truc To to make these inquiries.

193.   Altorelli then instructed Parmar to resign from the board.  By this time, Parmar was represented by counsel and had informed Altorelli of this fact.  In a flagrant violation of his ethical responsibilities, under Rule 4.2 of the Rules of Professional Conduct, Altorelli continued to communicate directly with Parmar and explicitly told him not to listen to his own attorneys and to listen to Altorelli instead. Altorelli threatened that if Parmar did not listen to him, he would be terminated for cause.  When Parmar asked what the cause was, Altorelli simply replied "you will see."

194.   At the next board meeting, Chu announced that Parmar had resigned and that he had accepted Parmar's resignation.  The truth is that Parmar never resigned.

195.   Altorelli was supposed to prepare an exit agreement for Parmar, which would detail the severance and consulting terms, as well as confidentiality and other restrictive terms, in accordance with Chu's promise to Parmar but this never happened.

**Chu Attempts to Extort and Steal Complete Ownership of CHT**

196.   Instead of going forward with the severance terms that he promised to Parmar, Chu instead shifted his focus upon Parmar's departure to efforts to steal the remaining equity in the company from Plaintiffs.  As Chu focused on stealing the assets, Altorelli to a leading role in extorting and sidelining Parmar.

197.   Chu hired Eric Edel, a former fund manager, as the replacement CEO for CHT.  Despite his limited experience, Mr. Edel claimed that within three days of joining CHT, he had discovered what KPMG and CC Capital claims they could not in a year of extensive due diligence – that MDRX and Phoenix were empty shells. Mr. Edel turned in his cell phone and ceased all communications.

198.   This revelation, whether genuine or manufactured, gave Chu the pretext he needed to begin acting on his plan for the empty shells.  He sent Altorelli to Parmar's home late that night to talk with Parmar and attempt to extort a resolution.

199.   Parmar offered to resolve the issue by completing the pending purchase of NACO, but using Parmar's own money.  NACO's actual revenue exceeded the fabricated revenue attributable to the empty shells, which would result in CHT being

more valuable than it would have been if the empty shells were legitimate.  Parmar offered to let CC Capital hold Plaintiffs' equity as collateral until CC Capital was satisfied that the revenue matched what they had expected.  Altorelli responded that a better solution may be for Plaintiffs to give Chu some of their equity and for Parmar to disappear.

200.   The next day, Altorelli called Parmar to meet at the CC Capital office. Soon after Parmar arrived and began talking with Altorelli, an employee walked out and handed Altorelli $20.  Altorelli explained that Chu had lost a bet because he didn't believe that Parmar would show up.  This meeting turned into the first of a week of proposals and threats.

201.   While many proposals were tossed around, the bottom line remained the same.  Chu wanted Parmar to give him all of Plaintiffs' interest in CHT and pay him several million dollars on top.  At one point, Parmar asked Chu how it is possible that he didn't already know the truth about the empty shells, considering the fact that he purchased the company at a 50% discount from the expert valuations.  Rather than respond directly to this inquiry, Chu and Altorelli instead rattled off more threats, including that they would have Parmar arrested and charged criminally if he did not submit to their extortionate demands.

202.   During a subsequent communication, Chu became even more explicit in connecting his financial demands to the threat of criminal prosecution. In

November 2017, after the DOJ had seized the funds in the escrow account of Plaintiff's attorneys, Chu told Parmar that if he paid, Chu would get the FBI to stop their investigation.

203.   It was also during this period of time that Parmar received multiple death threats from Defendants.

204.   First, Chu told Tomer Vardi, Parmar's friend, words to the effect that "this thing is not going to end with Paul just going to jail but will end with his death in jail as I have taken investment money from the Chinese Mafia and they will chase him in jail."  Chu made this communication for the express purpose of having the threat reach Parmar and intimidate him into bending to Chu's will.

205.   Two weeks later, Parmar was walking through Battery Park with Sam Zaharis when two Chinese men approached them and one asked Paul what time it was.  When Parmar reached into his pocket to get his phone and check the time, the other man said "Paul, you don't have a watch?" and walked on without waiting to hear what time it was.

206.   Parmar reported these incidents to the FBI at the time.

207.   Later, Parmar met with Altorelli to negotiate a settlement.  During this meeting, Altorelli asked Parmar words to the effect of "Where do you sleep nowadays?"  When Parmar responded that he was staying in the same house he has

lived for the past 15-years, Altorelli responded, "aren't you afraid to go to the same locations, where someone could put a bullet in the back of your head?"

208. During this time, Altorelli introduced Chu to his former partner at DLA Piper, bankruptcy and restructuring attorney Tom Califano ("Califano"). Altorelli brought Califano in to facilitate Chu's desire to steal the rest of CHT and defraud the banks though the filing and prosecution of a fraudulent bankruptcy proceeding.

## Defendants Intentionally and Corruptly Devalue CHT

209. In an effort to set up their later fraudulent designs in the bankruptcy court, defendants knowingly and intentionally chose to take a series of actions to devalue CHT.

210. The bank debt which had been placed on CHT, without any consideration, as part of the going private transaction was an enormous and unnecessary debt, but ultimately not enough to justify a credible bankruptcy petition. The monthly payments were actually less than the payments CHT had been making before the going private transaction on the loans that were paid off at Defendants' direction to manipulate the valuation.

211. CHT took on additional bank debt to complete the acquisition of NYNM, which had been negotiated and finalized prior to going private, but delayed at Defendants' direction. However, on information and belief, Defendants arranged for a loan in excess of the amount needed to consummate this transaction, unlawfully

diverting approximately $8 million of the funds to Defendant Newton's personal account. Thus, Defendants continued to unlawfully enrich themselves at the expense of CHT and its shareholders.

212. Ultimately, the expenses which helped push CHT over the edge into bankruptcy were the bankruptcy related expenses themselves. Defendants brought in FTI and various law firms to assist in putting CHT into bankruptcy. Ironically, these entities provided multiple levels of help, both in their traditional role as counselors, but also through the charging of exorbitant fees. An examination of FTI's billing demonstrates that much of these fees went well beyond what was necessary to service CHT in bankruptcy, but rather served the needs of CC Capital.

**Defendants Hire FTI to Manipulate the Data and Make CHT Appear Insolvent**

213. In September 2017, FTI was engaged, ostensibly to conduct multiple investigative, advisory, and restructuring tasks regarding CHT. The scope of FTI's engagement initially focused on the following areas:

   a. The financial condition of CHT at the time of a "going private transaction" in January 2017 in which CC Capital CHT Holdco, LLC ("CC Holdco"), a special purpose entity managed by CC Capital Management, LLC ("CC Capital"), acquired a controlling interest in CHT ("the Merger.");

   b.  The accuracy of information provided to CC Holdco and CC Capital by CHT, Parmar, Zaharis, Chivukula, and other individuals acting on behalf of CHT and/or the sellers; and,

   c.  The circumstances surrounding certain merger and acquisition transactions announced by CHT prior to the Merger.

214.   On information and belief, FTI began preparing false and misleading forensic accounting reports, at Defendants' direction, for the purpose of both supporting false claims to be filed in the bankruptcy, as well as to present a false narrative to DOJ in an effort to have Parmar arrested.

215.   Despite these efforts behind the scenes, in January 2018, Tim Dragelin, FTI's manager and CEO of CHT stated in a meeting words to the effect that "the company has a good cash generating engine and [he] intends to keep it humming."

216.   Notwithstanding this claim by Dragelin, FTI was actually working with Defendants to put CHT and its subsidiaries into bankruptcy based on fraudulent grounds.

217.   Unfortunately for Defendants and FTI, later financial disclosures in the bankruptcy have demonstrated not only that CHT was a very profitable company that was more than capable of meeting its financial obligations, but also that the results of FTI's forensic accounting were inaccurate at best and downright fraudulent at worst.

218.   Perhaps the best description of FTI's work was by Chu's own attorney, John Altorelli, who admitted that the incomplete nature of the FTI report was by design and at the direction of Chinh Chu.  Altorelli explained that once FTI had found "fake bank statements," "fake entities" and "Regus offices," they had found enough, and Chinh Chu pulled FTI back to intentionally prevent them from finishing the investigation to actually link these allegedly fake documents to any fraudulent activity.

**Fraudulent Bankruptcy Proceedings**

219.   On Friday, March 16, 2018, the parties appeared in the Chancery Court in Delaware to discuss whether the escrowed funds should remain under the control of the Delaware restraining order, or if they should be released to the DOJ.  Attorneys who jointly represented CHT and CC Capital argued that the funds should be released to the DOJ, whereas attorneys representing Destra, argued that the funds should remain in Delaware and not be released to the DOJ.  At approximately 3:00 pm that Friday afternoon, the judge in Delaware ruled that if the DOJ served a seizure warrant, the escrowed funds could be released to the DOJ without the need for further permission from the Court.

220.   Five hours later, on Friday night, Defendants, on behalf of CC Capital, caused CHT and most of its subsidiaries to file Chapter 11 petitions for bankruptcy in the Eastern District of New York.  A letter was prepared and sent to the escrow

agent in Delaware informing them of this and directing them, pursuant to the automatic stay imposed by the bankruptcy filings, not to release the funds to DOJ – a 180-degree reversal of the position advanced by CC Capital and CHT just hours earlier.

221.   This petition was filed in direct violation of the Operating Agreement, which required Alpha Cepheus' consent to:

> the filing of a voluntary petition in bankruptcy, the filing of a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation relating to bankruptcy, the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator or of all or any substantial part of its properties.

222.   Perhaps the most stunning reversal of the day was that in the afternoon, attorneys from DLA Piper appeared in the Delaware Court on behalf of Destra to oppose CC Capital and CHT's application, while the bankruptcy petitions filed just hours later were filed by Tom Califano of DLA Piper on behalf of CHT.

223.   Amazingly, although CC Capital, CHT, and DLA Piper clearly knew that the bankruptcy petitions would be filed within hours and that they would be advancing the argument that the bankruptcy stay should prevent the funds from being transferred to DOJ, none of them informed the Delaware judge of this fact. Instead, they allowed the Court to conduct a lengthy hearing, with ten different

72

attorneys appearing, without informing anyone that whatever the judge decided, it would be moot, as the Court was prevented from knowing all the relevant circumstances.

224.   The petitions were fraudulent in many respects:

a.   Defendants failed to obtain, or even attempt to obtain the permission of Alpha Cepheus, as required by the operating agreement.

b.   The Petitions were filed in the Eastern District of New York, which has minimal, if any jurisdiction over CHT and its subsidiaries.   Altorelli explained to Parmar that this was done by Califano to steer the case to be assigned to a trustee that Califano has an extensive personal and social relationship with.

c.   The petitions listed Winston & Strawn, LLP as the largest unsecured creditor at $3,000,000.   Winston & Strawn never provided any services to CHT, was paid a grossly inflated $2,555,023.91 at the closing of the going private transaction for its representation of CC Capital, and never submitted any invoices to CHT for work allegedly performed.

d.   Failure to list several companies controlled by Parmar as creditors of CHT, as they were owed $96 million, under consulting agreements.   Had CHT prepared a truthful petition, Parmar would have been appointed chair of

the unsecured creditors committee.  Instead, Chinh Chu placed Winston & Strawn in this position.

e. The financial statements later submitted showed that CHT and its subsidiaries are turning a significant profit and are more than capable of paying the BofA loan payments.

225.   With the bankruptcy in place, Chinh Chu then put into motion an elaborate plan to steal all the assets of CHT through the orchestration of two auctions.  Both auctions were set up the same way:

i.   Chinh Chu brought in a straw purchaser to make an extremely low opening bid and act as the "stalking horse." On information and belief, although the stalking horses seemed independent, they are funded and controlled by Chinh Chu.

ii.   CHT's bankruptcy attorneys, at Chinh Chu's direction, set out bidding procedures designed to protect the stalking horse bid and prevent any legitimate bidders from entering the auction.

iii.   Chinh Chu's stalking horse would win the auction and thus purchase all of CHT's assets out of the bankruptcy court at a fraction of their actual value and debt free.

226.   On May 10, 2018, CHT, now controlled by Chinh Chu, presented the Bankruptcy Court with proposed bidding procedures and timeline for the first sale

of a portion of CHT's assets. CHT's attorneys informed the Bankruptcy Court that this opening bid of $10 million was based on a non-binding letter of intent that Medical Transcription Billing, Corp ("MTBC") had issued on April 10, 2018.

227.   MTBC is a publicly traded company that has operated at a net loss every single year, with total losses of over $26 million since 2014 and would have been unable legitimately to offer a $10 million bid on CHT's assets.

228.   On April 4, 2018, just six days before issuing their letter of intent, MTBC announced a $10.5 million public offering of non-convertible preferred stock.  Two days later, on April 6, 2018, MTBC announced that it had closed this $10.5 million public offering, with CEO Stephen Snyder saying:

> This upsized raise puts us in an excellent position to execute the Company's growth initiatives. As of today, we have approximately $13 million of cash, an untapped $5 million line of credit with Silicon Valley Bank, as well as positive cash flow from operations.

229.   On information and belief, this public offering was orchestrated and purchased by Chinh Chu, so that he could set up MTBC as the stalking horse.

230.   On May 17, 2018 TG Capital, LLC, an entity associated with Arvind Walia, CEO of Orion, submitted a competing bid for $11,000,000, but MTBC countered to win the auction, buying assets that produce $50-60 million annually, debt free, for $12.6 million.

231.   When Chinh Chu invested in MTBC, it was trading at $3.43/share. Within three months of his investment, MTBC's stock price rose to $5.25/share. On August 16, 2018, after MTBC released their unexpectedly high second quarter earnings, analysts began predicting that MTBC may reach $10/share by the end of the year. Chinh Chu's insider trading will likely net him several million dollars profit.

232.   On July 5, 2018, CHT moved in the bankruptcy court to sell the remaining assets of CHT. This time, Chinh Chu selected HealthTek Solutions, LLC ("HealthTek") as his straw purchaser stalking horse with an initial bid of $16.5 million. HealthTek was incorporated on June 19, 2018 by TG Capital, LLC, the bidder associated with Arvind Walia, with Arvind Walia as a 10% shareholder. In this motion, CHT explained that when TG Capital submitted a competing bid of in the first auction, it was for $23 million to purchase all the CHT assets, including those reserved for the second auction. After some negotiations, TG Capital bifurcated its bid to $10.5 million on the first auction and $16.5 million on the second.

233.   The value of TG Capital/Healthtek's bid is curious, as Altorelli met with Parmar on night of March 16, 2018, as the bankruptcy petitions were being filed and explained that Chinh Chu had attempted to give $26 million to another person to act as a straw purchaser and make a $26 million bid on the CHT assets.

Unfortunately for Chinh Chu, this straw purchaser hadn't followed the plan and offered less than $10 million, which was rejected and forced CHT to proceed with the bankruptcy, or as Altorelli called it "phase 2." Altorelli told Parmar words to the effect of now that the bankruptcy had been filed, they were in "phase 2," where "the whole thing can officially go for less than $30 million now."

234. On information and belief, TG Capital/Healthtek's bids were orchestrated and funded by Chinh Chu.

235. As there were no competing bidders, Healthtek purchased CHT's remaining assets for $16.5 million. These were new assets, as CHT had purchased them for $60-95 million, paid over 3 years, depending on revenue, in February 2017. This asset was acquired by CHT immediately after the going private transaction had closed and Chinh Chu was running CHT.

**All of these Sales and Filings Were Fraudulent Because CHT had a Pre-Bankruptcy Offer That Would Have Satisfied All Secured Creditors.**

236. At the time that Defendants advanced MTBC as the "highest and best offer," they had an offer in hand, which had been made for months before the filing of bankruptcy, and which was reoffered several times. This offer, by GSS Infotech Ltd. ("GSS"), was to purchase all of the assets of Orion and its 20 subsidiaries for $245.5 million, plus the assumptions of the liabilities of Orion. GSS's offer was backed by commitment letters from three funding sources. Notwithstanding the fact that they had a purchase offer on the table, since before the filing, which would have

satisfied all secured claims, Defendants fraudulently misrepresented to the Bankruptcy Court that MTBC's bid was the "highest and best offer in terms of value for the estates."

237.   Neither GSS, nor its three funding sources are owned or controlled by Parmar, but they all do have relationships with Parmar.  It was Parmar that arranged for this superior bid, in an attempt to ensure that the creditors were made whole and that CHT would not be destroyed, as Chu planned to do.

238.   Just prior to the filing of bankruptcy, Califano had asked GSS if they were interested in acting as the stalking horse when the sale comes to an auction. GSS quickly responded that they would, Califano stopped communicating with GSS.

239.   On information and belief, Califano was directed by Chu to cease communications with GSS, because, while Califano was attempting to get the largest sale price, Chu wanted to sell CHT to the lowest bidder, that he could control.  GSS's bid represented a devastating threat to Chu's corrupt design.

240.   Defendants intentionally structured the bankruptcy sale to separate assets into smaller tranches so that they could ignore GSS's bid, which was for the entirety.

241.   As discussed in the next section, Chu corruptly coordinated and influenced members of the DOJ to have Parmar arrested and his properties seized,

in an effort to take Parmar out of the equation and derail any potentially legitimate counter-offer by GSS.

242.   As a result of these two (2) sales to straw purchasers, the entirety of CHT's assets have been sold for $29.1 million.  The costs thusfar of the bankruptcy proceedings for Administrative and legal fees and FTI total approximately $25 million.  This leaves a relatively small amount, minus future Administrative and legal fees, plus payments to Houlihan Lokey to pay creditors, whereas the GSS offer would have resulted in full payment to the creditors, while significantly reducing the costs.

### Defendants Engage in Obstruction of Justice to Cause Parmar to be Arrested and Detained

243.   Throughout this process, Defendants and their representative have been communicating with members of the DOJ, FBI and USAO-NJ (collectively, "DOJ") to provide knowingly false information designed to corruptly cause Parmar to be arrested and held without bail.

244.   The purpose behind Defendant's illegal and corrupt actions was twofold: to sideline Parmar and prevent him from interfering in Defendant's fraudulent activities in the Bankruptcy Court, and to punish Parmar for having the audacity to defy Chu and threaten the goals of the Enterprise.

245.   Because Defendants failed to obtain the required consent of Alpha Cepheus to commence or continue prosecuting the bankruptcy proceedings,

sidelining Parmar, Alpha Cepheus' manager was of tantamount importance to allowing their fraudulent scheme to proceed.

246.   On information and belief, starting in or around November 2017, Defendants began providing documents to DOJ that were from sealed court filings in Delaware in an effort to get them to start a criminal investigation into Parmar.

247.   These sealed documents contained knowingly false information that was created by, or at the direction of, the Defendants.

248.   At the core of Defendants knowingly false representations to the DOJ is the claim that Parmar and others fraudulently misrepresented to CC Capital and KPMG the financial health of CHT, thereby causing CC Capital to agree to pay an inflated price in the going private transaction.

249.   In fact, Defendants were fully aware of the financial condition and true valuation of CHT and used that information to negotiate a sale price at or below the actual value of CHT.

250.   It appears that the improper flow of documents and information flowed both directions, as Chu talked openly before Parmar's arrest about how he was going to jail and warned others, including Tomer Vardi, that they may get arrested as well and should leave the country.  As a result of Chu's threats, Vardi did travel to Costa Rica.

251.   On May 16, 2018, Parmar was arrested by the FBI and charged by the USAO-NJ with securities fraud.  Civil suits were simultaneously filed by the SEC and USAO-NJ against Parmar and his properties.

252.   The complaints against Parmar appears to based largely on the false submissions prepared by Defendants in the Destra litigation and bankruptcy filings. They contain numerous false allegations of wrongdoing by Parmar and losses sustained by CC Capital that are based on the unlawful, false and corrupt statements made by Defendants to representatives of DOJ.

253.   The complaints against Parmar are striking, but not for what they contain, but rather what they omit.  For example:

   a. The complaints present the due diligence process as if the Defendants simply received a few spreadsheets and emails from Parmar and then accepted them as true without any efforts to validate or review the underlying data.

   b. The complaints claim generally that Parmar inflated CHT's value but offer no insight as to what the actual value of CHT was.

   c. The complaints fail to acknowledge the inquiries by the Financial Times, the Destra lawsuit and other red flags that were raised during the due diligence process, but which Chu refused to allow to derail the deal.

    d. The complaints discuss the raise-ups and the fact that MDRX and Phoenix were not filled with reported assets but fail to discuss the fact that funds from the raise-ups were used to purchase Vachette, ACA, ABC, NYNM, pay: Taxes, earn outs, loans and warrants and even contributed $5 million to the going-private transaction.

    e. The complaints discuss the transfer of funds used to purchase apartments, but fail to address the fact that Plaintiffs were owed substantially more than these funds in contractual fees and expenses.

254.   On information and belief, the reason these complaints omit these facts, and others, is because Defendants intentionally withheld and misled the DOJ and SEC.

255.   The timing of Parmar's arrest is also highly suspect, as it occurred just after Defendants filed a motion in the bankruptcy court for the first fraudulent auction and before the filing deadline for objections to the proposed auction.

256.   On information and belief, the date of Parmar's arrest was triggered by Defendants submitting false information to the DOJ to create a false sense of urgency that Parmar needed to be arrested before he could run away.

257.   Additionally, Defendants provided DOJ a knowingly false tip that Chivukula was scheduled to fly back to the United States on May 16, 2018.  This false claim was made for the purpose of causing the FBI agents to arrest Parmar on May 16, 2018.  At Parmar's bail hearing on May 31, 2018, AUSA Paul Murphy argued that:

> [Chivukula] was scheduled to come back, fly into Newark, New Jersey, the morning that the defendant was arrested. May 16th. He was not on board that plane, and to our knowledge, has not returned to the United States.

258.   The reality, which was later revealed, is that Chivukula was not planning on returning that day and did not even have a ticket.  This was a fiction wholly invented by Defendants to ensure that Parmar would be taken out of the picture at a critical juncture in their fraudulent bankruptcy scheme. Incredibly, the Government had access to flight manifests and should have been aware that this tip was false.

259.   When it appeared that Parmar may be granted bail to be released pending his trial, Defendants conspired to ensure that bail would not be granted.  On information and belief, Defendants prepared and transmitted an anonymous tip to the FBI that was full of knowingly false information, designed to ensure that bail would be denied.  This anonymous tip stated:

> re: Former CEO, CFO and Director of Health Care Services Company Charged in Elaborate $300 Million Investment Fraud Scheme   UNITED   STATES   OF   AMERICA   PARMJIT

PARMAR, a/k/ a "Paul Parmar," SOTIRIO S ZAHARIS, a/k/ a "Sam Zaharis," RAVI CHIVUKULA Hon. Leda D. Wettre Mag. No. 18-8040 CRIMINAL COMPLAINT Paul Parmar will have a hearing for his bail tomorrow morning. He is a known fraudster. He is planning to escape the country once out on a bail. He has transferred lots of money overseas such as India and UAE. He in fact has purchased a property in the Address building Mr. Salman Khan and his family in Dubai as his plans to escape. This was overheard in the conversation of arranging the bail money and leaving the country. He has moved lots of money overseas using complex business structures and such as via Arvind Walia and others in India and other country. He is working on some arms deal with Russian party.

260.   The FBI initially traced this anonymous tip to London. But noticeably declined to interview the individuals mentioned in the tip, such as Arvind Walia, who lives in Nassau County and works for Chu.

261.   Around this time, Chu was overheard at a party bragging that "Paul will not be granted bail and will have to fight his case from inside the jail.  We have made sure of that."

262.   Subsequently, Parmar was granted bail.  After his release, John Altorelli spoke with Parmar (without Parmar's counsel being present or giving consent) and expressed his complete and total surprise that Parmar was granted bail and that he did not give up and take a plea deal while he was still incarcerated.  He repeated this statement multiple times during the conversation.

**All of These Bankruptcy Filings and Criminal Complaints are Baseless and False Because the Value of CHT Exceeded the Price of the Going Private Transaction**

263.   The going private transaction was based on a share price of $2.93, for a total enterprise value of $269,799,181.76.

264.   In their bankruptcy filings, as well as their false statements to DOJ, Defendants have claimed that CHT was worth far less.   However, they have noticeably never provided any specific valuation, despite having full access to all financial data of CHT.

265.   The valuation provided by D&P was, and still is, an accurate valuation of CHT at the time of the going private transaction.

266.   D&P used three different methods to value CHT, Discounted Cash Flow method, Range of M&A Transactions, and Range of Select Public Companies. These three methods are similar, in that they apply multiples to the revenue or EBITDA of a company to determine a value range.   The difference in these methods is how the multiples are determined (terminal growth rate, comparisons to recent similar M&A transactions, or comparing revenue and value of similar publicly traded companies).

267.   D&P applied these methods using numbers that were reported by Parmar, with some interference by Chu, as discussed above, in June 2016 as follows:

| | 2016E | 2017P | 2018P | 2019P | 2020P | 2021P |
|---|---|---|---|---|---|---|
| **Revenue** | $126.4M | $140.4M | $142.0M | $143.7M | $145.4M | $147.2M |
| **Growth** | 64.7% | 11.1% | 1.2% | 1.2% | 1.2% | 1.2% |

268.   The 2016 expected revenue number was accurate at the time it was reported by Parmar to D&P because it accounted for the plan to acquire NYNM in June, 2016.  As NYNM reported an annual revenue of approximately $98M, Parmar was accounting for this acquisition to significantly increased the 2016 expected revenue of CHT.[7]

269.   Ultimately, the 2016E number was inaccurate because, subsequent to Parmar reporting this number to D&P, Defendants demanded that the NYNM acquisition be postponed until after the closing of the go-private transaction. However, even this delay would not have had a significant effect on the valuation, as NYNM's revenue would become part of the 2017 projected revenue.

270.   Because the projected 2017 revenue accurately reflected the increased revenue from the NYNM transaction and ultimately, the projection was less than the actual recorded revenue, D&P valuation was accurate at the time it was given.

271.   While Defendants have avoided performing any subsequent valuations that would immediately reveal their fraudulent designs, the collections numbers

---

[7] It is undisputable that the NYNM agreement had already been entered into at the time these numbers were provided to D&P and that NYNM's annual revenue was also known to both Parmar and Defendants.  Defendants cannot now credibly claim that this transaction was expected to close in 2017, given that the jump from 2016E to 2017P was only $14 million, rather than the actual $90+ million increase.

which have been reported in the bankruptcy by FTI can be applied to the D&P methodology to show that their original valuation was accurate.

272.   FTI and Defendants have conspicuously declined to reveal the true financials of CHT in any public filing.  In any ordinary bankruptcy proceeding or litigation, the accounting firm would be expected to produce a detailed profit and loss statement ("P&L").  In the case of CHT, the accountants at FTI have had full access to every financial detail of the company and have charged millions of dollars in fees but have failed to produce any accounting for the true financial health of CHT or its subsidiaries.  This is indicative, not only of a concerted effort to conceal the performance of CHT, but also provides further evidence that the bankruptcy auctions were a sham.  If Defendants and FTI truly wanted to maximize the potential bids on the assets sold at auction, they would have produced P&L statements.  This is also consistent with Altorelli's admissions regarding Chu's directives to FTI to find just enough to look incriminating, but not enough to complete the picture.

273.   Instead of proper financials, Defendants and FTI chosen to report only collections receipts.  Without access to the individual breakdowns and percentage agreements, it is impossible to determine the exact revenue of CHT from these gross numbers.[8]  However, based on comparison to prior years' collection receipts, it

---

[8] Defendants cannot make a similar argument about the due diligence process, as all of the required information is contained in the Pegasus system, which they had access to.

appears that CHT's approximate revenue for 2017 was $158 million, well above the projected $140.4 million provided to D&P.

274.   Applying the methods[9] employed by D&P to the actual 2017 numbers, the following values result:

Discounted Cash Flow        (3.3x – 4.0x)    **$521.4 million to $632 million**
Observed Public Companies   (3.31x – 3.10x)  **$489.8 million to $522.98 million**

275.   In an effort to conceal the abject baselessness of their claims in bankruptcy and complaints to DOJ, Defendants have fastidiously avoided disclosing any CHT revenue figures or valuation estimates.   However, it is undisputable that the enterprise value used in the go-private transaction of $269.8 million is well below the values reached when applying the D&P valuation method to CHT's actual 2017 revenue.

276.   Unfortunately, this value of CHT has been degraded and ultimately completely eviscerated by the intentional and corrupt actions of Defendants:

> a.   Immediately after closing, Chinh Chu issued an edict that CHT would not be taking on any new customers.   At the time, there were several prospects, both individual and group, amounting to thousands of doctors.   These prospects would have brought

---

[9] Because Observed M&A Transactions method is based on past acquisitions by CHT, Plaintiff will rely only on Discounted Cash Flow and Observed Public Companies methods.

significant revenue into CHT, but for Defendants' choice to refuse all new business.

   b. Aside from NYNM, which had already been a committed deal, Defendants killed all potential acquisitions.  At the time of closing there were multiple potential subsidiary acquisitions in progress, with CHT having expended considerable time and money on negotiations and due diligence, all of which was wasted by Defendants' choice to refuse all new acquisitions, including NACO.

   c. Throughout its existence, CHT has never missed a single payment on any obligation (i.e. rent, loans, payroll), other than monies due to Plaintiffs.  Suddenly, after Parmar was pushed out, Defendants caused CHT to miss payments on loans, earnouts, leases, and professional fees.

277.   Through these actions, Defendants successfully stopped all growth at CHT and set the company on a path towards destruction.  This downward trend was accelerated by Defendants' activities surrounding the bankruptcy filings.

278. Defendants' campaign to devalue the company and avoid all opportunity to save CHT is evident from the fact that from September 2017 to March

2018 CHT received fully funded and committed offers to acquire CHT at a valuation higher than $300 million.

279.   Chu refused to seriously entertain this offer and offered nothing but excuses, such as blaming the bank (who later denied this), saying that there has to be no connection to Paul (which there was not), that the offer has to be fully funded (which it was).  In fact, the bank subsequently wrote an email to an attorney for the Parmar parties confirming that the bank never ever had any of the artificial requirements that Chu used to scuttle this potential offer.

280.   Upon reading the offer to acquire CHT, John Altorelli replied that Chinh will never ever sell the company, if we really wanted Chinh to change his mind it will take a Billion dollars for Chinh to sell.

281.   When the potential buyer found out the Defendants were pushing the company into bankruptcy, they wrote extensively to both BofA and CC Capital that such an action will kill the value of the company, as it is a service business and the customer base will not survive a bankruptcy filing.

282.   Defendants ignored all attempts by a legitimate buyer with a fully funded offer to acquire CHT.

### Witness Intimidation and Theft as the Truth Starts to Come Out

283.   On July 10, 2018, Parmar filed an answer with cross-claims in the adversary proceeding in the Bankruptcy case, which contains substantially the same

fact pattern as this complaint.  Unfortunately, as Parmar was still being held without bail at the time and, therefore had limited access to materials which the Defendants and the Government already had access to, he was hampered in his ability to provide the same level of detail which he has been able to provide in filings made after his release.

284.   On August 16, 2018, Parmar filed a motion to dismiss the SEC's civil complaint against Parmar.  In this 558-page motion, Parmar laid out much of the factual basis that also underlies this complaint, which is supported by the documentary evidence in 28 exhibits.  Additionally, Parmar offered to provide that Court with an electronic data file on the collections data, which clearly established CC Capital's knowledge of the true financial condition of CHT, but did not include this as an exhibit, as it would have been 17,850 pages long.

285.   On August 25, 2018, Parmar filed a motion to dismiss the USAO-NJ's civil forfeiture petition, which included and incorporated all of the facts, exhibits and arguments from the motion to dismiss the SEC's case, plus several additional arguments.

286.   With these three filings, the stunning truth about Chu's illegal and corrupt activities has finally started to come out.  As some media outlets (Law360 and Financial Times) began to report on Chu's misconduct, Chu started to become

unhinged and decided to dig himself in even deeper.  Chu speaks about wanting this to all go away and how he wants Parmar to just plead guilty and go off to jail.

287.   Chu and Newton hired MOSAIC a team of mercenaries and thugs, led by Schiena, for the dual purpose of gaining information about Parmar's activities, as well as to try to intimidate him into silence.

288.   While the employment of private investigators to get information on an opposing litigant is common, accepted, and legal, Chu and Newton wanted information and results far beyond what is legally permissible for a licensed private investigator.  For this reason, they chose to hire a mercenary group that advertises expertise in intelligence services, crisis management, and cybersecurity or hacking.

289.   It is telling that while most litigants have their attorneys hire licensed private investigators, so that their activities are covered under privilege, Chu and Newton instead chose to hire unlicensed mercenaries, without the assistance or protection of their team of attorneys.  On information and belief, this is either because they wanted to keep their unlawful activities hidden from their attorneys, or because their attorneys refused to participate in this unlawful design.

290.   Schiena then hired Ernst, Stepien and Cardona, to pretend to be private investigators and conduct surveillance outside of Parmar's home.  Ernst, Stepien and Cardona are not licensed private investigators in the State of New Jersey and, in fact, all are statutorily prohibited from participating in private investigative activities in

the State of New Jersey, by reason of their status as law enforcement officers or a convicted felon on probation.

291.   Soon after Parmar filed his two motions to dismiss, Defendants began maintaining a surveillance detail outside of Parmar's home.  However, while normal licensed private investigators would make efforts to be discreet, Defendants made no such efforts.  On the contrary, they are using an intimidation technique known as an "open tail," where they made it a point to ensure that Parmar, his relatives, employees and friends would be fully aware that they were being watched and followed.  Stepien followed Parmar's girlfriend as she drove to another town, following her onto private property and, upon being confronted, laughed and spun his tires, throwing gravel at her.

292.   Parmar has also discovered that these fake investigators have been hacking into his home's server and illegally downloaded a large amount of data from his system.  This data includes, but is not limited to, Parmar's privileged communications, which is being accessed, on information and belief, in an effort to get advanced information about Parmar's legal strategy.

293.   Upon the filing of the complaint in this action, Ernst, Stepien and Cardona negotiated a settlement in exchange for providing truthful information about Chu, Newton, Schiena and MOSAIC.  However, this settlement fell apart as Chu, Newton and Schiena took efforts to threaten and intimidate Ernst by breaking

into his vehicle and remote starting it when he approached.  Immediately following this incident, counsel for Ernst, Stepien and Cardona sent a letter outlining Defendants intimidation tactics and, as a direct result, Ernst, Stepien and Cardona have refused to provide any further information on Chu, Newton, Schiena and MOSAIC.

294.   Additional unlawful activites outside Mr. Parmar's home include the sabotage of his security camera system and the destruction of the analog telephone lines.  Both of these unlawful actions occurred in direct response to defensive actions taken by Parmar.

295.   The security camera system, and the server containing all recorded videos were sabotages shortly after it became clear that Parmar would not remain silent and began to reveal Defendants' unlawful activities in court filings and reports to law enforcement.

296.   The analog telephone lines were physically destroyed immediately after Parmar switched the telephone system from the VoIP system, that was vulnerable to remote hacking by Defendants, to the analog system which is not vulnerable to remote hacking.

## FIRST COUNT
### (Securities Fraud)

297.     All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

298.   This Count is asserted against Defendants CHINH CHU, DOUGLAS NEWTON, TRUC TO, CC CAPITAL CHT HOLDCO, LLC AND CHT HOLDCO, LLC and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

299.   During the relevant time period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to agree to the terms of the going private agreement. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

300.   Pursuant to the above plan, scheme, conspiracy and course of conduct,

each of Defendants participated directly or indirectly in the preparation and/or issuance of proxy agreements, proxy statements, press releases and other statements and documents described above, as well as oral statements directly to Plaintiffs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CC Capital's plan for CHT's business prospects

301.    The Plaintiff entities who held shares of CHT at the time it was publicly traded on the AIM had no obligation to agree to the going-private transaction and, as they controlled a majority of the issued shares of CHT, could have singlehandedly rejected the deal.  Instead, Plaintiffs relied upon the fraudulent misrepresentations of the Defendants in agreeing to the provisions of the going-private transaction. Specifically, Plaintiff's relied upon the following misrepresentations by Defendants:

a.    Defendants claimed to have conducted complete due diligence and fully understood all financial issues with CHT.  Although they did not explicitly mention the empty shells, Defendants represented that they would work to fix the issues with CHT and allow it to continue to grow as a profitably company.  This representation was materially false, as Defendants instead chose not to fix the problems and force the company into an unnecessary and fraudulent bankruptcy where they could loot all

of the assets.

b.  Defendants represented that Parmar would remain as the CEO of CHT and continue to oversee CHT's growth. This representation was materially false, as Defendants commenced a search for a replacement CEO the day after closing and took efforts to force Parmar's resignation.

302.   Had Defendants not made these two fraudulent misrepresentations, Plaintiffs would never have agreed to allow the going-private deal to close. Plaintiffs justifiably relied upon Defendants misrepresentations that they would allow CHT to continue to grow and become more profitable, under Parmar's leadership.

303.   More importantly, had Plaintiffs not relied upon these fraudulent misrepresentations, Plaintiffs would not have retained 49.6% ownership of CHT. Had Plaintiffs known that Defendants intended to destroy the value of CHT, Plaintiffs would have either taken Defendants' offer to sell all of their equity or cancel the deal entirely. Plaintiffs only agreed to permit the deal to close, while retaining a significant amount of equity in CHT, in detrimental reliance upon the fraudulent misrepresentations of Defendants.

304.   By virtue of their positions at CC Capital and KPMG, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs, or, in the

alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

305.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of CC Capital, the Defendants had knowledge of the details of the plans for CHT.

306.   The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants were able to and did, directly or indirectly, control the content of the statements. As officers and/or directors of CC Capital and KPMG, the Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CC Capital's businesses, operations, future financial condition and future prospects, as they relate to CHT. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, Plaintiffs agreed to allow the going-private transaction to proceed and retain a 49.6% ownership in CHT securities

upon statements disseminated by Defendants and were damaged thereby.

307.  By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

308.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities.

## SECOND COUNT
### (Securities Fraud)

309.  All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

310.  This Count is asserted against Defendants CHINH CHU, DOUGLAS NEWTON, TRUC TO, CC CAPITAL CHT HOLDCO, LLC and CHT HOLDCO, LLC and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

311.  During the relevant time period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to agree to the terms of the going private agreement. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

312.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of proxy agreements, proxy statements, press releases and other statements and documents described above, as well as oral statements directly to Plaintiffs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CC Capital's plan for CHT's business prospects

313.   Defendants used a variety of methods to manipulate the closing documents and funds flow requirements to fraudulently induce Plaintiffs into contributing a much larger percentage of their equity than necessary, so that Defendants could take additional money out of the transaction.

314.   Documents show that, at the time of the going-private transaction, there were 92,081,632 outstanding shares of CHT, which were being purchased at a price of $2.93/share.   This resulted in a total cash value of $269,799,182.   Plaintiffs contributed $80,164,000 from their equity, the banks provided $130 million, and $5

million was taken from CHT's operating account.  This leaves only $54,635,182 remaining cash required to purchase the equity.

315.   Defendants have claimed, at various times that CC Capital contributed $88,687,476.20 in cash to this transaction.  If this were true, then this would result in $34,052,294.20 to pay the transaction related expenses – well over the already inflated fees that were provided for in the final funds flow documents.  This means that approximately $20 million simply vanished or was unlawfully misappropriated by Defendants.

316.   By virtue of their positions at CC Capital and KPMG, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

317.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As

the senior managers and/or directors of CC Capital, the Defendants had knowledge of the details of the plans for CHT.

318.   The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants were able to and did, directly or indirectly, control the content of the statements. As officers and/or directors of CC Capital and KPMG, the Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CC Capital's businesses, operations, future financial condition and future prospects, as they relate to CHT. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, Plaintiffs agreed to allow the going-private transaction to proceed with a funds flow at closing that permitted Defendants to unlawfully funnel millions of dollars out and were damaged thereby.

319.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

320.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities.

## THIRD COUNT
**(Racketeering)**

321.   All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

322.   From at least in or about 2017 up through and including the present, in the District of New Jersey and elsewhere, Defendants and others known and unknown, being persons employed by and associated with the racketeering enterprise described in paragraphs 22 through 30 above, namely, CC Capital, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully intentionally, and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), that is, through the commission of the following racketeering acts:

### The Pattern of Racketeering

323.   The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act One – Conspiracy to Commit Extortion

324.   CHINH CHU and DOUGLAS NEWTON committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act One:

a.   In or about 2017, in the District of New Jersey and elsewhere, CHINH CHU, and others known and unknown, unlawfully, willfully, and knowingly conspired to commit extortion, in violation of 18 U.S.C. §1951.  The defendants, attempted or conspired to obstruct, delay, or affect commerce or the movement of any article or commodity in commerce, by extortion by attempting to obtain the property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.  Specifically, Chu and Altorelli attempted to extort Parmar to unlawfully obtain Plaintiffs' interest in CHT by threatening that the FBI would arrest Parmar unless he paid them $10 million and caused all of Plaintiffs' interest in CHT to be transferred to CC Capital.

b.   In or about 2017, in the District of New Jersey and elsewhere, CHINH CHU and others known and unknown, unlawfully, willfully, and knowingly did commit extortion and aided and abetted extortion, in violation of 18 U.S.C. §1951.  The defendants did make threats to Mr. Parmar to pay them $10 million and transfer all of Plaintiffs' interest in CHT to CC Capital or they would ensure that Parmar was arrested by the FBI.  When Parmar refused to capitulate to their extortionate demands, defendants did, in fact, cause Parmar to be arrested by the FBI.

325.   The target objective of this extortion was to unlawfully deprive Plaintiffs of their valuable assets.  This was not a derivative claim, as the target

104

objective of Defendants' unlawful actions was Alpha Cepheus' stock, not simply a diminution of value.  As a result of defendants' unlawful activity, Plaintiffs have been significantly damaged.

<u>**Racketeering Act Two – Bankruptcy Fraud**</u>

326.   CHINH CHU and DOUGLAS NEWTON committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Two:

c.      In or about 2017, in the District of New Jersey, the Eastern District of New York and elsewhere, CHINH CHU, DOUGLAS NEWTON and others known and unknown, unlawfully, willfully, and knowingly conspired to commit bankruptcy fraud, in violation of 18 U.S.C. §157.  The defendants, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so, filed a petition under title 11, filed a document in a proceeding under title 11, and made a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11.

d.      In or about 2017, in the District of New Jersey, the Eastern District of New York, and elsewhere, CHINH CHU, DOUGLAS NEWTON and others known and unknown, unlawfully, willfully, and knowingly did commit bankruptcy fraud and aided and abetted bankruptcy fraud, in violation of 18 U.S.C.

§157.  As a result of their false and fraudulent representation, CHT's assets were sold at an auction to straw purchasers on Defendants' behalf for significantly less than the actual value.

327.    The target objective of this bankruptcy fraud was to damage Plaintiffs through the unlawful taking of all of their assets – to wit, the value of their interest in CHT.  As a result of defendants' unlawful activity, Plaintiffs have been significantly damaged.

328.    This is not a derivative claim, as Defendants' actions were designed to circumvent the operating agreement and deprive Plaintiff Alpha Cepheus of its voting rights to prevent the bankruptcy.  Defendants' unlawful actions did deprive Alpha Cepheus of those voting rights, resulting in direct, identifiable financial injury to Alpha Cepheus.

329.    This is not a derivative claim, as Defendants' actions were designed to loot, devalue, and destroy CHT, thereby depriving Plaintiff FUH of significant monetary value, which was due under the valid consulting agreement. Defendants' unlawful actions did deprive FUH of that significant monetary amount by diverting funds to Defendants benefit, including, but not limited to, $8 million fraudulently transferred to Defendant Newton.

## Racketeering Act Three – Obstruction of Justice

330.   CHINH CHU, DOUGLAS NEWTON, and TRUC TO committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Three:

e.      In or about 2017 through 2018, in the District of New Jersey and elsewhere, CHINH CHU, DOUGLAS NEWTON, and TRUC TO, together with others known and unknown, unlawfully, willfully, and knowingly conspired to commit obstruction of justice, in violation of 18 U.S.C. §1503.  The defendants conspired and attempted to corruptly influence the due administration of justice by providing knowingly false information to the Department of Justice, the Federal Bureau of Investigations, and the U.S. Attorney's Office for the District of New Jersey.  The defendants conspired and attempted to obstruct justice by falsely claiming that they had been defrauded by Parmar in an effort to have Parmar falsely arrested and prosecuted

f.      In or about 2017 through 2018, in the District of New Jersey and elsewhere, CHINH CHU, DOUGLAS NEWTON, and TRUC TO, together with others known and unknown, unlawfully, willfully, and knowingly did commit obstruction of justice and aided and abetted obstruction of justice, in violation of 18 U.S.C. §1503.  As a result of defendants knowingly false statements to officers of the Department of Justice, the Federal Bureau of Investigations, and the U.S.

Attorney's Office for the District of New Jersey, Mr. Parmar was arrested, falsely charged, and held without bail.

331.    The target objective of this obstruction of justice was to remove Mr. Parmar from active participation in the bankruptcy proceedings, thus clearing the way for defendants to damage Plaintiffs through the unlawful taking of their valuable assets.  As a result of defendants' unlawful activity, Plaintiffs have been significantly damaged.

### Racketeering Act Four – Obstruction of Justice

332.  CHINH CHU and TRUC TO committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Four:

g.    In or about May 22, 2018, in the District of New Jersey and elsewhere, CHINH CHU and TRUC TO, and others known and unknown, unlawfully, willfully, and knowingly conspired to commit obstruction of justice, in violation of 18 U.S.C. §1503.  The defendants conspired and attempted to corruptly influence the due administration of justice by providing a knowingly false anonymous tip to the Department of Justice, the Federal Bureau of Investigations, and the U.S. Attorney's Office for the District of New Jersey.  The defendants conspired and attempted to obstruct justice by falsely claiming that Parmar was a flight risk, in an effort to corruptly influence both the U.S. Attorney's Office for the

District of New Jersey, as well as the United States District Court for the District of New Jersey to ensure that Mr. Parmar was denied bail. Metadata indicates that this tip originated from London, UK, where Truc To maintains a residence and citizenship. To wit, this anonymous tip stated as follows:

> re: Former CEO, CFO and Director of Health Care Services Company Charged in Elaborate $300 Million Investment Fraud Scheme UNITED STATES OF AMERICA PARMJIT PARMAR, a/k/a "Paul Parmar," SOTIRIOS ZAHARIS, a/k/ a "Sam Zaharis," RAVI CHIVUKULA Hon. Leda D. Wettre Mag. No. 18-8040 CRIMINAL COMPLAINT Paul Parmar will have a hearing for his bail tomorrow morning. He is a known fraudster. He is planning to escape the country once out on a bail. He has transferred lots of money overseas such as India and UAE. He in fact has purchased a property in the Address building Mr. Salman Khan and his family in Dubai as his plans to escape. This was overheard in the conversation of arranging the bail money and leaving the country. He has moved lots of money overseas using complex business structures and such as via Arvind Walia and others in India and other country. He is working on some arms deal with Russian party.

h.    In or about May 22, 2018, in the District of New Jersey and elsewhere, CHINH CHU and TRUC TO and others known and unknown, unlawfully, willfully, and knowingly did commit obstruction of justice and aided and abetted obstruction of justice, in violation of 18 U.S.C. §1503. The defendants did send this anonymous and knowingly false tip to the FBI. The defendants' target objective was achieved, as the U.S. Attorney's Office for the District of New Jersey was deceived and influenced to communicate this false information to the judge. This knowingly false anonymous tip contributed, at least in part, to Mr. Parmar being

denied bail and continued to be wrongfully detained at the Essex County Correctional Facility.

333.   The target objective of this obstruction of justice was to remove Mr. Parmar from active participation in the bankruptcy proceedings, thus clearing the way for defendants to damage Plaintiffs through the unlawful taking of their valuable assets.  As a result of defendants' unlawful activity, Plaintiffs have been significantly damaged.

## Racketeering Act Five – Tampering with a Witness

334.   CHINH CHU, DOUGLAS NEWTON, ANTONIO SCHIENA, MOSAIC, WARREN ERNST, JAMES STEPIEN, and VICTOR CARDONA committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Five:

a.   In or about September 2018, through the present, in the District of New Jersey and elsewhere, CHINH CHU, DOUGLAS NEWTON, ANTONIO SCHIENA, MOSAIC, WARREN ERNST, JAMES STEPIEN, and VICTOR CARDONA and others known and unknown, unlawfully, willfully, and knowingly conspired to tamper with a witness, in violation of 18 U.S.C. §1512(c).  The defendants conspired and attempted, with the intent to influence, delay or prevent the testimony of Parmar and others have using intimidation and threats.

b.      Specifically, Ernst, Stepien, Cardona, and others, at the direction of Schiena, MOSAIC, Chu and Newton, did work in a three-car team to follow and intimidate Parmar, his family and friends.   Stepien followed one of Parmar's associates for several miles and followed her onto private property, before speeding away and throwing gravel on her by spinning his tires.

c.      On information and belief, an individual, acting at the direction of Defendants, dumped 26 gallons of fuel into the storm drain in front of Parmar's home, with the intent of killing the swans, ducks, and geese in the pond on Parmar's property to send a message to Parmar.   Luckily for the waterfowl, an oversized overflow tank had been installed, preventing the fuel from reaching the pond.

d.      On information and belief, Defendants, or someone working on their behalf and at their direction, destroyed the phone lines into Parmar's home and sabotaged the security camera system for the dual purpose of intimidating Parmar, neutralizing his security system to leave him and his family more vulnerable to physical attack, and force him to use internet based communications that they could monitor.

e.      The unlawful surveillance outside Mr. Parmar's home continues to this day.

f.      In or about September 2018, up through the present, in the District of New Jersey and elsewhere, CHINH CHU, DOUGLAS NEWTON, ANTONIO

SCHIENA, MOSAIC, WARREN ERNST, JAMES STEPIEN, and VICTOR CARDONA and others known and unknown, unlawfully, willfully, and knowingly did commit tampering with a witness, in violation of 18 U.S.C. §1512(c).

335.    The target objective of this witness tampering was to intimidate Parmar and others into keeping silent and not providing testimony or information in judicial proceedings that would further expose Defendants' unlawful activity and thereby permit them to damage Plaintiffs through the unlawful taking of their valuable assets. As a result of defendants' unlawful activity, Plaintiffs have been significantly damaged.

### Racketeering Act Six – Tampering with a Witness

336.    CHINH CHU, DOUGLAS NEWTON, ANTONIO SCHIENA, and MOSAIC committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Six:

g.      In or about October 2018, in the District of New Jersey and elsewhere, CHINH CHU, DOUGLAS NEWTON, ANTONIO SCHIENA, and MOSAIC and others known and unknown, unlawfully, willfully, and knowingly conspired to tamper with a witness, in violation of 18 U.S.C. §1512(c). The defendants conspired and attempted, with the intent to influence, delay or prevent the testimony of Warren Ernst, James Stepien and Victor Cardona and others have using intimidation and threats. Specifically, after Ernst, Stepien and Cardona offered to cooperate as

112

witnesses in this matter, Defendants broke into Ernst's car, remote started the car and, on information and belief, took additional actions to threaten and intimidate Ernst and his team of Cardona and Stepien.  These efforts unquestionably achieve the necessary result, as Ernst admitted, through his attorney, that he chose to "remove[] his family from his family residence due to the fear that the same persons who are the subject of your order to show cause or a party to the litigation may have been sending him a 'message' and may in fact attempt to cause harm to him or his family."

h.    In or about October 2018 in the District of New Jersey and elsewhere, CHINH CHU, DOUGLAS NEWTON, ANTONIO SCHIENA, MOSIAC and others known and unknown, unlawfully, willfully, and knowingly did commit tampering with a witness, in violation of 18 U.S.C. §1512(c).

337.    The target objective of this witness tampering was to intimidate Ernst, Stepien, Cardona, and others into keeping silent and not providing testimony or information in judicial proceedings that would further expose Defendants' unlawful activity and thereby permit them to damage Plaintiffs through the unlawful taking of their valuable assets.  As a result of defendants' unlawful activity, Plaintiffs have been significantly damaged.

## FOURTH COUNT
### (Violation of The Stored Communications Act 18 U.S.C. §2707)

338.   All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

339.   At all relevant times herein, The Stored Communications Act, 18 U.S.C. § 2701 et seq. was in full force and effect and governed the accessing of facilities through which electronic communication service is provided.

340.   At all relevant times herein, 18 U.S.C. § 2701(a) prohibited the intentional unauthorized accessing of a facility through which an electronic communication service is provided whereby an individual obtains access to an electronic communication which is in electronic storage in such system.

341.   Plaintiff CHI registered the domain contellationhealthgroup.com on July 5, 2013, prior to the formation of CHT.  CHI has always been the sole owner of this domain name and the associated email addresses.

342.   Thereafter, Parmar provided the login information to the IT department at Orion for the sole purpose of assisting him in creating logins.  The domain name was never to be used for any employees of Orion of CHT and the IT department had no authorization to access the contents of any of the communications on this domain name.

343.   On September 30, 2017, Defendants CHINH CHU, DOUGLAS NEWTON and TRUC TO illegally and without authorization, accessed the email

114

server to obtain all of the email communications by Parmar, including many of which that are protected under attorney-client privilege.

344.   Defendants then illegally and without authorization altered and prevented access by Parmar or CHI to the electronic communications stored on the system.

345.   On October 12, 2017, Defendants representatives Altorelli and Dragelin, along with attorney John West, were made fully aware of the illegality of Defendants actions by an email from counsel for Mr. Parmar.

346.   Altorelli acknowledged that he understood the issue and that he had ordered that all of the accessed communications and server would remain in a "frozen state" and that if the parties could not agree on the status, they would seek a judicial determination.

347.   Rather than seek a judicial determination, Defendants flagrantly continued to access the communications and to transmit them to other parties, including, but not limited to, the DOJ, USAO-NJ, and SEC.  The DOJ, USAO-NJ and SEC then used those illegally obtained communications, including attorney-client privileged communications to file criminal charges, an SEC complaint, and a civil forfeiture complaint.  Defendants have also made use of these illegally obtained communications to further their fraudulent bankruptcy proceedings.

348.   From September 2017 to present, Defendant violated 18 U.S.C. §2701(a) by intentionally and without Plaintiff's authorization repeatedly accessing his electronic communications, i.e. e-mails, while said communications were in electronic storage with the email providers. Pursuant to 18 U.S.C. §2707, Plaintiff is entitled to relief for the Defendant's violations of 18 U.S.C. §2701(a).

## FIFTH COUNT
### (Violation of The Stored Communications Act 18 U.S.C. §2520)

349.   All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein

350.   At all relevant times herein, 18 U.S.C. §2511 prohibited the intentional interception, disclosure, use, or endeavoring to use the contents of any electronic communications between two parties without the consent of one or both of the parties to that communication.

351.   Defendants CHU and NEWTON hired a team of individuals, including MOSAIC, SCHIENA, ERNST, STEPIEN and CARDONA, who have been posing as private investigators to conduct surveillance, but have actually been threatening and intimidating Parmar and his family.  Defendants have used this surveillance pretext to get close enough to Parmar's residence to illegally access the network and illegally access and download and monitor Parmar's stored electronic communications, including attorney-client privileged communications.

116

352.   Much of the stolen communications were made by Parmar in his capacity as manager of the Plaintiff entities, or in his efforts to protect the Plaintiff entitites' assets.

353.   Defendants intentionally intercepted Parmar and Plaintiffs' electronic communications, i.e., email, without consent or the consent of any other parties to said communications, thereby violating 18 U.S.C. §2511(1)(a).

354.   On information and belief, although the intercepts were actually performed by MOSAIC, Schiena, Ernst, Stepien, and Cardona, they were acting under the direction of Chu and Newton and the fruits of these illegal actions were provided to Chu and Newton.

355.   On information and belief, Defendants are making use of these stolen communications to further their fraudulent bankruptcy proceedings and to gain insight into Parmar's defense strategies related to the criminal charges, civil forfeiture, and SEC complaint.

356.   Defendants intentionally disclosed or endeavored to disclose Plaintiffs' electronic communications, i.e. e-mails, to Chu and, upon information and belief, to others, without Plaintiffs' consent, while knowing or having reason to know that the information was obtained through the interception of wire, oral or electronic communication in violation of 18 U.S.C. §2511(1)(c).

357.   Defendants have intentionally used, or endeavored to use, the contents of Plaintiffs' electronic communications, i.e., e-mail, in pursuing the unlawful goals of the enterprise, while knowing or having reason to know that the information was obtained through the interception of wire, oral or electronic communications in violation of 18 U.S.C. §2511(1)(d).

358.   Pursuant to 18 U.S.C. §2520, Plaintiffs are entitled to relief for the Defendants' violations of 18 U.S.C. §2511(1)(a), (c), and (d).

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury as to all issues.

**WHEREFORE,** Plaintiffs demand judgment against Defendant for

    a.    Compensatory damages;

    b.    Punitive damages;

    c.    As to the Third Count, treble damages;

    d.    Costs of the Suit, including Attorneys' fees and reasonable expenses;

    e.    Ordering Defendants to divest themselves of any interest, direct or indirect in CC Capital;

    f.    Enjoining Defendants from engaging in the same type of endeavor as CC Capital

    g.    Ordering the dissolution of CC Capital.

Dated March 26, 2019
      New York, New York

                              Respectfully submitted,

                              Timothy C. Parlatore, Esq.
                              Parlatore Law Group, LLC
                              *Attorney for the Plaintiffs*
                              One Bridge Plaza North, Suite 275
                              Fort Lee, New Jersey 07024
                              212-679-6312
                              212-202-4787 Facsimile
                              timothy.parlatore@parlatorelawgroup.com