# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ALPHA CEPHEUS, LLC, et al.,** | |
| *Plaintiffs*, | |
| v. | **Civil Action No. 18-14322** |
| **CHINH CHU, et al.,** | **OPINION** |
| *Defendants.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE:**

**THIS MATTER** comes before the Court on Defendants Chinh Chu's ("Chu"), Douglas Newton's ("Newton") and Truc To's ("To") (collectively "Defendants") Motions to Dismiss, ECF Nos. 70 & 71, Plaintiffs Paul Parmar ("Parmar") and Alpha Cepheus, LLC's, First United Health, LLC's, Constellation Health, LLC's, Naya Constellation Health, LLC's, Constellation Health Investment, LLC's ("CHI," and together with Alpha Cepheus, LLC, First United Health, LLC, Constellation Health, LLC, Naya Constellation Health, LLC, the "LLC Plaintiffs")[1] Amended Complaint, ECF No. 65. For the reasons stated herein, the motions are granted.

## I.     BACKGROUND

### A.     Factual Background

This action arises from a transaction to take a medical billing company private, uncovering an alleged fraud by its the senior officers and shareholders.

---

[1] Alpha Cepheus, LLC is a Delaware limited liability, and a 49.6% shareholder in Constellation Health Technologies, Inc. Am. Compl. ¶ 31. The remaining LLC Plaintiffs owned shares in Constellation Health Technologies, Inc., before the "go private" transaction that is the subject of this litigation, and are currently shareholders of Alpha Cepheus, LLC. Id. ¶¶ 32-35. Parmar is the manager of the LLC Plaintiffs. Id. ¶ 36.

### 1. Parmar, CHT and the "Empty Shell" LLCs

In 2012, Parmar and others acquired Orion Healthcorp, Inc., a medical billing, collections and physician practice management company. Am. Compl. ¶ 57. They merged the company into Constellation Healthcare Technologies, Inc. ("CHT"), which they later took public, listing CHT's shares on the London Stock Exchange's Alternative Investment Market ("AIM"). Id. ¶ 60. CHT grew its business by acquiring existing medical billing and practice management companies, to use their existing customer lists and relationships. Id. ¶ 59. CHT followed a "common pattern" for its acquisitions, first forming a "shell" subsidiary limited liability company ("LLC"), with the intention of merging the proposed target into the shell. Id. ¶ 61. "[E]very acquisition of CHT" followed this pattern, and "the majority of these shell [LLCs] were filled, but two remained unfilled: Phoenix Health LLC ('Phoenix') and MDRX Medical Billing, LLC ('MDRX')." Id. ¶¶ 61-62. A third shell LLC, Northstar First Health, LLC ("Northstar") "was filled, but with a smaller subsidiary than expected." Id. ¶ 62.

While CHT was a public company, it regularly sought financing in the form of secondary share offerings and announced its activities via press releases. Id. ¶¶ 63-64. CHT issued press releases concerning Phoenix, MDRX, and Northstar, which they concede were inaccurate. Id. These included: (1) an announcement that CHT acquired Northstar on September 16, 2015, when Northstar was actually a shell LLC filled by Vachette Business Services, LLC; (2) an announcement that CHT acquired Phoenix on September 18, 2015, when Phoenix was a shell LLC created by CHT; and (3) an announcement on February 10, 2016 that CHT acquired MDRX, when MDRX was also a shell LLC created by CHT. Id. ¶¶ 65-66, 68.

### 2. CC Capital's Interest in CHT

In September 2015, Parmar met Chu. Am. Compl. ¶ 70. Chu is the Senior Managing Director and Founder of nonparty CC Capital, LLC ("CC Capital"), a private equity firm. Id. ¶ 37.

Defendant Newton is a CC Capital Senior Managing Director.  Id. ¶ 39.  In January 2016, Chu began to show interest in acquiring CHT, de-listing its stock and taking it private.  Id. ¶¶ 70-71.

CC Capital's first set of bids were unsuccessful.  After an initial disagreement, Parmar and Chu agreed that Parmar would hold a minority position after the deal "and give limited voting rights to CC Capital on the equity [he and the LLC Plaintiffs] continue to hold."  Id. ¶ 74.  In order to raise the price offered for CHT, Parmar agreed to contribute $10 million to the purchase.  Id. ¶ 77.  As a result of his position as a buyer, CHT's board required Parmar to recuse himself from bid evaluations and formed a special committee to evaluate the offer.  Id. ¶¶ 77-78. Chu directed CC Capital to hire defendant To, then a KPMG partner, to conduct due diligence.  Id. ¶ 80.  After receiving a fairness opinion from Duff & Phelps, CHT's special committee rejected Chu and Parmar's bid on August 23, 2016.  Id. ¶ 86.

At this time, Parmar did not want to proceed with the transaction, and told Chu and Newton as much.  ¶¶ 87-88, 90.  Parmar "was honest with Newton," telling him that he wanted "more time to resolve the CHT issues," while Newton responded that "Chu did not want to drop the deal and that they would be happy to work out any of CHT's issues with Parmar once they became partners."  Id.  ¶ 92.  Despite wanting to proceed with the transaction, on September 12, 2016 CC Capital withdrew its offer, allegedly in order to have Chu select advisors for a new CHT special committee.  Id. ¶ 99.  Chu then had his associates introduce Parmar to SunTrust Robinson Humphrey ("SunTrust") and McGuireWoods LLP as potential financial and legal advisors for CHT.  Id. ¶¶ 102-03.

Before CC Capital withdrew its first bid, To and KPMG began performing due diligence.  Id. ¶ 108.  CC Capital had access to CHT's proprietary internal database that accurately represented all "data, collections and fees" concerning CHT, and thus Plaintiffs allege that Chu and To "had

actual knowledge" that MDRX, Northstar and Phoenix were not as represented by CHT, and that "the empty shells had no assets, revenue or employees," Id. ¶¶108-09. Plaintiffs also claim that other audit data provided to To and Chu indicate that they "knew that the empty shells were indeed empty." Id. ¶¶ 109-13.[2]

### 3. The Deal Closes

CC Capital submitted another bid for CHT on September 14, 2016. Id. ¶ 119. CHT formed a new independent committee and rejected the offer, without the benefit of a new fairness opinion.[3] Id. ¶¶ 124, 129. CC Capital then raised its bid again, which the committee again rejected, after which all board members offered to resign. Id. ¶ 131. CC Capital then increased its bid "by 2 cents/share," and at the request of the special committee's legal counsel, included an offer of indemnity for the committee's counsel and all board members, along with increased compensation for board members. Id. ¶ 133. The board approved this offer on November 29, 2016, with defendant CHT Holdco LLC, an entity part owned by CC Capital and Plaintiffs, to purchase CHT. Id. ¶¶ 133-34. At the CHT board's request, Chu agreed to add a 30-day "go shop" period, during which CHT could solicit competing bids. Id. ¶¶ 134-42. Plaintiffs allege that Chu set up this go shop period "to ensure that no other buyer could outbid him" and that he "improperly and corruptly influenc[ed] the bidding process" to ensure that his bid was successful. Id. ¶ 141, 145. Despite receiving at least one other bid, CHT accepted CC Capital's offer. Id. ¶ 145.

---

[2] As further support for their contention that Chu and Newton knew that the shell LLCs were empty, Plaintiffs allege that in August 2016, a reporter from the Financial Times newspaper "began asking about the legitimacy of the acquisitions of Phoenix, Northstar and MDRX." Id. ¶ 116. However, "Chu directed his public relations firm to try to kill the Financial Times story" and "let the deal proceed to closing." Id. ¶ 117.

[3] Plaintiffs allege that although Chu arranged to have Parmar and the CHT board hire SunTrust to be the board's second financial advisor, SunTrust resigned after it was unable to provide a fairness opinion with a price in the range Chu wanted. Am. Compl. ¶¶ 102-03, 124-29. They further allege that SunTrust's principal told Parmar that Chu had a "reputation for vindictiveness" and that others are loyal to Chu for the fees that he generates, which "were not limited to the normal, legal and ethical fees associated with transactions, but rather included gifts, kickbacks, bribes, prostitutes, drugs, and other improper forms of compensation." Id. ¶ 105.

As part of the transaction, certain Plaintiffs[4] executed a "Voting and Support Agreement and Release of Claims" (the "Proxy Agreement"), agreeing to vote in support of the proposed merger and to release certain claims.  Id. ¶ 146.  Plaintiffs allege that the Proxy Agreement "was fraudulent in several respects and unenforceable in others," specifically that the document failed to disclose that Duff & Phelps's fairness opinion concluded CHT was worth more than CC Captial's offer, SunTrust's resignation (see supra n. 3),  that CHT's board had approved the offer without a fairness opinion, that CHT had delayed a scheduled acquisition at the request of CC Capital, that CHT disregarded superior bids during the go shop period, that CHT's special committee refused to approve the CC Capital offer without indemnification, or that the special committee were given additional compensation to approve CC Capital's offer.  Id. ¶ 148(a)(i)-(vii). The Proxy Agreement was also allegedly unenforceable as it purported to release future claims, in violation of Delaware law.  Id. ¶ 148(b)(i)-(ii).

Additionally, on January 26, 2017, the Financial Times published a story on the empty shell LLCs, "exposing" them four days before the transaction closed on January 30, 2017.  Id. ¶¶ 174, 177.  Plaintiffs allege that "at closing, the final funds flow document showed a very different flow of funds than was anticipated in the prior documents."  Id. ¶ 180.  This document allegedly reflected that CC Capital contributed approximately $6 million less to the transaction than "originally anticipated" and included fees of "questionable legitimacy."  Id. ¶ 180.

### 4. Post-Closing and CHT's Bankruptcy

As part of the merger, Parmar and Chu agreed to keep Parmar as CHT's CEO after closing. Id. ¶ 186.  Chu also requested that To be hired as chief financial officer of CHT.  Id. ¶ 185. Plaintiffs allege that Chu had Parmar fired as CEO in July 2017, shortly after the transaction closed.

---

[4] Plaintiffs First United Health, LLC, Constellation Health, LLC and Parmar executed three identical Voting and Support Agreements.

Id. ¶ 189.  After Parmar was fired, "multiple employees" told him that To had approached them, stating that "they were aware that Parmar and Zaharis had been stealing money and faking the books, and asking for any information that they might have."  Id. ¶ 191.

CHT filed for bankruptcy on March 16, 2018, in the United States Bankruptcy Court for the Eastern District of New York.  Id. ¶ 220.  Plaintiffs allege that the bankruptcy petitions on behalf of CHT were fraudulent as they failed to disclose that plaintiff Alpha Cepheus, LLC's consent to filing was required under an operating agreement executed as part of the merger, that the Eastern District of New York had "minimal" jurisdiction over CHT and was chosen to steer the bankruptcy to a specific trustee, and failed to properly list all creditors of CHT.  Id. ¶ 224.  Chu allegedly engaged in other misconduct related to the bankruptcy, including inter alia, an attempt to rig a bankruptcy auction to ensure that Chu's preferred entity won some of CHT's assets, Id. ¶¶ 225-35, and making fraudulent representations as to the value of CHT.  Id. ¶¶ 236-42.

### 5. Parmar's Arrest and Criminal Charges

On May 15, 2018, the United States Attorney for the District of New Jersey (the "Government") filed a two-count criminal complaint against Parmar and two of his associates, Sotirios Zaharis and Ravi Chivukula.  See Compl., United States v. Parmar, No. 18-cr-735 (D.N.J. May 15, 2018) (the "Criminal Complaint").  The Criminal Complaint charges Parmar, Zaharis and Chivukula with one count of securities fraud in violation of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, and one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, based on misstatements in the press releases concerning the empty shells.  Id.

Specifically, the Government claims that the false press releases were part of a scheme to "grossly inflate the value" of CHT.  Criminal Compl. ¶ 2.  The press release concerning Northstar represented that CHT had acquired it for $18 million, and that it was an operating company with

77 retained clients, more than 200 employees, and approximately $7.9 million in revenue.  Id. ¶¶ 33-34.  In reality, Northstar was formed only a few months before its acquisition, and only two weeks before the press release had purchased a business asset for approximately $2.78 million.  Id. The Government also contends that Parmar and his codefendants misrepresented that they used $15 million from secondary offerings to purchase Northstar, while the company's bank records do not reflect any such use of those funds.  Id.  Two days after the Northstar announcement, Parmar, Zaharis and Chivukula announced that CHT had acquired Phoenix for $14 million, "which it described as a company employing 138 people with revenue of $9.8 million as of the end of 2014." Id. ¶ 35.  In reality, Phoenix was formed only a week before the release, and had no employer tax number.  Id. ¶ 36.

Finally, the Government also alleges that Parmar and his codefendants used information they received from an unrelated third-party company to make it appear that MDRX was an operating company, when in fact it was not.  Parmar, Zaharis and Chivukula allegedly "used the description" of the unrelated company "in many cases lifting the description word for word."  Id. ¶ 18. They allegedly created an extensive set of false documentation concerning MDRX, including a detailed merger agreement, false financial documents, and bank transfers to make it appear as though MDRX was an operating company.  Id. ¶¶ 23-32.  The Government indicted Parmar, Zaharis and Chivukula on December 13, 2018, and that indictment is still pending.  See Indictment, ECF No. 32, United States v. Parmar, No. 18-cr-735 (D.N.J. December 13, 2018)

Parmar was arrested by the Federal Bureau of Investigation ("FBI") on May 16, 2018.  Id. ¶ 251.[5]  Plaintiffs allege Parmar was arrested at the direction of CC Capital, which made "false

[5] That same day the Government commenced a civil forfeiture proceeding against Parmar, and the Securities and Exchange Commission ("SEC") filed a civil complaint against Parmar.  Am. Compl. ¶ 251.

representations to the DOJ" after Parmar refused Chu's demands to transfer his interest in CHT to him and to give Chu $10 million. <u>Id.</u> ¶¶ 248, 256, 201-02, 324(b). Plaintiffs also allege that "Defendants prepared and transmitted an anonymous tip to the FBI" that falsely stated that Parmar was planning to flee the United States to Dubai to have him detained without bail pending his trial. <u>Id.</u> ¶ 259-60.

### 6. Surveillance of Parmar

Parmar was eventually released on bail. <u>Id.</u> ¶ 262. After his release, Chu and Newton hired defendant Antonio Schiena and his company, Multi Operational Security Agency Intelligence Company ("MOSAIC") to "surveil, intimidate and threaten Parmar." <u>Id.</u> ¶¶ 22, 287. Schiena and MOSAIC then engaged defendants James Stepien, Warren Ernst, and Victor Cardona. <u>Id.</u> ¶ 290.

As part of this operation, Stepien, Ernst and Cardona "hack[ed] into [Parmar's] home's server and illegally downloaded a large amount of data from his system" including "privileged communications" regarding his legal strategy. <u>Id.</u> ¶ 292. They also followed Parmar, his family and friends, and Stepien followed one of Parmar's "associates for several miles," "before speeding away and throwing gravel on her by spinning his tires." <u>Id.</u> ¶ 334(b). The security camera system at Parmar's home was sabotaged, and his "analog telephone lines" were destroyed, but Plaintiffs attribute these actions only to an unknown "individual, acting at the direction of Defendants." <u>Id.</u> ¶¶ 294-96, 334(d).

After Plaintiffs filed the complaint in this action, they reached a settlement with Ernst, Stepien and Cardona, whereby those defendants would "provide truthful information about Chu, Newton, Schiena and MOSAIC." <u>Id.</u> ¶ 293. But after the settlement, Chu, Newton and Schiena threatened and intimidated Ernst "by breaking into his vehicle and remote starting it when he approached." <u>Id.</u> ¶¶ 293, 336. As a result of these tactics, Ernst, Stepien and Cardona "have refused to provide any further information on Chu, Newton, Schiena and MOSAIC." <u>Id.</u> ¶ 293.

Plaintiffs assert five cause of action based on these facts: Counts One and Two assert claims of securities fraud, in violation of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, against Chu, Newton, To, CC Captial CHT Holdco, LLC, and CHT Holdco, LLC, for making certain representations in connection with the CHT transaction, and for manipulating the final funds flow documents, Am. Compl. ¶¶ 297-320. Count Three asserts a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., against all defendants, Am. Compl. ¶¶ 321-37, and Counts Four and Five assert claims under the Stored Communications Act, 18 U.S.C. §§ 2707 (Count Four), 2511 (Count Five), Am. Compl. ¶¶338-58.

### B. Procedural History

Plaintiffs brought this action on September 26, 2018. ECF No. 1. On October 19, 2018, Plaintiffs sought a temporary restraining order preventing Defendants from conducting surveillance and other intimidating conduct allegedly directed by Chu. ECF No. 13. The Court denied the request by letter order on October 29, 2018. ECF No. 21. Plaintiffs sought reconsideration of that order on November 13, 2018, ECF No. 34 which the Court denied on June 11, 2019, ECF No. 73. Chu and Newton moved to dismiss the original complaint on January 25, 2019, ECF No. 49, and To also moved to dismiss on February 6, 2019. While those motions were pending, Plaintiffs amended their complaint on March 26, 2019. ECF No. 65. The present motions to dismiss followed.

## II. LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. The

facts alleged, however, must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## III. ANALYSIS

### A. Securities Fraud Claims

Plaintiffs assert two securities fraud claims against Chu, Newton, To, CC Capital CHT Holdco, LLC and CHT Holdco, LLC based on three allegedly fraudulent misrepresentations. In Count One, Plaintiffs allege that these defendants misrepresented that they had conducted complete due diligence on CHT, and would "work to fix" problems with the company, and that Parmar would remain CEO of CHT and oversee its growth. Am. Compl. ¶¶ 301(a)-(b). In Count Two, Plaintiffs allege the same defendants fraudulently manipulated certain closing documents, and funds flow requirements to "induce Plaintiffs into contributing a much larger percentage of their equity than necessary." Id. ¶ 313.

Chu and Newton argue that Plaintiffs' securities fraud claims fail because Parmar and the entities he controls waived those claims as part of the CHT merger, and because Plaintiffs have failed to plead their claims with particularity, as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"), and Federal Rule of Civil Procedure 9(b). Def. Mem. at 9, ECF No. 70.1. Defendant To also argues that these claims should be dismissed as to him because Plaintiffs do not allege that he made any misrepresentation. To Mem. at 6, ECF No. 72. The Court agrees as to all points.

### 1. Waiver

Under Delaware law,[6] courts "recognize the validity of general releases" and if clear and unambiguous, a general release may only be set aside where there is fraud, duress, coercion or mutual mistake concerning the existence of the parties' injuries. Deuley v. DynCorp Int'l, Inc., 8 A.3d 1156, 1163 (Del. 2010).

In connection with the sale of CHT, Parmar executed Proxy Agreements on behalf himself, First United Health, LLC, and Constellation Health, LLC. See Proxy Agreements, Brenner Decl. Ex. E, ECF No. 70.7.[7] These agreements included both an irrevocable proxy to vote in favor of the transaction, and a provision releasing certain claims. Proxy Agreement § 4(d)(i). The release defines "Released Parties" to include CHT, CHT Holdco LLC, "and each of their respective affiliates and each of the respective officers [and] directors." Id. Plaintiffs allege that defendants CHT Holdco LLC and CC Capital CHT Holdco LLC are both subsidiaries of CC Capital, and therefore "affiliates" of both CHT and CHT Holdco, LLC, and that Chu and Newton are officers of this affiliate, and are therefore also "Released Parties." See Am. Compl. ¶¶ 37, 39, 45-46.[8] The release therefore includes all claims against Chu, Newton, CC Capital CHT Holdco, LLC, and CHT Holdco, LLC. This provision defined "Releasing Parties" to include the stockholder who

---

[6] The Proxy Agreements elects Delaware law to govern them. Proxy Agreement § 11(a), Brenner Decl. Ex. E, ECF No. 70.7.

[7] The Court can consider the Proxy Agreement on this motion to dismiss, even though it was submitted by defendants, because Plaintiffs rely on it in the Amended Complaint and it is therefore integral to that complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

[8] "Affiliates" is undefined in the Proxy Agreements, but the first recital states that "Capitalized Terms used and not otherwise defined . . . shall have the respective meanings ascribed to them in the Merger Agreement. Proxy Agreement at 1. Under the Merger Agreement, "Affiliate has the meaning given to such term" in Exchange Act Rule 12b-2, 17 C.F.R. § 240.12b-2. Merger Agreement § 1.1, Brenner Decl. Ex. C, ECF No. 70.5. Under Rule 12b-2, an "An 'affiliate' of . . . a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." 17 C.F.R. § 240.12b-2. Because Plaintiffs allege that CHT Holdco LLC and CC Capital CHT Holdco LLC are under the common control of CC Capital, they are affiliates of CHT and CHT Holdco, and are Released Parties under the Proxy Agreement.

executed the Proxy Agreement, "and its affiliates." Proxy Agreement § 4(d)(i). The stockholders that executed the Proxy Agreements are Parmar, First United Health, LLC and Constellation Health, LLC. Id.

The language of the release is also broad enough to encompass the claims at issue here: the Releasing Parties released "any and all" claims they had against the Released Parties arising from the merger or the closing. Proxy Agreement § 4(d)(i). This provision clearly and unambiguously releases the securities fraud claims in Counts One and Two, because they are claims related to representations from the sale of CHT.

To avoid the preclusive effect of the releases, Plaintiffs argue that they should be set aside because they were procured by fraud. They argue that the Proxy Agreements' failure to disclose Duff & Phelps's fairness opinion, that SunTrust had not rendered a fairness opinion, that the special committee was unable to obtain a fairness opinion, that a pending acquisition by CHT was "stalled" by CC Capital during the merger, that the go shop period produced three superior bids, and that the special committee refused to approve the deal without indemnification and were given additional compensation to finally approve the deal renders them fraudulent, and thus should not preclude their claims here. Am. Compl. ¶ 148; Pl. Mem. at 16, ECF No. 83. This argument is based on a misreading of the law.

Under Delaware law, a party executing a general release of claims may bring an action for fraudulent inducement and have the release in question set aside. E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage, 744 A.2d 457, 462 (Del. 1999). Plaintiffs explicitly disclaim any reliance on fraudulent inducement as to the Proxy Agreements, instead arguing that the Proxy Agreements "are void because the parties knew that they were based on false information." Pl. Mem. at 16. Thus, Plaintiffs do not plead "that the release itself was induced by the defendant's

fraud," but rather that because Parmar and Defendants were aware that the releases were based on false information, that they are void.  Seven Investments, LLC v. AD Capital, LLC, 32 A.3d 391, 396 (Del. Ch. 2011).  This misreads Delaware law providing that a "clear and unambiguous release 'will [only] be set aside where there is fraud, duress, coercion, or mutual mistake concerning the existence of a party's injuries.'"  Deuley, 8 A.3d at 1163 (quoting Parlin v. Dyncorp Int'l, Inc., No. 08C-01-136FSS, 2009 WL 3636756, at *4 (Del. Super. Ct. Sept. 30, 2009)).  The release clearly and unambiguously applies to the securities fraud claims in Counts One and Two, and Plaintiffs have not pled any legal ground sufficient to set it aside.  Instead, Plaintiffs have expressly pled that Parmar had actual knowledge of all omissions allegedly present in the Proxy Agreements, and thus even if they were seeking to set aside the release on the grounds that they were fraudulently induced into it, they would be unable to do so.  See DuPont, 744 A.2d at 461-62 (requiring party seeking to set aside release under fraudulent inducement theory to be able to state claim for fraud).  Chu and Newton's motion to dismiss Counts One and Two is granted.

### 2. Failure to State Claim

Defendants also argue that Counts One and Two fail to state a claim.  The Court agrees.[9]

"To state a claim under Rule 10b–5, a plaintiff must allege:  '(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp, 908 F.3d 872, 879 (3d Cir. 2018) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005)).  Securities fraud plaintiffs must also satisfy the exacting standards of the PSLRA, which requires plaintiffs to "specify each statement

---

[9] Defendant To does not argue that the release in the Proxy Agreement covers Plaintiffs' claims against him, and only argues that the securities fraud claims fail.  To Mem. at 6, ECF No. 72.

alleged to have been misleading, the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); see also Williams v. Globus Med., Inc., 869 F.3d 235, 240 (3d Cir. 2017).

### i.    Count One:  Due Diligence and Parmar as CEO

Plaintiffs allege two sets of misrepresentations in Count One:  that defendants "claimed to have conducted complete due diligence and fully understood all financial issues with CHT," and that they "would work to fix the issues with CHT and allow it to continue to grow;" and second, that "Parmar would remain as the CEO of CHT and continue to oversee CHT's growth."  Am. Compl. ¶¶ 301(a)-(b).

As an initial matter, both sets of allegations fail to meet the standards of the PSLRA. Plaintiffs never point to a single statement by a Defendant where they stated that they "understood all financial issues" with CHT, or why such a representation would be misleading.  As to the whether Defendants told Plaintiffs that they were aware of the empty shell LLCs and CHT's misrepresentations concerning them, Plaintiffs themselves admit that Defendants "did not explicitly mention the empty shells," and do not identify any statement by Defendants that implies that they did.  Am. Compl. ¶ 301(a).  The same is true of the claim that Parmar would remain as CEO:  while Plaintiffs allege that Parmar and Chu "agreed that he would remain as CEO . . . and was expected to remain in that position," they never allege that any Defendant represented that Parmar would remain as CEO, or for how long.  Plaintiffs also do not identify any statement at all by To.  Without attributing a specific statement to a defendant, Plaintiffs cannot carry their burden under the PSLRA.

More fundamentally, the representation that defendants "fully understood all financial issues with CHT" and that they "would work to fix the issues" are not sufficiently specific to be material.  "A representation is immaterial if the 'statement at issue is too vague to be actionable.'" In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 283 (3d Cir. 2010) (quoting In re Burlington Coat

14

<u>Factory Sec. Litig.</u>, 114 F.3d at 1428). "Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism." <u>EP Medsystems, Inc. v. EchoCath, Inc.</u>, 235 F.3d 865, 872 (3d Cir. 2000). The statement that CHT "fully understood all financial issues" and would "work to fix" the issues with CHT is just such a vague statement of motive or intention that is not material, and cannot state a claim.

Plaintiffs also cannot plead that they relied on any representation that Parmar would remain as CEO. In order to plead reliance, Plaintiffs must allege that they were aware of the relevant misrepresentation and engaged in the transaction on that basis. <u>Halliburton Co. v. Erica P. John Fund, Inc.</u>, 573 U.S. 258, 267 (2014); <u>Roofers' Pension Fund v. Papa</u>, No. 16-2805, 2017 WL 1536222, at *5 (D.N.J. Apr. 27, 2017). As part of the merger, Parmar executed an employment agreement that set the terms of his continuing employment as CEO of CHT. <u>See</u> Employment Agreement ("Employment Agreement'), Brenner Decl. Ex. F, ECF No. 70.8.[10] Under this agreement, Parmar's "employment with [CHT] and Period of Employment may be terminated by [CHT] immediately upon notice to [Parmar] . . . without cause." <u>Id.</u> § 5(a). As Parmar's employment was terminable by CHT without cause, he could not have reasonably relied on any contrary statement regarding his term of employment, and thus he fails to state a claim under this portion of Count One.

### ii.  Count Two:  Funds Flow at Closing

In Count Two, Plaintiffs allege improprieties concerning the final funds flow at closing. Defendants allegedly manipulated "the closing documents and funds flow requirements to

---

[10] Because Plaintiffs allege misrepresentations arising from Parmar's employment with CHT, this agreement is integral to the Amended Complaint.

fraudulently induce Plaintiffs into contributing a much larger percentage of their equity than necessary" and to enable Defendants to "take additional money out of the transaction." Am. Compl. ¶ 313. However, Plaintiffs allegations as to how Defendants accomplished this are unclear. They do not allege what percentage of Plaintiffs' equity would have been "necessary" to complete the CHT merger, or otherwise specify what they lost in the transaction. They further allege that "approximately $20 million simply vanished or was unlawfully misappropriated by Defendants," without elaboration, and without explaining how they came up with this figure.[11] Id. ¶ 315. These allegations fail under the PSLRA as they do not identify any statement that is alleged to be misleading. Count Two is therefore dismissed.

### B. RICO Claims

Defendants also argue that Plaintiffs have failed to plead a RICO claim. The Court agrees.

RICO makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).[12] To state a claim under Section 1962(c), a plaintiff "must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362 (3d Cir. 2010) (quoting Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir.2004)). A pattern of racketeering activity "requires at least two acts of racketeering activity within a two-year period. Id. Acts of racketeering activity, referred to as "predicate acts" are listed in 18 U.S.C. § 1961(1).

---

[11] Puzzlingly, Plaintiffs' memorandum in opposition cities disagreements of approximately $6 million in the amount of cash CC Capital contributed to the transaction, and suggests that CC Capital may have contributed "more than $34 million less" than previously stated, and does not mention whether Plaintiffs contributed more equity than necessary. Pl. Mem. at 22, ECF No. 83.

[12] Plaintiffs do not specify which subsection of Section 1962 they assert claims under. As their Amended Complaint closely tracks the language of subsection (c), the Court construes it as arising under that subsection. See Am. Compl. ¶ 322.

A "pattern of racketeering activity . . . require[s] at least two acts of racketeering activity." 18 U.S.C. § 1961(5). To qualify as a pattern, a Plaintiff must allege "that the racketeering predicates are related, <u>and</u> that they amount to or pose a threat of continued criminal activity." <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989). "'Relatedness' can be shown through evidence that the criminal activities 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" <u>United States v. Bergrin</u>, 650 F.3d 257, 267 (3d Cir. 2011) (quoting <u>H.J. Inc.</u>, 492 U.S. at 240). Continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." <u>H.J. Inc.</u>, 492 U.S. at 241. Open-ended continuity "can 'be established by proving a threat of continuity, which exists where the predicate acts themselves involve threats of long-term racketeering activity, or where the predicate acts are part of an entity's regular way of doing business." <u>Germinaro v. Fid. Nat'l Title Ins. Co.</u>, 737 F. App'x 96, 102 (3d Cir. 2018) (quoting <u>United States v. Pelullo</u>, 964 F.2d 193, 208 (3d Cir. 1992)). For closed-ended continuity, a plaintiff must allege "a series of related predicates lasting a 'substantial period of time.'" <u>Hughes v. Consol-Pennsylvania Coal Co.</u>, 945 F.2d 594, 609 (3d Cir. 1991) (quoting <u>H.J. Inc.</u>, 492 U.S. at 242). "A short-term scheme threatening no future criminal activity will not suffice." <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1412 (3d Cir. 1991). While there is no fixed rule regarding how long a "substantial period of time" is, the Third Circuit has consistently held that closed-end periods of racketeering activity lasting less than "twelve months [are] not a substantial period of time." <u>Hughes</u>, 945 F.2d at 611; <u>see</u> <u>also</u> <u>Yucaipa Am. All. Fund I, LP v. Ehrlich</u>, 716 F. App'x 73, 79 (3d Cir. 2017) (affirming dismissal of RICO claim where plaintiff alleged pattern of racketeering acts lasting over period of nine months); <u>Turner v. New Jersey State Police</u>, No.

08-5163, 2017 WL 1190917, at *34 (D.N.J. Mar. 29, 2017) ("[I]n the Third Circuit, close-ended continuity is presumptively not satisfied by predicate acts spanning less than one year.").

Plaintiffs allege that the relevant RICO "enterprise" is CC Capital, and that Defendants conducted its affairs through six separate predicate acts of racketeering: (1) that Chu and Newton conspired to commit extortion in violation of 18 U.S.C. § 1951 when they threatened Parmar with arrest if he did not pay them $10 million and transfer Plaintiffs' interest in CHT to them, Am. Compl. ¶ 324(b); (2) that Chu and Newton committed fraud on the bankruptcy court in violation of 18 U.S.C. § 157 by filing a false petition in CHT's bankruptcy, Am. Compl. ¶ 326; (3) that Chu, Newton and To obstructed justice in violation of 18 U.S.C. § 1503 by falsely informing the FBI and Department of Justice that they had been defrauded by Parmar, Am. Compl. ¶¶ 330-31; (4) that Chu and To conspired to obstruct justice in violation of 18 U.S.C. § 1503 by providing a false tip to the FBI that Plaintiff was planning to flee the jurisdiction, in order to have Parmar denied bail and to keep him from participating in the bankruptcy proceedings, Am. Compl. ¶¶ 332-33; (5) that Chu, Newton, Schiena, MOSAIC, Ernst, Stepien and Cardona conspired to tamper with a witness in violation of 18 U.S.C. § 1512(c) by following Parmar and his associates, dumping fuel in his storm drain to harm waterfowl on Parmar's property, and sabotaging his phone lines and security system, to intimidate Parmar into not participating in "judicial proceedings," Am Compl, ¶¶ 334-35; and (6) that Chu, Newton, Schiena and MOSAIC conspired to tamper with a witness in violation of 18 U.S.C. § 1512(c) by attempting to delay or prevent Ernst, Stepien, Cardona "and others" from providing information to Parmar, by breaking into Ernst's car and remote starting it, Am. Compl. ¶¶ 336-37.

Chu and Newton argue that Plaintiffs have failed to allege a pattern of racketeering activity because there are no allegations supporting an open-ended threat of future criminal activity and

the alleged racketeering acts took place over a period of eleven months. The Court agrees. There is no suggestion in the Amended Complaint that there is any threat of continuing criminal activity from the racketeering acts, and all six alleged acts allegedly took place in less than a year. See Am. Compl. ¶¶ 202-06, 324 (describing earliest racketeering act of extortion occurring in November 2017); id. ¶¶ 336-37 (latest racketeering act in October 2018). As they did not allege one of RICO's essential elements, Plaintiffs' claim must fail.

There are further problems with Plaintiffs' RICO predicates. The second act of racketeering asserts bankruptcy fraud in violation of 18 U.S.C. § 157. Am. Compl ¶¶ 326-29. But this provision is specifically excluded from RICO's list of predicate racketeering acts. See 18 U.S.C. § 1961(1).[13] Plaintiffs' third and fourth RICO predicates are two instances of obstruction of justice in violation of 18 U.S.C. § 1503: once when Chu and Newton submitted false statements to the FBI to have Parmar arrested and criminally charged, and again when Chu, Newton and To submitted an anonymous tip to the FBI to have Parmar denied bail. Am. Compl. ¶¶ 330-33. Plaintiffs fail to plausibly allege either predicate. For the third predicate, Plaintiffs never allege what Defendants told the authorities that was false, or why the authorities acted on this information to arrest Parmar, they merely make conclusory allegations without any supporting facts. For the fourth predicate, Plaintiffs allege that Defendants emailed a tip stating that Parmar might flee, so he would be denied bail. The only fact in support of this predicate is that To maintains a residence in London (where the tip allegedly originated) and citizenship of the United Kingdom. Id. ¶ 332(h). This is insufficient to connect this anonymous tip to Chu, Newton and To, and thus fails to state a claim for witness intimidation as a RICO predicate.

---

[13] In opposition Plaintiffs argue that despite alleging a bankruptcy fraud predicate under Section 157, they have adequately stated a claim under 18 U.S.C. § 152(5). Pl. Mem. at 26. The Court will not consider these allegations, as Plaintiffs cannot amend their complaint in a brief in opposition to a motion to dismiss. Alfaro v. Client Servs., Inc., No. 11-05463, 2012 WL 1150845, at *1 (D.N.J. Apr. 5, 2012).

**C.      Stored Communications Act and Wiretap Claims**

Finally, Defendants argue that Counts Four and Five fail to state a claim.  The Court agrees.

"To state a claim under the Stored Communications Act ["SCA"], a plaintiff must show that the defendant '(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system.'"  In re Google Inc. Cookie Placement Consumer Privacy Litig., 806 F.3d 125, 145-46 (3d Cir. 2015) (quoting 18 U.S.C. § 2701(a)).

In Count Four, Plaintiffs claim that Parmar registered the domain "constellationhealthgroup.com" on behalf of CHI, and that it has always owned the domain.  Am. Compl. ¶ 341.  They then allege that Chu, Newton and To accessed an unidentified email server "illegally and without authorization."  Id. ¶ 343.  In the context of an SCA claim, these allegations regarding the ownership of the domain are puzzling:  that the constellation domain was owned by CHI says nothing about the ownership of the relevant server or computer facility that stored Parmar's emails.  Plaintiffs' allegations regarding this facility are wholly conclusory, and limited to unadorned statements that Chu, Newton and To gained unauthorized access to Parmar's communications.  See Am. Compl. ¶¶ 343-44.  This is insufficient to state a claim under the SCA.

Finally, Plaintiffs' Wiretap Act claims are also deficient.  "A plaintiff pleads a prima facie case under the Wiretap Act by showing that the defendant '(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device.'"  In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 274 (3d Cir. 2016) (quoting In re Google Inc. Cookie Placement, 806 F.3d at 135).  Under the Wiretap Act, any interception of email communications must occur

contemporaneously with the communication—simply accessing an email does not come within the statutory definition of "intercepting." Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 114 (3d Cir. 2003), as amended (Jan. 20, 2004).

Here, Plaintiffs either allege that MOSAIC, Schiena, Ernst, Stepien and Cardona "download[ed] and monitor[ed] Parmar's stored electronic communications," which facially alleges access to stored communications rather than contemporaneous interception. Am. Compl. ¶ 351. Plaintiffs' remaining allegations are simply conclusory and unsupported by any facts, and thus Count Five is also dismissed.

## IV.    EFFECT OF DISMISSAL

Chu, Newton and To all seek dismissal with prejudice, arguing that any amendment would be futile. The Court agrees as to Counts One and Two, and the RICO claim in Count Three, based on the predicate acts as alleged. Dismissal with prejudice is appropriate where any amendment to the complaint would be futile. See In re Burlington Coat Factory, 114 F.3d at 1434. As noted above, Plaintiffs' securities fraud claims are barred by the Proxy Agreements, and this deficiency cannot be cured by amendment. Similarly, the pattern of racketeering acts underlying Plaintiff's RICO claim only supports a closed-ended pattern of insufficient duration. Any number of additional predicates acts could not cure this deficiency, and thus Plaintiff's RICO claim is dismissed with prejudice, to the extent that it arises from a closed-ended pattern of racketeering lasting less than twelve months.

As to the remaining claims in the Amended Complaint, Defendants have not shown that any amendment to these claims would be futile, and thus the Court declines to dismiss these claims with prejudice.

## V.   CONCLUSION

Based on the foregoing, Defendants' Motions to Dismiss, ECF Nos. 70, 71 are **GRANTED**

and this action is **DISMISSED**.  An appropriate order follows.

/s Madeline Cox Arleo

**Hon. Madeline Cox Arleo**
**United States District Judge**